Rachel Doughty (CBN 255904)
Jennifer Rae Lovko (CBN 208855)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
rdoughty@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

|  |  |
|---|---|
| SAVE OUR FOREST ASSOCIATION, INC. | Case No.:    5:24-cv-01336 |
| Plaintiffs, | **PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| vs. | |
| U.S. FOREST SERVICE, an agency of the U.S. Department of Agriculture, and MICHAEL NOBLES in his official capacity as Acting District Ranger for the San Bernardino National Forest, | |
| Defendants. | |

- 1 -

## INTRODUCTION

1.      This is an action for declaratory and injunctive relief brought by Plaintiff Save Our Forest Association, Inc. challenging the U.S. Forest Service ("**USFS**") decision to allow BlueTriton Brands, Inc.'s ("**BTB**") illegal occupancy of San Bernardino National Forest ("**SBNF**") lands and the dewatering of SBNF Strawberry Creek and its tributary Springs ("**Strawberry Creek**"). BTB does not have, nor can it obtain or maintain, a valid Special Use Permit ("**SUP**") from the USFS. With this illegal occupancy, BTB has engaged and will continue to engage in the diversion of substantially all of the water from SBNF's Strawberry Canyon, negatively impacting the Forest, local communities, and downstream users.

2.      The SBNF was founded on February 25, 1893, with the primary purpose of protecting the watershed and timber supply for the surrounding communities. Prior to diversions, the United States Geological Survey ("**USGS**") and other sources documented that Strawberry Creek and its tributary springs were historically perennial, flowing even in the dry months and supporting fish and a lush riparian fauna and flora.

3.      Strawberry Creek is a tributary to the Santa Ana River and part of the Santa Ana River Watershed. The USGS documented that Strawberry Creek is a recharge source for the Bunker Hill Basin. The dry and diminished Strawberry Creek has led to impaired riparian fauna and flora and a creek that cannot support fish, like the native Speckled Dace, as fish need water to survive. BTB's occupancy has

dewatered Strawberry Creek and diverted natural springs leaving a Strawberry Creek with only intermittent pooling water and fractured habitats.

4.     The Santa Ana River Watershed was decreed to have no water available for appropriation decades ago and is fully appropriated. The Bunker Hill Basin remains in deficit, giving diminished water for agricultural and nearly a million people. BTB is taking the Strawberry Creek water that should be recharging the basin.

5.     Plaintiff files this Complaint to prevent USFS from continuing to allow BTB's occupancy and diversion of water in violation of the Federal Land Policy Management Act, 43 U.S.C. § 1701 et seq. ("**FLPMA**"), The National Forest Management Act, 16 U.S.C. §1600 et seq. ("**NFMA**"), the Administrative Procedure Act, 5 U.S.C. § 501 et seq. ("**APA**"), and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("**NEPA**").

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 28 U.S.C. §§ 2201-2 (declaratory judgment and injunctive relief), 28 U.S. Code § 1361 (mandamus) and the APA, 5 U.S.C. § 701, et seq.

7.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because this is an action against United States agencies and officials and because a substantial part of the events and omissions giving rise to the claims in this case occurred in this District, and because Plaintiff SOFA resides within the District.

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8.    Plaintiff has exhausted all administrative remedies and has no further administrative recourse.

## **THE PARTIES**

9.    Plaintiff Save Our Forest Association, Inc. ("**SOFA**") is a non-profit 501(3)(c) corporation located in Rimforest, California, an unincorporated community in the San Bernardino Mountains of San Bernardino County, California. Since 1989, SOFA and its members have been dedicated to protecting the long-term health and vitality of the forest ecosystem in the San Bernardino Mountains.

10.    Since 2014, SOFA has participated in efforts to address BTB's occupancy and diversion of water in the San Bernardino National Forest. SOFA and its members have expressed profound concern about the diversion of scarce water resources from public lands, and the impact that has to the flora and fauna that depend on that water, especially when critically impacted by drought conditions.

11.    SOFA participated as a party in the California State Water Resources Control Board seeking state regulation of the diversion of flow from Strawberry Canyon.

12.    SOFA and its members have biological, conservation, recreational, aesthetic, and spiritual interests in the resources of the SBNF, including its water resources. SOFA and its members regularly visit or recreate in and near the SBNF,

including in or near Strawberry Canyon, and intend to continue to do so regularly in the future.

13.   SOFA has participated in the Headwaters Resiliency Partnership, which USFS was party to.

14.   SOFA members have led frequent hikes in the SBNF, including in or near Strawberry Canyon. From such hikes, they have witnessed the serious ecological consequences that BTB's actions are having on the limited water resources of the Forest.

15.   The above-described biological, conservation, recreational, aesthetic, and spiritual interests of SOFA and its members have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by the Defendant's actions and inactions in allowing BTB to continue to occupy federal land and divert water without a valid SUP, which diversion has contributed to dewatering of Strawberry Creek and impacts the resources of the area.

16.   The injuries described above are actual, concrete injuries suffered by SOFA and its members. These injuries are caused by Defendant's actions and inactions in allowing BTB to continue to operate, modify, and at times substantially replace key components of BTB's operation in the SBNF without a valid SUP.

17.   The relief sought herein would redress Plaintiff's injuries. Plaintiff has no other adequate remedy at law.

18.   Defendant USFS is an agency of the U.S. Department of Agriculture. The USFS is responsible for the administration and management of the federal lands subject to this action in compliance with all pertinent laws including the FLPMA, NFMA, NEPA, and the APA.

19.   Defendant Michael Nobels is the Acting District Ranger for the Front Country Ranger District of the San Bernardino National Forest, and therefore the official in charge of land management for the natural resources at issue in this matter, including SUP administration for Strawberry Creek.

## **LEGAL BACKGROUND**

**A.    FLPMA**

20.   FLPMA:

[r]equires that public land be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public land in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use. Also states that the United States shall receive fair market value of the use of the public land and their resources unless otherwise provided for by law.

San Bernardino National Forest Land and Resource Management Plan ("**SBNF LRMP**"), Part 3, p. 27.

21.   Defendant USFS is authorized under FLPMA to grant or renew rights of way upon USFS lands for various special uses, including "pipes, pipelines ... and other facilities and systems for the impoundment, storage, transportation, or distribution of water." 43 U.S.C. §§ 1761-66; 36 C.F.R. §§ 251.50-65. However, SUPs for such rights of way must be subject to terms and conditions that, *inter alia*, ensure compliance with federal and state laws regarding air and water quality and environmental protection, and that "minimize damage to scenic and aesthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. §1765.

**B.    NFMA**

22.   The NFMA requires the USFS to develop, maintain, and, as appropriate, revise a land and resource management plan ("**LRMP**") for each unit of the National Forest System. The LRMP must "provide for … watershed, wildlife, and fish" and "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(A) & (B). All projects within a national forest *must* comply with that forest's LRMP. 36 C.F.R. § 219.15(c). Here, the USFS must comply with the SBNF LRMP, which was adopted in 2005.

23.   LRMPs must include enforceable design criteria—"the rules"—that managers legally must operate within in order to achieve desired conditions set forth

in the LRMP's "vision." 36 C.F.R. § 219.15(d)(2). For the SBNF LRMP, these rules

are presented as standards.

> Standards are mandatory requirements that come into play as site-
> specific activities are planned for implementation, and are designed to
> be consistent with achieving the objectives and desired conditions.  The
> standards act as thresholds or constraints for management activities or
> practices to ensure the protection of resources.

SBNF LRMP, Part 1, p. 3.

24.   SUPs must include terms and conditions "which will . . . Require

compliance with State standards for public health and safety, environmental

protection, and siting, construction, operation, and maintenance if those standards are

more stringent than applicable Federal standards." 36 C.F.R. § 251.56(a)(1)(i).

25.   Issuance of a new special use authorization for an existing use is subject

to the holder being in compliance with all the terms of existing authorization and

must be accompanied by "appropriate environmental analysis." 36 C.F.R. §251.64(c),

(d).

26.   All proposals for special use also must provide information demonstrating

the proposal's compliance with applicable laws, regulations, and orders. 36 C.F.R. §

251.54(d)(4).

27.   In keeping with NFMA's mandates, the SBNF LRMP requires that for

surface water development projects, "instream flows favorable to the maintenance

and restoration of riparian dependent and aquatic resources and channel conditions will be required." SBNF LRMP, Part 3, p. 11, S48. It also requires that surface water diversions and groundwater extractions, including well and spring developments, may only be authorized upon demonstration that the water extracted is in excess to the current and reasonably foreseeable future needs of forest resources; approved extractions must provide for the "long-term protection and reasonable use of surface water and groundwater resources." SBNF LRMP, Part 3, p. 10, S46.

28.   The LRMP's mandates are intended to implement the overarching goals set forth in Part 1 of the SBNF LRMP. One of those goals is that "[w]atersheds, streams, groundwater recharge areas, springs, wetlands and aquifers are managed to assure the sustainability of high quantity and quality water. Where new or re-authorized water extraction or diversion is allowed, those facilities should be located to avoid long-term adverse impacts to national forest water and riparian resources." SBNF LRMP, Part 1, Goal 5.1 p. 41. The LRMP ask the "outcome evaluation question" for Goal 5.1: "Is the national forest making progress toward sustaining Class 1 watershed conditions while reducing the number of Condition Class 2 and 3 watersheds?" SBNF LRMP, Part 1, pp. 40-41.

29.   The SBNF LRMP incorporates the Forest Service Handbook regarding Soil and Water Conservation Practices specific to the San Bernardino National Forest, FSH 2509.22 ("**FSH**"). For riparian conservation areas ("**RCAs**"), activities are limited, and watersheds are to be managed to improve degraded riparian areas for

native populations of riparian-dependent species. RCAs include perennial and intermittent springs, seeps, springs, and inner gorges. FSH 2509.22.2.5. The FSH directs that:

> Existing uses, activities, or occupancy within RCA's should be evaluated for risks or impacts and mitigated during special use renewal or re-issuance. If mitigation measures are not effective, reassess with the option to modify or eliminate the use, activity or occupancy when impacts are unacceptable.

FSH 2509.22.3.21. Additionally,

> Review new special use permit applications for surface and ground water extraction and for transport of water across National Forest System lands and assess the potential impacts on aquatic and riparian ecosystems on or off the forest. Proponents should demonstrate that proposed development would meet the riparian management objectives. Apply forest plans standards S45, S46, S47, and S48 as applicable.

FSH 2509.22.3.25. The FSH further directs the USFS to manage watersheds to "improve or restore degraded riparian areas to proper functioning condition for native populations of riparian-dependent species." FSH 2509.22.1.1.

30.   The FSH describes the affirmative duty of the USFS to ensure that "proof of water right is established prior to issuing or re-issuing [SUPs]" and that the applicant has complied with "applicable environmental laws. … Where water use . . .

is evident [the USFS must] ensure that all SUP applicants have secured the

appropriate … California Department of Fish and Game 1602 Stream Alternation

[sic] Agreement … before issuing a SUP that would result in channel alteration."

31.   Applications for special uses by a private corporation also require a

demonstration of technical and financial capability:

> Technical and financial capability. The proponent is required to provide
> sufficient evidence to satisfy the authorized officer that the proponent
> has, or prior to commencement of construction will have, the technical
> and financial capability to construct, operate, maintain, and terminate
> the project for which an authorization is requested, and the proponent is
> otherwise acceptable.

36 C.F.R. § 251.54(d)(3).

**C.   NEPA**

32.   Congress enacted NEPA as a national policy to "encourage productive

and enjoyable harmony between man and his environment," to help "prevent or

eliminate damage to the environment," and "to enrich the understanding of the

ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

33.   NEPA has two fundamental purposes: (1) to guarantee that, before taking

an action, federal agencies take a "hard look" at the consequences of that action to

ensure that "the agency, in reaching its decision, will have available, and will

carefully consider, detailed information concerning significant environmental

impacts;" and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

34.   As a practical matter, NEPA requires comparing a baseline, determined from "accurate information and defensible reasoning" against the conditions expected after approval of a proposed project in order to determine the impact on the environment. *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).

35.   Supplemental NEPA analysis is required when "there are specific new circumstances or information relevant to the environmental concerns that have bearing on the proposed action or its impacts." 40 CFR § 1502.9(d)(1)(i)-(ii). Supplemental environmental impact statements may also be required when the agency determines that the purposes of NEPA will be furthered by doing so. 40 CFR § 1502.9(d)(2).

**D.    APA**

The APA provides for judicial review of agency action. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in the record." *Id.* at § 706(2). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be …. the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

36. When reviewing agency action under the APA, a court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Id.* at 59. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

37. Where an agency has "entirely failed to consider an important aspect of the problem" that is at issue, courts have held such action to violate the APA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S.29, 43 (1983).

38. Under the APA, a reviewing court must also set aside agency action, findings, and conclusions found to be without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

## FACTUAL ALLEGATIONS

**A.    Historical Condition of Strawberry Canyon**

39. BTB operates and maintains water diversion structures in the **Strawberry Creek Watershed** (also referred to as **Strawberry Canyon**) within the SBNF.

40. **Strawberry Creek** is tributary to **East Twin Creek** and the Santa Ana River. The West Fork of Strawberry Creek originates in the SBNF with its

headwaters in Township 2 North Range 3 West (T2N R3W) ("**Headwaters Springs**"). Strawberry Creek flows approximately three miles, into Township 1 North Range 3 and 4 West (T1N R3W and R4W), which is where the Arrowhead Hotel is located. BTB's present-day spring diversions are from the Headwaters Springs and from a complex of springs (10, 11, 12) which are located, like the Headwaters Springs, in the drainage area of a tributary of Strawberry Creek, but at a lower elevation (the "**Cienega Springs**"). Both the Headwaters Springs and the Cienega Springs are located within the SBNF. All of the water at issue in this complaint is diverted from the West Fork of Strawberry Creek Watershed, which is within the Strawberry Creek Watershed, and all within the SBNF.

41.   **Exhibit 1** to this Complaint is a set of figures which were attached to the California State Water Resources Control Board ("**SWRCB**") Order WR 2023-0042 ("**SWRCB Order**"). These figures show the location of the Strawberry Creek Watershed and its tributaries.

42.   In the early 1900s, before any water was diverted from Strawberry Canyon, the canyons near the Arrowhead Hot Springs Hotel were wet and lush, "flower-decorated and musical with the songs of mountain brooks. Overhead [were] the arches formed by the branches of the heavy tree growth; sycamore, maple, oak, alder, pine, cedar and juniper, hiding the sun. . . Sparkling streams of purest water, gushing from eternal springs, tumble and leap over ledges and among the boulders;

now stopping to play a while in some emerald pool sunk in the granite, then hiding in the shadows of ferns and vines."

43.  Prior to diversion, Strawberry Creek was a popular fishing stream.

44.  USGS survey teams visited and mapped Strawberry Creek Watershed in the late 1890s, establishing that Strawberry Creek was a perennial stream prior to diversion.

45.  USGS quadrangle maps show Strawberry Creek as a perennial stream, and the Headwaters Springs and the Cienega Springs, all as blue lines. Retired Cartographer Greg Allord was the project manager for the USGS when it scanned and georeferenced the entire collection of historical USGS topographic maps, and he testified before the SWRCB that the purpose of the USGS quadrangle maps "was to *accurately* represent these natural features, including water" and that the mapped physical features would have been "based upon direct observation." He offered his opinion "based upon my viewing of tens of thousands of historical USGS maps, that the symbols for perennial and intermittent streams have stayed the same for the approximately 140 years, since the first USGS topographic maps were released, and the upper reaches of Strawberry Creek are therefore accurately portrayed on the 1901 Redlands quadrangle as they were observed in 1898/99." These years in which perennial flow was observed by the USGS field survey teams, like those in which Rowe observed streamflow, were relatively dry as compared to average rainfall years.

46.   Engineer W.P. Rowe,[1] hired by BTB's predecessor in interest around 1929 to explore water to develop, found when he first explored Strawberry Canyon:

> Strawberry creek drains a portion of the south slope of the San Bernardino Mountains. It has its source at a group of springs which issue from the side of Strawberry peak. … The flow from these springs being deep seated should be fairly regular, especially during the late summer season. The observations show this to be the case. The dependable supply will aggregate about 10 inches.[2]

Rowe went on to describe the water as supporting "alder, sycamore, dogwood and cedar trees together with ferns and thimble berry bushes" in Strawberry Canyon.

47.   The years that Rowe observed—1929 through early 1930s--were dry years, relative to average rainfall. Nevertheless, even during dry months in a dry year, Rowe described flow in parts of Strawberry Creek and the Headwaters Springs which are now essentially dry creek bed or missing entirely.

48.   Rowe's observations are consistent with the direct field observations of the USGS survey teams which visited and mapped Strawberry Creek Watershed in the late 1890s.

_____

[1] W.P. Rowe was a well-respected civil engineer, who would today be called a hydrologist.
[2] One Miner's Inch is the equivalent of 9 gallons per minute; 1 gallon per minute is the equivalent of 1,440 gallons per day; 1 gallon per minute is the equivalent of 1.61 acre-feet/year. Ten inches year-round even during dry periods, as described by Rowe, converts to 99 gallons per minute.

**B.      Water Diversion from Strawberry Canyon**

49.   The SBNF was reserved in 1893 for the primary purpose of conserving the water supply and timber for the adjoining communities. Despite this, since 1931, the USFS has issued numerous SUPs to allow the diversion of Strawberry Creek's water for bottling outside of the watershed.

50.   The present-day engineering of the water diversion system in Strawberry Canyon started in 1929 and 1930 with no valid, required state diversion permits. The system expanded over the years with the addition and deepening of boreholes, larger pipes, and more points of diversion.

51.   There are no present-day diverters from Strawberry Canyon other than BTB.

52.   BTB diverts substantially all of the flow from the Headwaters Springs and Cienega Springs at or near their source, dewatering the Strawberry Creek for all or most of its reach in the San Bernardino National Forest.

53.   As a result of BTB's diversion, the sort of flows historically described by Rowe and USGS survey teams, which allowed Strawberry Creek Watershed to support high quality fish and lush riparian wildlife, including many now-endangered species, do not exist today. Water-dependent flora like alders and willows no longer line the upper reaches of Strawberry Creek. Because BTB has withdrawn so much water, the species observed in the 1920s are gone from the Canyon.

54.   Monitoring reported to the USFS by BTB consultants shows that all of that spring flow in the Headwaters Springs is now being diverted and continues to dry up Strawberry Creek in the upper watershed during summer and fall, which is the most critical period of the year for fish, wildlife, and riparian habitat. Even in wet years, the removal of substantially all of the water from the Headwaters Springs and Cienega Springs year-round dries up the West Fork each summer and fall and adversely affects flows and natural resources downstream.

55.   The USFS has rated each stretch of the Headwaters and Cienega Springs–public resources on public lands set aside for the protection of watersheds and habitat–as in poor condition as a direct result of BTB's diversions. Downstream water right holders San Bernardino Valley Municipal Water District ("**SBVMWD**") and San Bernardino Valley Water Conservation District ("**SBVWCD**") report adverse impacts–both in a reduction in the quantity of water to which it is entitled, and in damage to natural resource restoration efforts. SBVWD engineering reports show the Bunker Hill Basin in deficit. The Southern California Native Freshwater Fauna Working Group, which includes in its membership the former USFS biologist assigned to Strawberry Canyon, notes it is "extremely concerned" about the "huge" amount of water diverted.

56.   Scenic values and recreational values are being adversely affected by the excessive removal of water from the Strawberry Creek Watershed. There would be more forest and woodland—preferred recreational destinations for forest visitors—if

there were natural water flows. Relatively natural front country chaparral drainages, like Strawberry Creek with perennial stream flows, are in short supply in Southern California, especially in the San Bernardino National Forest.

57.   BTB annually dumps a substantial amount of the water it diverts from the source of Strawberry Creek at the base of the mountain, putting it to no reasonable or beneficial use.

**C.     USFS Issuance of SUPs in Strawberry Canyon**

58.   FLPMA, NFMA, NEPA, and the APA apply to USFS' issuance of SUPs for the water diversion system in Strawberry Canyon.

59.   USFS did not issue any SUPs for water diversion in Strawberry Canyon until 1930 or 1931. At that time, USFS issued a SUP to Arrowhead & Puritas Waters Inc. and Arrowhead Springs Corporation (collectively "**Arrowhead**") for the purpose of "constructing and maintaining pipelines." No valid water claim was made as required by the 1930 and subsequent permits. The state has deemed that the watershed is fully appropriated and with no more water to appropriate.

60.   After the expiration of the 1931 SUP and until 1978, additional SUPs were issued to Arrowhead and/or its successors for the construction and maintenance of a water diversion infrastructure system in Strawberry Canyon, which system consisted of water transmission lines, pipelines, water collection tunnels, boreholes, wells, service trails, and more.

61.   The SUP issued in 1978 had an expiration date of 1988, although the Forest Service allowed diversion to continue under the 1978 SUP until 2018. This long period of operating on an expired SUP was overseen for many years by former SBNF Forest Supervisor Gene Zimmerman, who took a job doing paid consulting work for the alleged holder of the 1978 SUP--Nestlé Waters North America ("**Nestlé**")--upon his retirement.

62.   In 2016, the California Department of Fish and Wildlife ("**CDFW**") informed the USFS that pursuant to Section 1602 of the California Fish and Game Code, an application for a streambed alteration agreement ("**SAA**") was required for any water diversion use in Strawberry Canyon. None has been filed by BTB nor by any predecessor of BTB.

63.   CDFW will not issue a SAA to BTB for any of its diversion structure in Strawberry Canyon without BTB demonstrating compliance with the California Environmental Quality Act ("CEQA"). As CDFW wrote in 2016, "CDFW must rely on the CEQA document prepared by the Lead Agency in order to prepare and issue a Lake or Streambed Alteration Agreement."

64.   CEQA requires that environmental harm must be reduced or avoided by adopting feasible project alternatives or mitigation measures. Cal. Pub. Res. C. §§21002–21002.1. BTB's diversion of water, which is removing substantially all of the water from Strawberry Canyon, clearly is causing significant environmental harm.

1.     **2018 Decision to Issue SUP to Nestlé**

65.   On July 27, 2018, Forest Ranger Joseph Rechsteiner signed a decision memo ("**2018 Decision Memo**") memorializing his decision to issue a new SUP to the public company Nestlé, a subsidiary of public company Nestlé, S.A., to operate and maintain existing diversion structures in Strawberry Canyon. The 2018 Decision Memo allowed issuance of an SUP of 3 years' term with two one-year discretionary renewals. In support of his decision, Ranger Rechsteiner stated in the 2018 Decision Memo that applicant Nestlé's "claim of water rights was reasonable if mistaken" but did not find that Nestlé had proven its water rights. He also found that the extraction of water under the existing SUP is not in accordance with Standard 46 of the Forest LMP but that conditions on the SUP should move the watershed to "Functioning-At-Risk" [Class 2]—towards but not reaching the desired condition of fewer Class 2 and Class 3 waters; the number of Class 1 [functioning properly] waters would not be increased by his decision. He noted that:

> The initial studies provided by the permittee suggest that water
> extraction is reducing surface flow in Strawberry Creek. The effect of
> this flow reduction has not been thoroughly studied. The permittee will
> study comparison sites in adjacent unmanaged drainages to determine
> what conditions would exist in Strawberry Creek without water
> extraction in the upper watershed. This approach is typically referred to
> as a "paired basin" study . . . The study period is expected to last for a

minimum of three years. The Forest Service has determined that three

years is a reasonable term to complete the studies and ensure that

adequate information is available to consider a longer-term permit with

appropriate terms and conditions. I recognize that additional time (up to

two years) may be needed for the studies, so my decision provides for

discretionary annual permits for two (2) additional years.

66.   The California Department of Fish and Wildlife ("**CDFW**") commented in scoping preceding the 2018 Decision Memo that "[f]or any activity that will divert . . . the natural flow. . . of a river or stream. . . the project applicant (or "entity") must provide written notification to CDFW."

67.   Ranger Rechsteiner himself performed only a perfunctory environmental review to support the 2018 Decision Memo, making findings of no extraordinary circumstances necessitating an environmental assessment ("EA") or environmental impact statement ("EIS"), despite the acknowledged "impaired" status of Strawberry Creek Watershed due to the diversion. Despite acknowledged changes in management direction since issuance of the 1978 SUP, no consideration was apparently given to a no action alternative requiring a return to pre-diversion baseline conditions in Strawberry Canyon.

**2.     Nestlé 2018 SUP**

68.   On August 24, 2018, Nestlé's representative and Ranger Rechsteiner signed the three-year SUP authorized by the 2018 Decision Memo, which SUP would

expire on August 24, 2021 ("**Nestlé 2018 SUP**") (FCD728501). The Nestlé 2018 SUP stated that it was "subject to the additional resource mitigation measures, monitoring requirements, and adaptive management terms and conditions attached hereto and made part hereof as Appendix B." The actual adaptive management plan ("**AMP**") terms were not attached, and in fact the AMP was not completed until March 2019.

69.   On January 22, 2021, Nestlé asked the FS to renew the Nestlé 2018 SUP for one year, expiring on August 24, 2022. This request was granted, without modification to the 2018 Nestlé SUP.

70.   The contents of the Nestlé 2018 SUP specified that the permit was not renewable, assignable, or transferable. The 2018 SUP stated: "Any change in control of the business entity [holding the permit] shall result in termination of this permit."

71.   On March 31, 2021, the privately held private equity firm of One Rock Capital Partners, LLC, in partnership with the also-privately-held Metropoulos & Co., acquired Nestlé in a leveraged buyout. This sale operated to terminate the Nestlé 2018 SUP. Accordingly, on April 1, 2021, Nestlé filed with the USFS a "Request for Revocation" of the August 24, 2018, Nestlé 2018 SUP, on the basis that Nestlé had "conveyed all my (our) right, title, and interest in and to the improvements," the diversion infrastructure, to BTB.

**3.     BTB 2022 SUP**

72.    On August 18, 2022, Acting Ranger Joseph Jordan signed a SUP for BTB. This SUP expired six days later on August 24, 2022 ("**BTB 2022 SUP**"), FCD728502. It stated that "The CA State Water Board enforcement hearing in 2022 may clarify the water rights related to the system and/or uphold the draft Cease and Desist Order issued to the holder in 2021." However, the SUP made clear, on its face, that the USFS had not required BTB to establish its right to the water it planned to divert prior to issuing the BTB 2022 SUP. In the portion of the BTB 2022 SUP for "Water Rights Acquired in the Name of the Holder" in the blank after "Identification of Water Rights. The holder has obtained the following water rights for use under this permit in the holder's name:" "NA" is written next to owner.

73.    An adaptive management plan is attached to the BTB 2022 SUP.

**4.     BTB 2023 SUP**

74.    On February 21, 2023, the Forest Service and BTB executed a second SUP ("**BTB 2023 SUP**," **Exhibit 2**), FCD728503. The BTB 2023 SUP contained similar recitations and entries regarding water rights as the BTB 2022 SUP. The adaptive management plan was no longer attached, although the original, 2018 outline was referenced.

75.    The BTB 2023 SUP, by its own terms, expired on August 24, 2023, with a provision that "[a]pplications for a new permit must be submitted at least 6 months prior to expiration of this permit." It also states the holder "shall" comply with state

environmental laws. Upon termination, it is BTB's responsibility to "remove all structures and improvements [. . .] within a reasonable period prescribed by the authorized officer and shall restore the site to the satisfaction of the authorized officer."

76.   BTB did not submit an application for a new SUP six months prior to August 24, 2023. Nevertheless, BTB continues to occupy the SBNF and divert substantially all of the water from Strawberry Canyon.

**D.   New Information Since 2018 Decision Memo/Categorical Exclusion Adoption**

77.   Since the 2018 Decision Memo was signed, substantial new information has come to light. First, the SWRCB determined that BTB has made substantial unauthorized diversion of water from Strawberry Canyon to which it holds no right. Second, information gathered for the SWRCB Hearing shows that the waters BTB diverts *would have been surface water supporting a rich riparian corridor*. Thus, much of the stated purpose of the paired basin study has been vitiated. The 2018 Decision Memo stated that mitigation measures were "designed to ensure that the impact to natural resources will be minimal" and that those measures were also designed so that they "do not infringe upon water rights for developed spring water held by Nestlé under California water law." All of that information is out of date.

78.   The San Bernardino National Forest Summary of Monitoring Results for 2021-2022 stated that although the Santa Ana River flows were at the 75th percentile,

1   its tributary, East Twin Creek, into which Strawberry Creek discharges, were below

2   median.

3       79.   In 2023, BTB reported continued large volume spring water withdrawals

4   of over 100 million gallons from Strawberry Canyon despite the USFS AMP,

5   deteriorated Creek conditions, and deficit in the Bunker Hill Basin.

6                          **CLAIMS FOR RELIEF**

7                      ***FIRST CAUSE OF ACTION***

8   ***FLPMA, 43 U.S.C. §§ 1761-66, NFMA, 16 U.S.C., §1600 et seq., and APA, 5***

9                      ***U.S.C. § 706(2)***

10      80.   Plaintiffs hereby incorporate all previous allegations contained in this

11  Complaint as though fully set forth herein.

12      81.   In issuing SUPs for diversions in Strawberry Canyon and allowing BTB

13  to continue to operate under the same, Defendant violated its duties under the

14  FLPMA and the NFMA.

15      82.   In violation of the FLPMA, each of the SUPs issued since 2018 does not

16  contain terms and conditions that ensure compliance with federal and state laws

17  regarding air and water quality and environmental protection, and that "minimize

18  damage to scenic and aesthetic values and fish and wildlife habitat and otherwise

19  protect the environment." 43 U.S.C. §1765.

20

21

83.   In violation of the FLPMA and NFMA, each of the SUPs issued since 2018 was done without enforcing Section 1602 of the California Fish and Game Code and CEQA, despite knowledge of dewatering of Strawberry Creek.

84.   In violation of the NFMA, each of the SUPs issued since 2018 does not comply with the San Bernardino LRMP and its mandatory provisions.

85.   In violation of the NFMA, USFS did not demonstrate that the water extracted from Strawberry Creek pursuant to the 2018 Decision Memo and each SUP issued based upon that decision was excess to the current and reasonably foreseeable future needs of forest resources nor establish that extractions provide for the long-term protection and reasonable use of surface water and groundwater resources. It did not ensure that instream flows favorable to the maintenance and restoration of riparian dependent and aquatic resources and channel conditions will be required. It did not require that the permittee establish proof water rights prior to issuing or re-issuing the SUPs; obtain a Streambed Alteration Agreement pursuant to Section 1602 of the California Fish and Game Code; or consider beneficial uses, existing water rights, and the availability of other sources of water as part of the application for water extraction.

86.   In violation of the regulations implementing the NFMA, no SUP issued since 2018 for the dewatering of Strawberry Canyon has been based upon an appropriate environmental analysis.

87.   Defendant failed to collect any evidence that BTB had the technical and financial capability to operate, maintain, and terminate the project prior to issuing the BTB 2022 SUP or the BTB 2023 SUP.

88.   Defendant's actions have been arbitrary, capricious, and otherwise not in accordance with applicable law under the APA; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or without observance of procedure required by law.

### SECOND CAUSE OF ACTION

### NEPA and APA, 5 U.S.C. § 706(2)

89.   Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

90.   The USFS's NEPA analysis supporting the 2018 Decision failed to take into account baseline considerations before diversion of substantially all water from Strawberry Canyon—an alternative to issuing a new SUP that would have been more compatible with the SBNF LRMP.

91.   Based on substantial new information available since issuance of the 2018 Decision Memo, including accurate records of pre-permit conditions, Defendant should have conducted supplemental NEPA analysis prior to issuing the BTB 2022 SUP and 2023 SUP.

92.   Defendant's actions have been arbitrary, capricious, and otherwise not in accordance with applicable law under the APA; in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right; and/or without observance of procedure required by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment providing the following relief:

(1) Adjudge and declare that Defendant's actions in issuing the 2018 SUP to Nestlé violated FLPMA, NFMA, NEPA, and the APA;

(2) Adjudge and declare that Defendant's actions in issuing the 2022 and 2023 BTB SUPs violated FLPMA, NFMA, NEPA, and the APA;

(3) Adjudge and declare that Defendant's actions in allowing BTB to continue to operate in Strawberry Canyon without a valid SUP violates FLPMA, NFMA and the APA;

(4) Order Defendant to vacate and set aside the BTB 2023 SUP, the 2018 Decision Memo, and the NEPA conclusions supporting the 2018 Decision Memo;

(5) Enjoin Defendant from approving or allowing any third party to divert water from Strawberry Canyon by entry onto USFS land unless and until the USFS has performed a new or supplemental environmental analysis taking into account the historical information newly illuminated through the SWRCB Hearing, continuing damage to resources on the SBNF, and the failure to meet goals and standards of the SBNF LRMP;

(6)   Order Defendant to comply with FLPMA, NFMA, NEPA, and the APA in connection with BTB's diversion of water from the Strawberry Creek Watershed;

(7)   Order Defendant to remove, or require that former SUP-holders remove, the diversion structures in Strawberry Canyon and restore Strawberry Canyon to its condition pre-diversion;

(8)   Grant Plaintiff fees, costs, expenses and disbursements, including reasonable attorneys' fees as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(9)   Grant Plaintiff such additional and further relief as the Court deems just and proper.

DATED: June 25, 2024

Respectfully submitted,

*/s/ Rachel S. Doughty*

Rachel S. Doughty
*Attorneys for Plaintiffs*