# Exhibit  5

Exhibit 5                                    Page 196

1  SOMACH SIMMONS & DUNN
   A Professional Corporation
2  STUART L. SOMACH, ESQ. (SBN 90959)
   MAXIMILIAN C. BRICKER, ESQ. (SBN 350150)
3  500 Capitol Mall, Suite 1000
   Sacramento, CA 95814
4  Telephone: (916) 446-7979
   Facsimile:  (916) 446-8199
5  ssomach@somachlaw.com
   mbricker@somachlaw.com
6
   MICHAEL W. DAUGHERTY, ESQ. (Co. Bar 49074)
7  *Pro Hac Vice* Forthcoming
   RAMSEY L. KROPF, ESQ. (Co. Bar 21528)
8  *Pro Hac Vice* Forthcoming
   1155 Canyon Blvd., Suite 110
9  Boulder, CO 80302
   Telephone: (916) 446-7979
10 Facsimile: (916) 446-8199
   mdaugherty@somachlaw.com
11 rkropf@somachlaw.com
12 Attorneys for [PROPOSED] Plaintiff-Intervenor
   YUHAAVIATAM OF SAN MANUEL NATION,
13 a federally recognized Indian tribe, also federally
   recognized as SAN MANUEL BAND OF MISSION INDIANS
14
15              **UNITED STATES DISTRICT COURT**
16          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
17              **EASTERN DIVISION – RIVERSIDE**

18 | BLUETRITON BRANDS, INC.,                                | Case No.: 2:24-cv-09720-JGB-DTB |
   |---------------------------------------------------------|----------------------------------|
19 |                                       Plaintiff,        | **DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION** |
20 |     v.                                                  | |
21 | UNITED STATES FOREST SERVICE,                           | |
22 | RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service, | Hearing Date:    February 3, 2025<br>Hearing Time:   9:00 AM |
23 |                                                         | Courtroom:        1<br>Judge: Hon. Jesus G. Bernal |
24 | CHRISTOPHER FRENCH, in his official capacity as Deputy Chief for the National Forest System of the U.S. Forest Service, | Action Filed:  August 6, 2024 |
25 |                                                         | |
26 | JENNIFER EBERLEIN, in her official capacity as Regional Forester for the | |
27 | Pacific Southwest Region of the U.S. Forest Service,    | |
28 |                                                         | |

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO
INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION            -1-

Exhibit 5

Page 197

DANELLE HARRISON, in her official capacity as Forest Supervisor of the San Bernardino National Forest of the U.S. Forest Service,

MICHAEL NOBLES, in his official capacity as Front Country District Ranger of the U. S. Forest Service,

              Defendants.

YUHAAVIATAM OF SAN MANUEL NATION, a federally recognized Indian tribe, also federally recognized as SAN MANUEL BAND OF MISSION INDIANS,

          [Proposed] Plaintiff-Intervenor.

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION    -2-

I, Daniel J. Little, declare as follows:

1.     I am the Chief Intergovernmental Affairs Officer for the Yuhaaviatam of San Manuel Nation, a federally recognized Indian tribe, also federally recognized as the San Manuel Band of Mission Indians (the Nation), and on whose behalf I submit this declaration.  The facts set forth herein are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.     I have served as the Nation's Chief Intergovernmental Affairs Officer since August 2019.  In this capacity, I am responsible for protecting the Nation's interests on many issues, and to that end, I routinely engage with other governmental agencies and officials on behalf of the Nation, whether on a local, state, federal, or tribal level.

3.     Under the direction of the Nation's leadership, I am also charged with representing the Nation in government-to-government meetings and advocating for the Nation in the many contexts in which its interests are affected.  This engagement can involve informal meetings with other government officials, but it also can involve formal consultations as required by law, during which Tribal leadership participates as well.  I am familiar with the requirements of federal consultation with Indian tribal governments, to whom the United States owes a special trust responsibility.  I am particularly familiar with the requirements of Executive Order 13007 and Executive Order 13175 requiring the federal government to engage in meaningful consultation with tribal governments before taking action that could adversely affect them, their sacred sites, lands and resources.

4.     I have direct experience participating in tribal consultations on behalf of the federal government given my prior role with the National Indian Gaming Commission (NIGC).  I served as an appointed commissioner for the NIGC between April of 2010 and June of 2015.  During that time, I participated in over

---

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION                    -3-

Exhibit 5                                        Page 199

50 government-to-government consultations with tribes as an official representative of the United States government.  I believe I am an expert on what consultation means from both perspectives.

5.    In my position as Chief Intergovernmental Affairs Officer, I receive copies of correspondence addressed to the Nation from other governmental agencies, and I closely monitor such correspondence to protect the Nation's interests.  I also monitor other sources of information, to ensure I am aware of other entities' activities or actions that could affect the Nation's interests.

6.    I have long been aware that the Nation relies upon water delivered to its Arrowhead Springs property (Arrowhead Springs) through infrastructure owned by a company called BlueTriton Brands, Inc. (BlueTriton).  It is my understanding that BlueTriton uses water diversions from Strawberry Canyon in the San Bernadino National Forest for its own bottling purposes, but also to deliver water to Arrowhead Springs.  These are water diversions upon which the Nation and its predecessors at Arrowhead Springs have long relied.

7.    Against this backdrop, I am aware that the United States Forest Service (USFS) issued to BlueTriton on July 26, 2024, a directive to cease all water flows through its infrastructure (including to the Nation) within seven days.  I have seen and reviewed a copy of this "Notice of Denial of Application for Use and Occupancy of National Forest Lands; Termination of Special Use Permit FCD728503" (Notice of Denial).  The USFS never notified the Nation of its Notice of Denial, before or after the notice issued.  It was only through BlueTriton that the Nation learned the USFS had directed the company stop all water flows through its water delivery system.  BlueTriton shared the notice with the Nation as a courtesy.

8.    The USFS' failure to notify, let alone consult with, the Nation about its Notice of Denial is particularly egregious as agency officials knew the Nation relied upon the water delivery from BlueTriton and used it for a variety of purposes at

---

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO
INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION          -4-

Exhibit 5                    Page 200

Arrowhead Springs, including for regional fire protection.  The USFS also knew the Nation had no alternative water resource.

9.    I have participated in numerous meetings with the USFS, both before and after the July 26, 2024 Notice of Denial was issued to BlueTriton.  By virtue of meetings that preceded the July 26, 2024 Notice of Denial, the agency was well aware of the Nation's reliance upon and need for the water delivered by BlueTriton, and in fact, we specifically informed the USFS of the Nation's various uses of the water at Arrowhead Springs, including for the benefit of the surrounding community, and the Nation's lack of an alternative water source.

10.    Starting in April 2024, the Nation received from BlueTriton copies of letters from the Front Ranger of the San Bernardino National Forest, Michael Nobles, to Louis Mixon of BlueTriton requesting information from BlueTriton about the Nation's water use at Arrowhead Springs.  The USFS had not asked the Nation for this information or provided the Nation copies of its correspondence to BlueTriton inquiring about the Nation.  A true and correct copy of the April 18, 2024 letter, from Front Ranger of the San Bernardino National Forest, Michael Nobles, to Louis Mixon of BlueTriton (as BlueTriton provided the Nation), is attached hereto as **Exhibit 1**.

11.    Thereafter, the Nation received from BlueTriton a copy of a May 24, 2024 letter from the USFS to BlueTriton, in which the federal agency was again inquiring about and making statements regarding the Nation's water use at Arrowhead Springs.  A true and correct copy of that May 24, 2024 letter, from the Front Ranger of the San Bernardino National Forest, Michael Nobles, to Louis Mixon, III of BlueTriton, which the Nation received from BlueTriton (not the USFS), is attached hereto as **Exhibit 2.**  The May 2024 letter mischaracterized and misstated the Nation's need for water at Arrowhead Springs, stating the following:

> As we discussed, one area where detail is significantly lacking concerns the quantities of water that were delivered to the Tribe (the San Manuel Band of Mission Indians) in the past and will

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION          -5-

Exhibit 5                                    Page 201

be delivered to the Tribe in the future. It is essential that, as the permittee, you provide a detailed account of the uses of this water. It is not appropriate to broadly categorize the water use as "primarily industrial, domestic and irrigation uses." While the Forest's knowledge of the uses of this property are incomplete, our records currently indicate no irrigated agricultural uses on the property. Nor are there any municipalities on the property. So far as we are aware there are no residences on the property. The existing hotel and conference facility is not currently being operated and is being maintained by a skeletal staff.

12. After receiving a copies of the April 18, 2024 and May 24, 2024 correspondence to BlueTriton, representatives of the Nation, including myself, met with USFS Supervisor Danelle Harrison and the Front Country District Ranger, Michael Nobles, for the San Bernardino National Forest and discussed the USFS' request for information about the Nation's water use at Arrowhead Springs to ensure the agency accurately understood the Nation's water uses and needs. In these discussions, we provided information to the USFS officials that contradicted its statements in the May correspondence to BlueTriton, demonstrating the agency was operating under a false understanding of the Nation's water uses and needs. We informed the agency officials that:

(a) the water received from BlueTriton was the primary water source for Arrowhead Springs and was essential for all property operations, including firefighting;

(b) there were no alternative sources of water as there was no nearby municipal water connection;

(c) the Arrowhead Springs property was being used by the Nation daily, including by the government departments housed in the administration building, the firefighters at the fire station, and the employees who operate the events that are held throughout the property;

(d) the Nation has a native plant propagation area on the property and irrigates a defensible green space for wildfire protection;

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION          -6-

Exhibit 5                    Page 202

(e)     water delivered to the property by BlueTriton is used by San Bernardino County, other local, state, USFS and the Nation's firefighters for fighting fires at the property and within the surrounding community, and indeed first responders from local, state and federal agencies use Arrowhead Springs for fire-fighting training.

We also informed the above-referenced agency officials that the USFS was obligated to consult with the Nation, and consider the impact to the Nation, before taking any action that could curtail BlueTriton's water deliveries to the Nation. We specifically reminded the USFS that as a Federal "trustee," we expected the USFS to provide a solution to the Nation's water needs if the BlueTriton option was not available. Finally, we offered to provide any additional information the USFS needed regarding Arrowhead Springs' water needs and uses, in writing or otherwise. The USFS officials acknowledged the information we provided, and also indicated they needed no additional information. However, they did ask that the Nation not get involved in USFS' discussions with BlueTriton as, they said, the discussion concerned BlueTriton's reporting and other obligations as a permittee and it was not about the Nation's water use. They specifically said that any actions the agency might take would be regarding BlueTriton and its uses of water, while intimating the Nation would not be affected. USFS officials never formally informed or discussed, much less consulted, with the Nation regarding the subsequent Notice of Denial that would issue against BlueTriton, and never provided the Nation notice upon its issuance.

13.     In addition to providing the USFS accurate information about the Nation's water needs and uses at Arrowhead Springs, the Nation provided similar information to BlueTriton, so that it could accurately respond to the agency's inquiries about the Nation's water use. To that end, we provided the following substantive statement to BlueTriton so that it would be in a position to answer the USFS' request about the Nation's water uses at Arrowhead Springs:

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION          -7-

Exhibit 5                    Page 203

The Tribe understands that BlueTriton Brands ("BTB") has been asked by the United States Forest Service ("USFS") for information regarding the use of the water provided to the Arrowhead Springs property by BTB. The Tribe uses the water delivered by BTB at the Arrowhead Springs property for a variety of beneficial and reasonable purposes as has occurred historically. The property is large with a variety of facilities, including, but not limited to, a conference and event center, administration buildings, and recreational and cultural facilities. Such facilities are used by the Tribe daily, including use by tribal citizens, various governmental departments and their employees that are housed in the administrative buildings, and for events. The Arrowhead Springs property lies within the Tribe's ancestral territory. The Tribe is intimately tied to their ancestral lands as this landscape has and continues to play an important role in the Tribe's cultural traditions. The Tribe has a history of responsible land and resources management and conducts restoration of native habitat and fire management activities on this property. For example, the Tribe, USFS and County of San Bernardino have jointly participated in the development and implementation of fire protection plans that include the property and rely upon the use of water. In keeping with the Federal government's fiduciary duty to the Tribe and the federal and state policies recognizing tribal expertise in stewardship of ancestral lands and the water and other natural resources on such lands, the Tribe would be glad to speak further with the USFS on a government-to-government basis.

The Tribe has broad water rights claims, including, but not limited to, those acknowledged by the California State Water Resources Control Board in order WR 2023-0042 (SWRCB Order).

It is my understanding that BlueTriton provided a copy of the above statement with a June 4, 2024 letter from Louis Mixon of BlueTriton to Front Ranger of the San Bernardino National Forest, Michael Nobles, to Louis Mixon of BlueTriton.  A true and correct copy of this correspondence that we received from BlueTriton, in which our statement was included, is attached hereto as **Exhibit 3**.

14.    For reasons that remain unknown, the Notice of Denial does not spare, or carve out, BlueTriton's deliveries to Arrowhead Springs as the State Water Resources Control Board (SWRCB) has done in acknowledging the Nation's water rights at Arrowhead Springs.  Instead, the Notice incorrectly asserts again that the "hotel and conference facility on the property is not operating."  The Notice also

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION                    -8-

Exhibit 5                                      Page 204

1   omits the fact that the Strawberry Canyon water is crucial for fire-fighting uses,[1]

2   among the Nation's other beneficial uses and needs that were clearly discussed with

3   both the Forest Supervisor, Danelle Harrison, and the Front Country Ranger,

4   Michael Nobles, mentioned above.

5        15.    It is unclear why the USFS, fully aware of the Nation's historic

6   reliance upon the water delivered by BlueTriton to Arrowhead Springs, failed to

7   include a carve out in its directive to Blue Triton, as the SWRCB has done in

8   acknowledging the Nation's water rights at Arrowhead Springs. Specifically, in

9   denying BlueTriton's right to appropriate water from certain sources in Strawberry

10  Canyon, the SWRCB acknowledged the Nation "has riparian rights that authorize

11  the diversions through these facilities for beneficial uses on the [Arrowhead

12  Springs] property."

13       16.    Upon learning that the USFS issued a July 24, 2024, Notice of Denial

14  directing BlueTriton cease all water delivers (including to the Nation) within seven

15  days, I reached out to Forest Supervisor Danelle Harrison in an effort to address the

16  significance and impact of the action on the Nation. In addition, the Nation notified

17  the agency in writing on July 30, 2024, that it had failed to engage in the formal

18  government-to-government consultation that federal law required (Request for

19  Consultation). Attached hereto as **Exhibit 4** is a true and correct copy of the

20  Request for Consultation. In this formal request, the Nation requested to meet with

21  the USFS officials so we could discuss the full scope of the problem they created

22  with the Notice of Denial and work collaboratively to find a resolution, including a

23  carve out of water deliveries to the Nation as the SWRCB had done.

24       17.    Since then, the agency has agreed to participate in weekly staff

25  meetings with Tribal personnel (beginning on September 25, 2024), and I and/or the

26  

_____

[1] *See, e.g.,* https://www.sbsun.com/2024/08/23/potential-water-restrictions-at-arrowhead-springs-hotel-raise-concerns-over-wildfire-danger/ (last visited December 30, 2024).

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO
INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION    -9-

1  director I oversee have attended all of these meetings.  I have also attended

2  additional meetings between UFS officials and Tribal personnel on August 21,

3  2024, September 25, 2024, and November 6, 2024.  In August, Tribal personnel

4  hosted USFS officials at Arrowhead Springs to allow them to observe the Nation's

5  water uses and water-related infrastructure at the property that USFS personnel had

6  incorrectly asserted in the Notice of Denial was "nonoperational."

7        18.    At no point have USFS officials acknowledged their lack of

8  consultation before issuing the Notice of Denial, and at no point have USFS

9  officials made a good faith consultation effort by presenting or entertaining

10  potential timely solutions to the issue of the Nation's Strawberry Canyon water

11  supply being impaired due to the agency's actions against BlueTriton.  Instead,

12  USFS officials have continually asserted, in a conclusory manner, that there is no

13  timely solution available.  At no point have USFS officials discussed any issues

14  addressing the water supply to the historic or culturally significant areas existing at

15  Arrowhead Springs.

16        19.    The Nation sent letters to USFS officials on November 4, 2024, and

17  November 15, 2024, respectively, to formally express the need for a solution before

18  January 15, 2025, and to express the Nation's dissatisfaction with USFS officials'

19  lack of engagement and the lack of progress that was made in the aforementioned

20  meetings.  *See* **Exhibit 5**, attached hereto, which includes true and correct copies of

21  both letters.  Still, USFS officials remain entrenched in their position, asserting that

22  no timely solution is available, and never explaining why the Nation is not entitled

23  to the carve out that the state water agency provided the Nation while denying

24  BlueTriton's right to divert water for commercial bottling purposes.  The USFS has

25  not only knowingly made inaccurate statements in its Notice of Denial regarding

26  the use of Arrowhead Springs, but its officials have continued thereafter to

27  misrepresent the facts about the Nation's use and need for water for Arrowhead

28  Springs to officials in Washington, D.C.  In essence, the agency has failed to engage

---

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO
INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION        -10-

Exhibit 5                     Page 206

in productive discussions, let alone meaningful consultation, with the Nation, either before or after the Notice of Denial was issued.

20. The November 4, 2024 Letter (Exhibit 2) also requested a copy of BlueTriton's Decommissioning Plan and demanded that the USFS consult with the Nation on the impacts of BlueTriton's Decommissioning Plan stating:

> We also request that the [San Bernardino National Forest ("SBNF")] consult with the Nation about mitigating any harm that implementation of the plan may have on the Nation. Again, our consultation with the SBNF about the removal plan is separate and distinct from any ongoing proceeding between the SBNF and BlueTriton, or other parties, and we will work with you to make sure that we only consult on those matters that directly impact the Nation as required by Executive Order 13175, Joint Secretarial Order 3403, USFS' Action Plan and other federal policies." Despite such request, the USFS has not provided a copy of BlueTriton's Decommissioning Plan, stating the Nation should obtain the document through a Freedom of Information Act request or from BlueTriton. The USFS has not consulted with the Nation on the Decommissioning Plan as was requested and as required by law.

21. The Nation continues to explore potential non-litigation solutions, including legislative and administrative remedies, to prevent the USFS from shutting off the Nation's Strawberry Canyon water supply on or after January 15, 2025. The Nation is also exploring securing alternative water supplies to meet the demands on Arrowhead Springs that are currently met by Strawberry Canyon diversions, in the event that it cannot prevent USFS from shutting off that supply (or from removing the BlueTriton's water transport facilities on San Bernardino National Forest lands or requiring BlueTriton to do the same). Indeed, the Nation has spent significant resources and time trying to find alternatives, including hiring consultants to advise the Nation on potential non-litigation solutions and alternative water supplies. None of these non-litigation solutions or alternative water supplies can be feasibly implemented by January 15, 2025.

22. Alternative water supplies may include municipal water from the San Bernardino Municipal Water District, but the Nation has been advised that it will take years to implement as it will require approvals and agreements from the City

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION   -11-

Exhibit 5      Page 207

of San Bernardino (property is in the City's jurisdiction), County of San Bernardino (pipeline must cross property owned by the County Flood Control District) or the Water District, may be cost prohibitive given the necessary infrastructure (over 6,000 linear feet of piping and pumping stations to connect to Arrowhead Springs gradient delivery system), and could not be fully operational for years.

23. The Nation hoped that USFS would consult in good faith to find a solution allowing continued water deliveries to Arrowhead Springs, whether by extending the temporary authorization or other means. Unfortunately, the agency has not indicated it is willing to further extend the temporary authorization so the Nation and agency can find a viable solution.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 2nd day of January 2025 at Las Vegas, Nevada.

_____
DANIEL J. LITTLE

DECLARATION OF DANIEL J. LITTLE IN SUPPORT OF MOTION TO INTERVENE AND MOTION FOR PRELIMINARY INJUNCTION                    -12-

Exhibit 5                    Page 208

# EXHIBIT 1



| | | | 602 S Tippecanoe Ave |
|---|---|---|---|
| **United States** | **Forest** | | |
| **Department of** | **Service** | | **San Bernardino, 92408** |
| **Agriculture** | | **Supervisor's Office** | **909-382-2600** |

**File Code:** 2720

**Date:** 04/18/24 , 2024

Louis Mixon, III
Senior Natural Resource Manager
BlueTriton Brands, Inc
4718 Mountain Creek Parkway
Dallas, TX 75236

Dear Sir,

The San Bernardino National Forest has been reviewing your application dated 21-Feb-2023 to Ranger Rechsteiner for a new special use authorization. The application states that:

"…no changes to the operation of the Business Facilities (as defined below) are being requested," and "The Business Facilities are used to supply bottled drinking water for retail purposes."

No other description of the beneficial use of water is described, whereas the reported use of water, specifically the delivery of water to the Arrowhead Springs Hotel property under a presumptive riparian water right from 2023 to 2024 is not authorized under BlueTriton's previous authorization FCD728503, nor is it part of BlueTriton's application for a long-term permit.

While the inconsistency does not constitute grounds for immediate dismissal of your application, the Forest needs to have a better understanding of what BlueTriton is requesting for any future use and occupancy of Forest Lands. For that reason, I am requesting that you provide the following information by 15-May-2024:

For each of BlueTriton's well, spring, or borehole locations located on Forest Lands (tunnels 2 and 3, horizontal wells 1, 1A, 7, 7A, 7B, 7C, 8, 10, 11, and 12), provide the following information in detail:

1. For each well, spring, or borehole: whether the extraction/diversion is groundwater or surface water.
2. For each surface water use: provide proof of water rights documentation as required by section VIII. H. *Water Facilities and Water Rights 3.) Water Rights Acquired in the Name of the Holder.*
3. For each well, spring, or borehole: how much water is planned for extraction or diversion, in gallons per month, or acre-feet per month, for the years 2025 to 2030.
4. For each well, spring, or borehole: a detailed description of the disposition of the water, the recipient, location of use, and beneficial use for the same period of time.

Sincerely,

Michael Nobles
DISTRICT RANGER



Caring for the Land and Serving People


Printed on Recycled Paper

Exhibit 1, P. 014

Exhibit 5

Page 210

# EXHIBIT 2

CaSe 5:24-cv-01203-JGB-DTB Document 65-1 Filed 08/26/25 Page 2 of 108 Page ID Page #1096:814



| United States<br>Department of<br>Agriculture | Forest<br>Service | San Bernardino National Forest<br>Supervisor's Office | 602 S Tippecanoe Ave<br>San Bernardino, CA 92408<br>909-382-2600<br>TDD: 1-800-735-2922 |
| --- | --- | --- | --- |

**File Code:** 2700                    **Date:**    May 24, 2024

Louis Mixon, III
Senior Natural Resource Manager
BlueTriton Brands, Inc
4718 Mountain Creek Parkway
Dallas, TX 75236

Dear Mr. Mixon,

Thank you for meeting with Forest staff at the Lytle Creek Ranger Station last week. I appreciate your willingness to come down and discuss these issues in person. I find that setting aside such time to establish the appropriate contacts and relations can help accelerate the exchange of necessary information. You should feel free to request such appointments in the future whenever they would be useful to you and be assured I will do the same.

The Forest continues to review your previously submitted correspondence, as we discussed. But as I explained several aspects of your use of Forest resources and permit compliance require further elaboration. Further we wish to correct several misapprehensions that were apparent in the correspondence. It is my hope that, after our conversation, you clearly understand my expectations at this point. The Forest is obligated to administer BlueTriton's current permit in accord with our regulations and the terms and conditions of the permit. We also require further information to process BlueTriton's application for a permit for future operations on the Forest.

As an initial matter, as you stated in your correspondence, the water extracted by BlueTriton from National Forest lands consists of percolating groundwater. (This is a revision of previous claims concerning surface water rights). The Forest agrees with this conclusion. However, at various times your correspondence refers to BlueTriton's appropriative rights to this groundwater. This is inaccurate. All BlueTriton's operations on National Forest lands are conducted under permits issued by the Forest Service, and this has been true of every predecessor back to the construction of these facilities under permit in the 1920's and 30's. The water groundwater rights remain with the United States and are used permissively. And BlueTriton's permits make clear that no water rights are transferred. Even if these operations were not under permit, adverse possession and prescriptive rights do not hold against the sovereign. The ground water rights utilized here remain with the United States as the overlying landowner. . Continued use of these rights requires compliance with BlueTriton's current permit, and future use of these rights is contingent upon the Forest receiving a complete application for a future permit. (And one requirement for that application is a thorough explanation of the proposed use.

As noted in our meeting yesterday, your responses to my previous letters are not sufficient in detail both in regard to the current operations under your permit or for our consideration for future permitted operations. This is now the third time that I have emphasized the lack of sufficient detail in your responses. For that reason, I am glad that we had the opportunity to



Caring for the Land and Serving People



Printed on Recycled Paper

Exhibit 2, P. 016

Exhibit 5                                                                                    Page 212

2

discuss why your answers were deficient and what further information is needed. As you work to provide me with sufficient detailed responses, please review my previous correspondence. You will see that the questions are designed to elicit responses that are quantitative in nature. Your answers should be tabular where appropriate.

As we discussed, one area where detail is significantly lacking concerns the quantities of water that were delivered to the Tribe (the San Manuel Band of Mission Indians) in the past and will be delivered to the Tribe in the future. It is essential that, as the permittee, you provide a detailed account of the uses of this water. It is not appropriate to broadly categorize the water use as "primarily industrial, domestic and irrigation uses." While the Forest's knowledge of the uses of this property are incomplete, our records currently indicate no irrigated agricultural uses on the property. Nor are there any municipalities on the property. So far as we are aware there are no residences on the property. The existing hotel and conference facility is not currently being operated and is being maintained by a skeletal staff. Thus, there are no significant operations in these categories on the property that would justify the use of up to 8 million gallons of water per month. We require a detailed description of the use of the waters diverted to this property including quantities for each use. Both BlueTriton and the Tribe noted in response that unused waters are returned to the stream below the property. The Forest appreciates this, but both State law and Forest policy would indicate that water that cannot be put to a beneficial use should be bypassed at the point of diversion rather than being diverted only to be returned to the water course at a lower point. The intervening Forest lands should not be deprived of water that is not being put to a beneficial use on the Tribe's immediate property.

One portion of your response that should be forwarded immediately is the April 2024 summary report that was not submitted by the May 15th deadline. This is a requirement of your permit and failure to report constitutes noncompliance.

Further detailed information about the projected uses of water withdrawn from Forest Lands is necessary to consider your application for a future permit. Specifically, please provide the information requested in my letter dated 18-Apr-2024.

To the extent that you believe your Summary Note on line 57 of your November 2023 Period Reporting Summary can be explained more clearly, please expound upon the Note.

As we discussed, your decommissioning plan should be technical in nature, specifying the construction methods, access, ground disturbance, etc.

Other points of discussion and required detailed responses:

- Please submit your Operations & Maintenance Plan (due 1-May-2024).
- For the missing monthly hydro reports (2015 and later) and quarterly biological reports (since inception of AMP): you may send all communication and reports to Mike Nobles (Michael.nobles@usda.gov), David Anderson (david.anderson2@usda.gov), Kelley (Kelley.giron@usda.gov), and Nicole (Nicole.molinari@usda.gov)

- Please provide a copy of the contractual agreement between BTB and the San Manuel Band of Missian Indians.

I appreciate your continued cooperation in this matter, and I look forward to seeing your responses before 5-Jun-2024.

Sincerely,

Michael Nobles
DISTRICT RANGER

# EXHIBIT 3





















June 4, 2024

*via email Michael.Nobles@usda.gov*
*Privileged and Confidential*
*Pursuant to 5 U.S.C. § 552(b)(4),(9)*

Michael Nobles, District Ranger
United States Forest Service
United States Department of Agriculture
San Bernardino National Forest
602 S. Tippecanoe Ave.
San Bernardino, CA 92408

District Ranger Nobles:

I am writing in response to your letter from the U.S. Forest Service (USFS) to BlueTriton Brands, Inc. (BTB) dated May 24, 2024 (Letter), which followed the in-person meeting between our respective teams at the USFS's offices on May 22, 2024 (Meeting). These followed the recent detailed submissions delivered by BTB to the USFS at the USFS's request, on April 23, 2024, and May 14, 2024 (Detailed Submissions).

As a preliminary matter, we wish to thank you for taking the time to meet with us to discuss the various issues related to BTB's pending special use permit application. BTB appreciates its nearly century-long relationship with the USFS in the San Bernardino National Forest, and BTB is committed to continuing its sustainable operations in Strawberry Canyon, as we have for over 120 years.

Given BTB's substantial efforts to work with the USFS on this matter, we are puzzled by the arbitrary nature of your actions over the past few months. We do not understand: (i) your suddenly urgent demands for information on 14 days' notice after having taken no material action on our permit application for 400+ days; (ii) your summary dismissal of the Detailed Submissions in their entirety as "insufficient," without offering any meaningful explanation as to why those submissions were insufficient or how they could be improved; or (iii) your numerous statements set forth in your Letter and at the Meeting that appear to constitute a drastic shift in USFS policy and/or to be made without merit. These actions have created the impression that the USFS is purposefully taking an adversarial posture towards BTB and the exercise of its water rights.

Nevertheless, in the interest of satisfying your requests and continuing our relationship, we have put forth our best efforts to comply with your most recent set of demands. These demands include, among other things, reproducing 9+ years of nearly 70 project submissions within an 8-business day period. As set forth in Attachment 1 to this letter, we have re-delivered as many of the requested materials as we have been able to locate within the 8-business day period imposed. We will continue to work to prepare and assemble any remaining materials as quickly as possible and will plan to re-deliver them to the USFS in due course on a rolling basis. Given our substantial efforts in preparing these materials on short notice, we hope that you will find them satisfactory.



BlueTriton Brands
4718 Mountain Creek Parkway
Dallas, TX  75236

louis.mixon@bluetriton.com
Mobile: (903) 216-2858
bluetriton.com

Exhibit 3, P. 020

Exhibit 5                                                    Page 216

*BTB Response to USFS Meeting and Letter (May 2024)*
*Privileged and Confidential Pursuant to 5 U.S.C. § 552(b)(4),(9)*

Page 2 of 2

We note that all information provided hereunder (or to be provided in accordance herewith) is delivered to the USFS for informational purposes only. BTB continues to consider the USFS's demands and BTB's legal rights in connection therewith, and BTB expressly retains all, and does not waive any, rights and/or remedies in connection therewith (including, without limitation, the right to pursue administrative and/or judicial relief in accordance with applicable law).

We look forward to hearing from you.

Sincerely,

Louis W. Mixon, III
Senior Natural Resource Manager, BlueTriton Brands, Inc.

cc:         Danelle Harrison
            Dave Anderson
            Wendy Brimmer
            Jamahl Butler
            Kelly Giron
            Noel Ludwig
            Nicole Molinari
            Santiano Rivera
            Joshua Rider, Esq.
            Hih Song Kim, Esq.
            Brendan O'Rourke
            Tam Pham
            Christopher W. Hasbrouck, Esq.
            Robert E. Donlan, Esq.

Attachments:   Attachment 1
               Exhibits A - D





Exhibit 3, P. 021

Exhibit 5

Page 217

ATTACHMENT 1

BTB RESPONSES TO USFS DEMANDS

A. Water Rights.

*"As an initial matter, as you stated in your correspondence, the water extracted by BlueTriton from National Forest lands consists of percolating groundwater. (This is a revision of previous claims concerning surface water rights). The Forest agrees with this conclusion. However, at various times your correspondence refers to BlueTriton's appropriative rights to this groundwater. This is inaccurate. All BlueTriton's operations on National Forest lands are conducted under permits issued by the Forest Service, and this has been true of every predecessor back to the construction of these facilities under permit in the 1920's and 30's. The water groundwater rights remain with the United States and are used permissively. And BlueTriton's permits make clear that no water rights are transferred. Even if these operations were not under permit, adverse possession and prescriptive rights do not hold against the sovereign. The ground water rights utilized here remain with the United States as the overlying landowner. . [sic] Continued use of these rights requires compliance with BlueTriton's current permit, and future use of these rights is contingent upon the Forest receiving a complete application for a future permit. (And one requirement for that application is a thorough explanation of the proposed use. [sic]"* (Letter at p. 1)

BTB is not aware of any binding authority, whether State or Federal, for the proposition that the water rights that BTB (and its predecessors) have relied on, since the first special use permit was issued back in 1930, are actually the property of the USFS (rather than BTB).   This position is inconsistent with California law, Federal regulations, and the undisputed understanding of the USFS over the last 90+ years.

As you know, rights for the diversion and collection of water on Federal lands are established under State law, not Federal law (*see, e.g.,* Ruby E. Huffman, 64 Interior Dec. 57 (1957)).  The Forest Service Handbook acknowledges this longstanding doctrine by requiring the inclusion of a standard permit clause in all special use authorizations for any use or occupancy that utilizes water (including surface water or groundwater) and/or requires water rights (including appropriative water rights).  (*See* Forest Service Handbook 2709.11 – Special Uses, Chapter 50, p. 154 (October 4, 2023)).  The standard permit clause is included in Permit No. FCD728503 issued by the USFS to BTB, which remains in effect today:

"The term 'water rights' includes all authorizations, such as certificates, reservations, decrees, or permits, for water use issued under state, local, or other law and all water rights otherwise recognized under state law.  **Any necessary water rights must be acquired and maintained by the holder in accordance with <u>state law</u>** and the terms of [this] permit."  (Emphasis added.)



BLUETRITON

           

Exhibit 3, P. 022

Exhibit 5                                                                                                    Page 218

*ATTACHMENT 1 – BTB Responses to USFS Demands*

---

*Page 2 of 7*

As your Letter acknowledges, BTB's boreholes and tunnels collect percolating groundwater. Rights to percolating groundwater may be either overlying or appropriative, and the collection and use of percolating water for beneficial use on non-overlying land is, by definition, appropriative (*see City of Pasadena v. City of Alhambra*, 33 Cal. 2d 908, 925 (1949)).

The precise extent of BTB's water rights in Strawberry Canyon is currently pending before the California Superior Court in Fresno County. Nevertheless, based on a series of legal opinions issued to BTB's predecessors by their respective legal counsel dating back to 1929, BTB strongly believes that it has lawfully established rights to collect water in Strawberry Canyon under California law, and we are confident that the courts will agree with our position. As you know, BTB has long claimed appropriative rights to percolating groundwater, as well as pre-1914 appropriative rights to surface water, in East Twin Creek and Strawberry Creek. These water rights are established by diversion and use of water, and were recognized in *Del Rosa Mutual Water Company v. Carpenter*, No. 31798 (Cal. Superior Ct., Oct. 19, 1931). For the avoidance of doubt, these water rights do not require permits from the California State Water Resources Control Board.

In fact, the USFS itself has recognized BTB's longstanding water rights on multiple occasions, including in the USFS's recent summary judgment filings in *Center for Biological Diversity v. Forest Service*, No. 15-cv-02098 (C.D. Cal) in February of 2016:

> "Since the 1890s, Arrowhead Puritas Waters, Inc., which through a series of mergers and name changes is now part of Nestlé Waters North America Inc. [now BTB], and its predecessors have been exercising their water rights under State law by extracting and transmitting water from and across the San Bernardino National Forest."

(Federal Defendant's Brief in Support of Summary Judgment at p. 2 (citing Federal Defendant's Statement of Undisputed Facts)).

It appears that the USFS has now changed its position with respect to BTB's water rights without explanation, in contravention of longstanding USFS policy and practice (and without any known legal basis). While the USFS may claim certain groundwater rights for itself in Strawberry Canyon, those rights are separate and distinct from the water rights that BTB and its predecessors have relied on to support their water collections in Strawberry Canyon over the last century.

B. Specificity of Responses.

**"As noted in our meeting yesterday, your responses to my previous letters are not sufficient in detail both in regard to the current operations under your permit or for our consideration for future permitted operations. This is now the third time that I have emphasized the lack of sufficient detail in your responses. For that reason, I am glad that we had the opportunity to discuss why your answers were deficient and what further information is needed. As you work to provide me with sufficient detailed responses, please review my previous correspondence. You will see that the questions are designed to elicit responses that are quantitative in nature. Your answers should be tabular where appropriate."** (Letter at pp. 1-2)



BLUETRITON

---

           

Exhibit 3, P. 023

Exhibit 5

Page 219

*ATTACHMENT 1 – BTB Responses to USFS Demands*

---

*Page 3 of 7*

As we attempted to explain at the Meeting, this type of generalized response is not helpful to the process if the USFS's goal is to obtain the information requested. In some cases, the information sought by the USFS may be available. In other cases, that information may not exist. In any event, other than your information request with respect to the San Manuel Band of Mission Indians (SMBMI) as noted below, you have repeatedly refused to give any specifics as to how BTB's Detailed Submissions were deficient, or to specify what specific information you are seeking instead. Your summary dismissals of material as "insufficient," and your vague assertions of "where appropriate," do not appear to be intended to elicit useful information. BTB also strongly disputes your representation in the Letter that you provided any meaningful direction to BTB at the Meeting. We appreciate the USFS's eagerness to obtain the information requested, but we cannot provide information that the USFS refuses to specify.

For the avoidance of doubt, we believe that our responses were, in fact, appropriately detailed.

C. <u>San Manuel Band of Mission Indians</u>.

***"As we discussed, one area where detail is significantly lacking concerns the quantities of water that were delivered to the Tribe (the San Manuel Band of Mission Indians) in the past and will be delivered to the Tribe in the future. It is essential that, as the permittee, you provide a detailed account of the uses of this water. It is not appropriate to broadly categorize the water use as 'primarily industrial, domestic and irrigation uses.' While the Forest's knowledge of the uses of this property are incomplete, our records currently indicate no irrigated agricultural uses on the property. Nor are there any municipalities on the property. So far as we are aware there are no residences on the property. The existing hotel and conference facility is not currently being operated and is being maintained by a skeletal staff. Thus, there are no significant operations in these categories on the property that would justify the use of up to 8 million gallons of water per month. We require a detailed description of the use of the waters diverted to this property including quantities for each use. Both BlueTriton and the Tribe noted in response that unused waters are returned to the stream below the property. The Forest appreciates this, but both State law and Forest policy would indicate that water that cannot be put to a beneficial use should be bypassed at the point of diversion rather than being diverted only to be returned to the water course at a lower point. The intervening Forest lands should not be deprived of water that is not being put to a beneficial use on the Tribe's immediate property."*** *(Letter at p. 2)*

The SMBMI is a sovereign nation and distinct political entity, separate and apart from BTB. BTB has no legal authority to compel the SMBMI to disclose the specific details of its internal operations, and BTB is in no position to make any comments or representations with respect thereto. Nevertheless, BTB has engaged with the SMBMI on multiple occasions, and has asked them to respond to your demands for information. The SMBMI previously provided a substantial response to the USFS, which we attached to our Detailed Submissions, and which was delivered to the USFS. The SMBMI has now provided a second substantial response to the USFS, which we have attached hereto as <u>Exhibit A</u>.



            

Exhibit 3, P. 024

Exhibit 5                    Page 220

As noted above, the SMBMI is an unrelated third party over which BTB has no control. BTB's predecessor purchased all of the water rights to the Arrowhead Springs from the SMBMI's predecessor back in the 1930s, and agreed to deliver 20% of the flow through the pipeline in perpetuity under an ongoing contract. All consideration for this 20% flow was pre-paid back in the 1930s. Now BTB is obligated to continue making these deliveries to the SMBMI in accordance with the terms of the contract. It would be patently unreasonable to hold a vendor responsible for a customer's use of property after a sale is complete and the customer has taken delivery (and the vendor's control over the property has ended).

D.  <u>April 2024 Summary Report</u>.

> ***"One portion of your response that should be forwarded immediately is the April 2024 summary report that was not submitted by the May 15th deadline. This is a requirement of your permit and failure to report constitutes noncompliance." (Letter at p. 2)***

Thank you for noting this oversight. We believed that we had previously delivered the April 2024 report to the USFS, but upon further review, it appears that it was inadvertently omitted from our prior delivery of revised reports on May 14, 2024. Upon receipt of the full Letter from the USFS on May 30, 2024, BTB discovered the oversight and promptly delivered the April 2024 report to the USFS via email later that day. We apologize for any inconvenience.

E.  <u>Water Use Projections</u>.

> ***"Further detailed information about the projected uses of water withdrawn from Forest Lands is necessary to consider your application for a future permit. Specifically, please provide the information requested in my letter dated 18-Apr-2024." (Letter at p. 2)***

As explained previously, BTB collects percolating groundwater at Arrowhead Springs using a gravity-fed system of tunnels and boreholes. The system does not utilize any pumps or mechanized facilities to collect or transport water. Accordingly, the volumes collected from the system each month vary based on climatic and hydrologic conditions. Because collection rates and beneficial use quantities are dynamic, BTB is unable to predict with any certainty exactly how much water will be collected or delivered for any particular beneficial use at a given point in the future. Nor is it possible to accurately state the beneficial uses to be made from a particular borehole or tunnel; water collected at the boreholes and tunnels is commingled in the system, and the sources cannot be disaggregated when delivered (though the amounts collected from each source, and the amounts discharged at each discharge point, can generally be accounted for).

BTB maintains operational readiness of the Arrowhead Springs load station as part of our portfolio of springs supporting the Arrowhead Brand. Our business relies on optimal sourcing from the portfolio to meet factory and consumer requirements. We may or may not utilize specific sources until required for support. Water quality and operational readiness must be maintained.



           

Exhibit 5

Given these limitations (which were described in greater detail in the Detailed Submissions), we note that any projections that BTB provides will necessarily be rough approximations with no material benefit or usefulness to the USFS, and that the USFS's continued demands for them (despite these known and unavoidable shortcomings) seem quite arbitrary.  If the USFS has further ideas on this matter, we would be happy to schedule a technical discussion to discuss potential resolutions.

We are currently preparing monthly water use projections for Arrowhead Springs through the end of calendar year 2024.  These projections will be broken out by source and by month, and will be based on the last year of data.  We will plan to deliver these projections to you as soon as they are complete.

F.  <u>Summary Note on Line 57</u>.

*"To the extent that you believe your Summary Note on line 57 of your November 2023 Period Reporting Summary can be explained more clearly, please expound upon the Note."  (Letter at p. 2)*

We assume that this statement refers to the Transect 6 removal that we described at length in the Detailed Submissions.  Accordingly, we would like to reiterate that the removal of the Transect 6 infrastructure did not cause a reduction in flow and was not the cause of any high-bias readings.  In fact, no measurement challenges were experienced prior to 2022 at the Transect 6 facility, since pipeline pressures at that time were balanced from all sources with a stable flow regime.  However, as noted in our November 2023 reporting documentation, BTB's shutting-in of certain spring sources following the issuance of the SWRCB Order created pipeline hydraulic operating conditions never before encountered in Strawberry Canyon.  These new conditions included reduced flow in portions of the pipeline due to the discharge to atmospheric pressure and entrained air in the pipeline, creating turbulent flow and high bias readings.  As part of its normal maintenance and operation of the collection system, BTB was able to diagnose the root cause of the issue, and installed and adjusted pressure maintenance valves and air evacuation valves to resolve any measurement errors.  These modifications should provide for accurate measurement at the SMBMI meter going forward.

In sum, the temporary closure of certain sources in accordance with the SWRCB Order reduced flow, which was partially offset by an increase in flow associated with the removal of the Strawberry Station discharge point.  These changes, combined with the removal of the Transect 6 discharge point (per the USFS's request), created the imbalance in the system.  As noted above, these issues have now been resolved.

G.  <u>Decommissioning Plan</u>.

*"As we discussed, your decommissioning plan should be technical in nature, specifying the construction methods, access, ground disturbance, etc."  (Letter at p. 2)*

We previously delivered with the Detailed Submissions a concept decommissioning plan for the USFS's review.  We will be happy to deliver a more detailed and technical decommissioning plan, but as you know, this will take considerable time and effort (since it will include, among other things,



           

*Page 6 of 7*

appropriate photographs of all applicable locations, local topographic surveys, access and erosion control plans, restoration, etc.).  We will continue our efforts in preparing this plan (including preparing the associated materials), and will deliver it to the USFS in due course when complete.

We would like to reiterate that Section VIII(G)(4) of the existing permit concerns the decommissioning process and, by its plain terms, applies only to "water wells that are no longer needed or maintained."  BTB can confirm that all spring sources connected to BTB's collection and transmission system (including spring sources 7, 7A, 7B, and 7C) continue to be both needed and maintained in accordance with BTB's business and operational needs.

H.   Declaration Regarding Non-Use.

***At the Meeting, we recall that you made the following statements in connection with the discussion of the decommissioning plan (paraphrased to the best of our ability): (i) if drought conditions exist, then BTB should reduce all water collections to zero (regardless of BTB's underlying water rights); (ii) if BTB reduces water collections at any source to zero for any period of time (regardless of whether such reductions are the result of USFS-required testing, SWRCB-required orders, customary maintenance and operations, or any other reason), then such reduction to zero constitutes "non-use"; and (iii) any non-use at any source for any period of time gives rise to a legally-binding obligation that BTB immediately decommission and remove all physical infrastructure related to that source, and cease collections from that source on a permanent basis.***

These positions would constitute a radical departure from the parties' longstanding understanding of the terms of these special use permits over the last 90+ years.  We would appreciate you confirming (or correcting) our recollection, and providing a written explanation for these statements.

I.   Updated Operations and Maintenance Plan.

***"Please submit your Operations & Maintenance Plan (due 1-May-2024)."***

Per your request, we have attached as Exhibit B hereto BTB's draft Operating Plan for 2024.  We are currently working on preparing Attachments A, B, and C to the Plan, and will plan to deliver the fully compiled and executed Operating Plan to the USFS in due course when complete.

J.   Re-Delivery of Prior Submissions.

***"For the missing monthly hydro reports (2015 and later) and quarterly biological reports (since inception of AMP)."***

It is not entirely clear what this reference refers to, but given your express statements at the Meeting, we assume that you are referring to your contention that the USFS apparently has "zero" or "essentially zero" submissions from BTB (or its predecessors) in its permit file.  This is a surprising development, since BTB has delivered many dozens of deliverables to the USFS at its request over



           

Exhibit 3, P. 027

Exhibit 5                                     Page 223

*ATTACHMENT 1 – BTB Responses to USFS Demands*

---

*Page 7 of 7*

the past 9+ year period.  In fact, our February 2023 permit renewal application included an exhaustive accounting of the nearly 70 project submissions (including 40+ hydrological and biological submissions) delivered to the USFS over the past 9+ year period (including delivery dates).  If the USFS confirms that these documents have in fact gone missing, please let us know as soon as possible so that we can take any appropriate measures in response (particularly with respect to any confidential materials that may be included in the missing documents).

As noted above, the USFS's sudden demand to re-assemble and re-deliver 9+ years of 70+ project submissions within an 8-business day period is a heavy lift.  Having said that, we have endeavored to re-assemble and re-deliver as many of the requested materials as we have been able to locate within the 8-business day period allotted.  Please see Exhibit C attached hereto, which includes a link to a dataroom that includes as many of the requested materials as we have been able to locate within the 8-business day period imposed.  We will continue to work to prepare and assemble any remaining materials as quickly as possible, and will plan to re-deliver them to the USFS in due course on a rolling basis.

K.  Recorded Agreements.

**"Please provide a copy of the contractual agreement between BTB and the San Manuel Band of Missian [sic] Indians."**

Per your request, we have attached copies of the recorded agreements as Exhibit D hereto.  As noted in our Detailed Submissions, these documents have been recorded in the Official Records of San Bernardino County for nearly a century, and the USFS is deemed to be on record notice of the matters described therein.  Copies should also be available from the County Recorder's Office.



           

Exhibit 3, P. 028

Exhibit 5                                    Page 224

EXHIBIT A

ADDITIONAL INFORMATION SUBMITTED BY SMBMI TO USFS

Following BTB's discussions with the SMBMI regarding the USFS's requests for information outlined above, the SMBMI agreed to provide the following additional statement to the USFS:

*The Tribe understands that BlueTriton Brands ("BTB") has been asked by the United States Forest Service ("USFS") for information regarding the use of the water provided to the Arrowhead Springs property by BTB. The Tribe uses the water delivered by BTB at the Arrowhead Springs property for a variety of beneficial and reasonable purposes as has occurred historically. The property is large with a variety of facilities, including, but not limited to, a conference and event center, administration buildings, and recreational and cultural facilities. Such facilities are used by the Tribe daily, including use by tribal citizens, various governmental departments and their employees that are housed in the administrative buildings, and for events. The Arrowhead Springs property lies within the Tribe's ancestral territory. The Tribe is intimately tied to their ancestral lands as this landscape has and continues to play an important role in the Tribe's cultural traditions. The Tribe has a history of responsible land and resources management and conducts restoration of native habitat and fire management activities on this property. For example, the Tribe, USFS and County of San Bernardino have jointly participated in the development and implementation of fire protection plans that include the property and rely upon the use of water. In keeping with the Federal government's fiduciary duty to the Tribe and the federal and state policies recognizing tribal expertise in stewardship of ancestral lands and the water and other natural resources on such lands, the Tribe would be glad to speak further with the USFS on a government-to-government basis.*

*The Tribe has broad water rights claims, including, but not limited to, those acknowledged by the California State Water Resources Control Board in order WR 2023-0042 ("SWRCB Order"). The Tribe's submission of the above information to BTB regarding water delivery to and uses of such water at the Tribe's Arrowhead Springs property does not constitute a waiver of the Tribe's sovereign immunity nor is it an admission or waiver as to any finding of fact or legal conclusions, including those made in connection with BTB's Special Use Permit with the USFS (the "Permit") or the SWRCB Order, adopted by the California State Water Resources Control Board on September 19, 2023, and as stayed by the California Superior Court. The Tribe is not a party to, nor is it bound by the terms of the Permit or the SWRCB Order, and therefore, to the extent either refers to the Tribe's land ownership or water rights claims, they do not adjudicate, resolve, or quantify any of the Tribe's claims or rights as they relate to land and water.*



BLUETRITON

            

Exhibit 3, P. 029

Exhibit 5                                    Page 225

EXHIBIT B

DRAFT OPERATING PLAN

[Document Commences on Following Page]



           

Exhibit 3, P. 030

Exhibit 5                    Page 226

# OPERATING PLAN

ARROWHEAD SPRINGS

SAN BERNARDINO, CALIFORNIA



BlueTriton Brands, Inc.

Ontario, California

June 2024

Exhibit 3, P. 031

Exhibit 5

Page 227

# TABLE OF CONTENTS

OPERATING PLAN ................................................................................................................1

1.0    SCOPE ...............................................................................................................1

2.0    RESPONSIBILITY AND COMMUNICATION PROTOCOL...................................1

  2.1    Routine and Non-Routine Operation and Maintenance...............................1

  2.2    Emergency Maintenance ............................................................................2

  2.3    Medical Emergencies and Law Enforcement Incident/Criminal Activity......2

  2.4    Incident Notification ...................................................................................2

3.0    ACCESS TO WATER COLLECTION SYSTEM AND PROJECT AREA...............3

4.0    ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES .......3

5.0    NON-ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES ...4

6.0    EMERGENCY MAINTENANCE ACTIVITIES.....................................................4

7.0    HYDROLOGIC AND RIPARIAN STUDIES AND ADAPTIVE MANAGEMENT PLAN .................5

8.0    RESOURCE MITIGATION MEASURES .............................................................5

  8.1    Cultural and Historic Resources .................................................................5

  8.2    Water Quality.............................................................................................5

  8.3    Water Resources .......................................................................................6

  8.4    Riparian and Aquatic Resources ................................................................6

  8.5    Wildlife .....................................................................................................6

  8.6    Species of Concern....................................................................................6

  8.7    Sanitation .................................................................................................6

  8.8    Hazardous Materials ..................................................................................6

  8.9    Access for Hydrologic and Riparian Studies ...............................................6

  8.10   Helicopter and Drone Operations ...............................................................7

  8.11   Invasive Species .......................................................................................7

  8.12   Fire Prevention and Control .......................................................................7

9.0    ACCEPTANCE & APPROVAL ........................................................................7

Exhibit 3, P. 032

Exhibit 5                                Page 228

# ATTACHMENTS

Attachment A – Project Aviation Safety Plan

Attachment B – Routine Maintenance Activities

Attachment C – Fire Prevention and Control Plan

Operating Plan
Arrowhead Springs

ii

BlueTriton Brands, Inc.
Ontario, California

Exhibit 3, P. 033

Exhibit 5

Page 229

# OPERATING PLAN

For Operation and Maintenance of Water Collection and Pipeline Infrastructure in Conjunction with U.S. Department of Agriculture, Fores Service Special Use Authorization ID FCD728503 per Amendment 1, dated April 19, 2023 (District Ranger Michael Nobles).

**BlueTriton Brands , Inc. (Permittee)**

## 1.0    SCOPE

Permittee operates and maintains a spring water collection system and water conveyance pipeline located in the San Bernardino National Forest (SBNF) collectively known as Arrowhead Springs. Spring water collection infrastructure includes a total of ten horizontal boreholes located within four spring vaults and two spring water collection tunnels.  The aggregate length of the pipeline covered under this permit is approximately 4.5 miles.

BlueTriton Brands, Inc. (BTB) operates five communication sites associated with the spring complexes and pipeline.  The communication sites are co-located with the spring vaults and are operated for the purpose of transmitting monitoring data describing system performance and security information.  BTB also operates and maintains four helicopter landing areas.

Operation of the Arrowhead Springs water collection and conveyance system requires periodic maintenance activities and occasional large-scale maintenance activities.  The scope of operations and maintenance activities are described in this document.  This document includes implementation details of how the permittee will comply with permit terms and resource mitigation measures.

## 2.0    RESPONSIBILITY AND COMMUNICATION PROTOCOL

Efficient and accurate communication during operations and maintenance of this project is essential.  A clear and consistent communication protocol will help to ensure that any issue is quickly and satisfactorily resolved.

### 2.1    Routine and Non-Routine Operation and Maintenance

The Permit Administrator will be the primary contact for all activities, required notifications, and for coordinating approvals by the Authorized Officer, i.e. District Ranger, unless otherwise specified in the Project Aviation Safety Plan, Fire Prevention and Control Plan or as stated under Medical Emergencies and Law Enforcement Incidents below.

---

Exhibit 3, P. 034

Exhibit 5                                                                      Page 230

## 2.2 Emergency Maintenance

The permittee will notify and request approval from the Forest Service of any emergency work as soon as possible. The Permit Administrator shall also be the contact in emergency maintenance situations during Forest Service office hours. However, when the Permit Administrator cannot be reached, Permittee will contact the District Ranger for the area where the emergency exists. When emergencies arise after hours and/or on weekends, the Permit Administrator will be notified on the next normal workday.

## 2.3 Medical Emergencies and Law Enforcement Incident/Criminal Activity

Permittee calls 911 or Forest Service Dispatch for immediate assistance.

## 2.4 Incident Notification

The permittee will contact the Authorized Officer as soon as practicable after the occurrence of any of the following incidents on National Forest System lands covered by a special use authorization.

- *An incident resulting in death, permanent disability, or personal injuries that are life-threatening or that are likely to cause permanent disability.*

- *A search and rescue operation to locate a person.*

- *Any other incident that has high potential for serious personal injury or death or significant property, environmental, or other natural resource damage, including avalanches, landslides, flooding, fire, structural failures, and release of hazardous materials.*

| Role | Responsibility | Contact |
|---|---|---|
| Permittee Representative | Responsible for project execution and oversight and providing emergency and Incident notification. Completing required notifications. Obtaining required permits, approvals, and monitoring oversight | Mr. Tam Pham Senior Springs Resource (909) 229-1650 tam.pham@bluetriton.com |
| Forest Service Authorized Officer | Issue permit and ensure holder compliance with terms and conditions of the authorization. | District Ranger Michael Nobles 602 S Tippecanoe Avenue San Bernardino, CA 92408 (909) 382-2600 michael.nobles@usda.gov |
| Forest Service Special Use Administrator | Primary contact for permit holder. Responsible for administering permit per its terms and conditions. | District Ranger Michael Nobles 602 S Tippecanoe Avenue San Bernardino, CA 92408 (909) 382-2600 michael.nobles@usda.gov |
| Forest Service Dispatch | Receives reports emergencies and wildfires, communications for helicopter flights and, coordination and contact for law enforcement and EMS | (909) 382-2600 |

Operating Plan
Arrowhead Springs
2
BlueTriton Brands, Inc.
Ontario, California

Exhibit 3, P. 035
Exhibit 5
Page 231

## 3.0   ACCESS TO WATER COLLECTION SYSTEM AND PROJECT AREA

Access for all site activities including routine maintenance; emergency maintenance; and hydrologic, riparian, and habitat studies will require the following site access.

- *Helicopter flights.*

- *Vehicle access to the lower pipeline areas from SBNF Road 1N24.*

- *Drone flights for aerial photography to support riparian and habitat studies.*

- *Hiking trails along the pipeline alignment and hiking trails to/from the helicopter landing areas.*

Details and conditions pertaining to helicopter access and drone flight activity are provided in the Project Aviation Safety Plan included in Attachment A.

## 4.0   ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES

Routine maintenance activities are those that are scheduled and regularly carried out to ensure safe and efficient operation of the spring water collection infrastructure, and that do not include increased land occupancy or new ground disturbance.  Basic non-ground disturbing Operation & Maintenance work such as that described in this section is allowed, consistent with terms and conditions of permit, including its appendices and this approved Operating Plan, without prior notification to the authorized officer.

The typical maintenance activities are described in Attachment B.  Typical maintenance of water collection and pipeline facilities are not limited to the activities described in Attachment B.  Maintenance does not include expansion or increase in scope or intensity to the water system components but does include replacement or repair of facilities "in kind."

The working area is the area needed for temporary use when routine maintenance work is conducted on the existing improvements.  The following working areas, as described in Table 1, are approved for use during the term of the permit:

| Table 1 – Working Areas | |
|---|---|
| *Improvement* | *Working Area\** |
| Vault Structures | 5-feet around structures |
| Above-Ground Pipeline | 2.5-feet each side |
| Buried Pipeline and Road 1N24 | 10-feet each side |
| Trails | 3-feet each side |
| Helicopter Landing Areas | 30-foot radius circle |
| *\*Prior notification and approval from the authorized officer is required if any additional working area beyond the set distance is needed for routine maintenance activities.* | |

Road maintenance will be performed in accordance with Appendices C & D of the permit.

---

| | |
|---|---|
| Operating Plan | BlueTriton Brands, Inc. |
| Arrowhead Springs | Ontario, California |

Exhibit 3, P. 036

Exhibit 5                                    Page 232

## 5.0 NON-ROUTINE PIPELINE AND INFRASTRUCTURE MAINTENANCE ACTIVITIES

Prior Notification to Authorized Officer Is Required for Non-Routine Maintenance Activities or System Modifications or Upgrades.  At a minimum, permittee will notify authorized officer of any plans for any system upgrades, ground disturbing activities, vegetation clearing, or helicopter flights that are in addition to existing authorized facilities, operations, and/or specified working areas.  This requirement does not include emergency work, see also Section 6 , regarding Emergency Maintenance Activities.

- *Ground disturbing work and vegetation clearing in previously surveyed areas may be allowed and approved to proceed after notification, unless new listed species must be considered.*

- *BTB would also refresh resource surveys for ground disturbing work in previously surveyed areas when new listed species must be considered.*

- *Resource surveys for ground disturbing work in areas not previously surveyed are required and would be completed for Forest Service review and approval prior to beginning any ground disturbing work in these areas.*

- *As appropriate, the special use authorization would be amended with additional uses, activities, and terms and conditions.*

## 6.0 EMERGENCY MAINTENANCE ACTIVITIES

Extraordinary events, such as wildfire, torrential rains, earthquakes, debris flows, tree fall, vandalism, or other unforeseen conditions, may damage the pipeline and its structures and require atypical emergency maintenance.  When work on the system is required on an emergency basis, emergency repair to pipelines and structures is conditionally authorized under this new permit.

- *Permittee is required to notify and request approval from the Forest Service of any emergency work as soon as possible.*

- *Permittee is required to utilize previously approved temporary work areas to the extent such use is possible.*

Emergency maintenance necessary to maintain operation of the conveyance pipeline and to prevent resource damage may include an increased frequency and intensity of the maintenance activities described in Attachment B,  and additional related activities including removal of selected trees, additional helicopter flights, increased personnel presence on site, an increase in the number of supplies/equipment utilized, and greater than normal occurrence of some routine maintenance procedures.  Scheduling of standard operations and maintenance actions may be interrupted or conducted at different intervals based upon the demand generated by non-standard conditions.

Exhibit 3, P. 037

Exhibit 5

Page 233

## 7.0 HYDROLOGIC AND RIPARIAN STUDIES AND ADAPTIVE MANAGEMENT PLAN

Permittee has committed to conduct a series of hydrologic, riparian, and habitat studies. The studies are described in the Adaptive Management Plan (AMP), the Paired Basin Study Plan, and the Hydrologic Data Collection Plan documents which have been transmitted under separate cover. Monitoring Stations and Established Plots - Required monitoring of resource conditions in locations downstream from the authorized facilities will include installation of instrumentation. All sites will include simple markers for established plots and cross sections.

## 8.0 RESOURCE MITIGATION MEASURES

### 8.1 Cultural and Historic Resources

If cultural materials are uncovered during project implementation, federal and state laws require work be stopped immediately in that area until an archeologist can evaluate the findings and provide additional protection measures or mitigate the impacts. Because there is high archaeological sensitivity at two sites on 1N24 for about 1/2 mile, an archaeological monitor must be present when work is done on 1N24. Call the Permit Administrator to schedule this monitor as far in advance of road work as possible.

### 8.2 Water Quality

All activities will be conducted in a manner to achieve the water quality objective identified in the AMP. Activities will be conducted in accordance with the following Best Management Practices (BMP) provided in the USFS Technical Guide FS-990a. BMPs will be applied to all activities that include planned ground disturbance or construction activities in the project area. The following BMPs described in USFS Technical Guide FS-990a will be applied.

- *Fac-8 - Nonrecreational Special Use Authorizations.*

- *Fac-9 - Pipelines, Transmission Facilities, and Rights-of-Way.*

- *Aq-Eco-2 - AqEco-2. Operations in Aquatic Ecosystems.*

- *WatUses-4 - Water Diversions and Conveyances.*

- *Road-4 - Road Operations and Maintenance.*

Application of each specific BMP will be proposed to the Permit Administrator in conjunction with the work plans submitted for approval prior to ground disturbance or construction activities.

Operating Plan
Arrowhead Springs
5
BlueTriton Brands, Inc.
Ontario, California

Exhibit 3, P. 038

Exhibit 5
Page 234

## 8.3    Water Resources

The permittee will install shut-off valves, flow control devices, and wildlife drinkers as described in Appendix B of the permit. Permittee will also take actions identified in the AMP to achieve stated SBNF goals regarding water flows and riparian conditions.

## 8.4    Riparian and Aquatic Resources

The permittee will take actions identified in the AMP to achieve stated SBNF goals regarding water flows and riparian conditions.  The Transect 6 discharge was installed, and removed, at the request of the USFS.

## 8.5    Wildlife

The permittee will install two wildlife drinkers at locations described in Appendix B of the permit. Plans for these features will be submitted to the authorized officer for approval prior to installation.

## 8.6    Species of Concern

The permittee will avoid use of motorized equipment during limited Operating Periods (LOPs), as described in Appendix B, unless survey confirms that the species are not nesting.  LOPs and associated avoidance and minimization measures apply to all activities described in this document, AMP, Paired Basin Study Plan, and Hydrologic Data Collection Plan documents. Vegetation management work is prohibited during the LOPs described in the Resource Mitigation Measures.

## 8.7    Sanitation

Trash shall be removed daily during all on-site activities for the protection of wildlife.

## 8.8    Hazardous Materials

Refueling of equipment and storage of fuel and other hazardous materials will not occur within 100 meters of Riparian Conservation Areas (perennial and seasonal streams, seeps, springs, and meadows).

## 8.9    Access for Hydrologic and Riparian Studies

The Hydrologic and Riparian studies require the clearing of helispots in the East Twin Creek drainage to provide access for monitoring.  Up to three helispots (TC I through 3) within Section 36, Township 2 North Range 4 West (refer to the June 14, 2017, map in the project records) may be developed.  Up to 12 additional helicopter flights are permissible to support monitoring.

- *Helispots will be cleared of brush in a 20-foot by 20-foot area; however, no trees will be removed.*

- *Brush will be cleared along foot trail access routes from the helispots to East Twin Creek monitoring locations.*

Exhibit 5                                                                          Page 235

The authorized USFS officer will approve final locations for any helispots, and access routes developed for monitoring in East Twin Creek. Pre-work resource surveys will be conducted if required by the authorized officer. Approved access routes and helispots will be amended to, and become part of, Hydrologic and Riparian Studies Plans.

## 8.10   Helicopter and Drone Operations

The Project Aviation Safety Plan (Attachment A) describes both helicopter and drone (small Unmanned Aircraft System or sUAS) usage to complete the project activities described in AMP, Paired Basin Study Plan, and Hydrologic Data Collection Plan documents. The permittee will provide Notification to Permit Administrator and Unit Aviation Officer (UAO) prior to any flight to:

- *Determine if a LOP is needed for nesting/breeding bird season for flycatcher/vireo if determined to be present during the permit period;*

- *Avoid any concerns with other flights in area - de-conflict airspace if needed; and,*

- *Provide Federal Interagency Communications Center (FICC)/dispatch with information to track flight if needed during fire season. The permittee will communicate with FICC/dispatch the day of any flight to ensure positive radio communication with dispatch over assigned frequency at beginning of day/flights into area and to close out last flight/exit from area at end of day.*

The Permittee is responsible for reporting mishaps related to sUAS usage. Special Use Permit FCD728503 also describes additional responsibilities for recovery of hazardous material, equipment retrieval, and liability after a sUAS mishap. Permittee representatives responsible for contacting UAO are listed in Section 2 of this document.

## 8.11   Invasive Species

Invasive Species within the project area will be managed in accordance with the Weed Management Plan provided as an attachment to the AMP.

## 8.12   Fire Prevention and Control

A project-specific fire prevention and control plan is provided in Attachment C of this document.

## 9.0   ACCEPTANCE & APPROVAL

This plan will be reviewed periodically and will be revised to reflect changed condition, except for the Project Aviation Plan, which will be submitted annually to the authorized officer for approval by the SBNF Aviation Officer.

Signatures appear on the next page.

_____

Tam M. Pham

Senior Springs Resource

BlueTriton Brands, Inc.

_____

Louis W. Mixon, III

Senior Natural Resource Manager

BlueTriton Brands, Inc.

_____

District Ranger Michael Nobles

US Department of Agriculture, Forest Service

_____

Operating Plan
Arrowhead Springs

8

BlueTriton Brands, Inc.
Ontario, California

Exhibit 3, P. 041

Exhibit 5

Page 237

EXHIBIT C

RE-DELIVERY OF PROJECT SUBMISSIONS

BTB-USFS - Previous Project Submissions
Password: Hunton1901
https://hunton.egnyte.com/fl/C6JZCrY8rd



            

Exhibit 3, P. 042

Exhibit 5                    Page 238

Exhibit D

Recorded Agreements

[Documents Commence on Following Page]



           

Exhibit 3, P. 043

Exhibit 5                    Page 239

STATE OF CALIFORNIA    )
                       )SS
COUNTY OF SAN BERNARDINO)

On this 19th day of July, A.D.,1930, before me, M. E. Crane, a Notary Public in and for said County and State, personally appeared Walter H. Holt and Margaret B. Holt, his wife, known to me to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

(NOTARIAL SEAL)                         M. E. Crane

                                        Notary Public in and for said County and State

No. 3, "Endorsed" Recorded at request of SECURITY TITLE INS. & GUARANTEE CO. Aug. 21, 1930, at 9 A.M. in book 643, page 121, Official Records, San Bernardino County, Calif. Fulton G. Feraud, County Recorder, by Eva Bemis, Deputy. Fee $1.00.

                                Compared

                        A.Larmore      M. Smith

                                o o o o

s. :  /11b E. :- 703
      : 137 " 422 "  "
      : 132 " 72  "  "

THIS AGREEMENT made and entered into this 6th day of August, 1930, by and between ARROWHEAD SPRINGS CORPORATION, a corporation organized and existing under and by virtue of the laws of the State of Delaware duly qualified to do business in the State of California (hereinafter called "Arrowhead"), and CALIFORNIA CONSOLIDATED WATER COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California (hereinafter called "Consolidated"),

WITNESSETH: THAT, WHEREAS, on the 4th day of December, 1928, Charles J. Anthony entered into a certain agreement with California Consumers Company, a Delaware corporation, relative to the purchase by California Consumers Company from Arrowhead of certain real estate, personal property, water and water rights of Arrowhead, all as more particularly described in said agreement and in certain exhibits and schedules attached thereto and made a part thereof; and

WHEREAS, on the said 4th day of December, 1928, the said Charles G. Anthony and California Consumers Company entered into a certain agreement amending the agreement as above described, which latter agreement was entitled "Amendatory Contract", and, among other things, amended paragraph eleventh of said contract first above described; and

WHEREAS, subsequent to the said 4th day of December, 1928, the said contract so entered into by and between Charles G. Anthony and California Consumers Company was fully approved and ratified by Arrowhead, as if the same had been originally entered into by the duly authorized officers of Arrowhead and was fully approved by stockholders of Arrowhead; and

WHEREAS, on the 19th day of December, 1928, the said Charles G. Anthony, California Consumers Company and Arrowhead entered into a contract entitled "Second Amendatory Contract", further amending said contract of December 4, 1928, as amended by the amendatory contract; and

WHEREAS, on the 28th day of February 1929, Arrowhead and Consolidated entered into an agreement relative to the carrying out of said agreements aforesaid, and containing additional

CaSas2e2542dv-0907283JGEGB-DTB DoDonunenet6533B-10-FileFiled1/03/25/25PagPeagZe4ff63of 1P8ge Page #D2243

covenants and agreements thereto; and

WHEREAS, all right and interest of California Consumers Company in and to said contract, said mandatory contract and said second amendatory contract were, subsequent to the execution thereof, transferred by California Consumers Company to Consolidated; and

WHEREAS, subsequently Arrowhead made, executed and delivered to Consolidated certain bills of sale, assignments and other instruments in consummation of the terms of said agreements and particularly a certain warranty deed, which deed was recorded on the 12th day of May, 1929 in Book 476, page 175, Official Records of San Bernardine County, California, which warranty deed granted to Consolidated, among other things, certain easements and water rights belonging to Arrowhead situate in San Bernardine County, California; and

WHEREAS, since the execution and delivery of said instruments and warranty deed a controversy has arisen between the parties hereto as to the character and amount of water to which Consolidated is entitled under the terms of said contracts and said deed, and as to the character and amount of water which Arrowhead has retained under said contracts and deed, and during such controversy each of the parties hereto has made such examination of the said premises of Arrowhead and contiguous properties with reference to the amount and flow of water, both surface and sub-surface, thereon and thereunder, as to satisfy it in the execution of this agreement; and

WHEREAS, the parties hereto now desire to enter into an agreement for the purpose of completely compromising and settling all disputes, controversies and matters of every kind and nature as between the parties relative to the amount of water to be received by Consolidated and the amount of water to be retained by Arrowhead,

NOW, THEREFORE, for the purpose of fully compromising and settling all of said questions of every kind or nature, and for and in consideration of the premises and of the covenants and agreements herein contained, the parties hereto do agree as follows:

First: Consolidated agrees that it will, as soon as practicable after the execution of this agreement, and at its own cost and expense, construct and build a pipe line at least three inches outside diameter from the intake of the present pipe line of Arrowhead in Strawberry Canyon, constructed in 1929, to the springs located in upper Strawberry Canyon, twelve thousand three hundred (12,300) feet, more or less, north of the present pipe line intake of Arrowhead in Strawberry Canyon, and also that it will construct a pipe line of at least three inches outside diameter from the end of said pipe line in Strawberry Canyon belonging to Arrowhead one hundred (100) feet north of the tunnel in Cold Water Canyon to a point ten (10) feet north of the existing storage reservoir, having dimensions of 50 x 100', belonging to Arrowhead, back of the existing hotel building of Arrowhead, and also that it will construct a pipe line from the said reservoir to storage tanks and leading depot owned and operated by Consolidated west of Hot Water Canyon.

Second: Upon the completion of said pipe line by Consolidated, it may thereafter, without interference from Arrowhead, conduct all water developed by it in Strawberry Canyon through the pipe line so constructed by it, and also through the present pipe line constructed in 1929 by Arrowhead, which latter pipe line consists of six inch, four inch and three inch outside dimension steel pipe, and Arrowhead hereby grants Consolidated an easement to use for the purpose aforesaid Arrowhead's said pipe line and any line, whatever the size thereof, constructed by way of replacement thereof or substitution therefor. Of the water so developed and conveyed through said pipe line, Consolidated shall be entitled to one-half thereof, and Arrowhead shall be entitled to one-half, and the point of delivery of that portion of said water to which Arrowhead is entitled shall be the point in said pipe line ten (10) feet north of the said rectangular reservoir having a dimension of 50 x 100', back of the hotel building of Arrowhead. The method of measurement of said water, so that both Consolidated and Arrowhead shall receive their proper proportionate part thereof, shall be agreed upon by and

124

between an engineer designated by Arrowhead and an engineer designated by Consolidated. If the two engineers so designated shall fail to agree, then they shall designate a third engineer who shall be impartial and the decision of any two of the three engineers then designated shall be binding upon the parties hereto as to the method of measurement of said water.

Arrowhead hereby grants to Consolidated (without any warranty whatsoever, except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein) the sole and exclusive right to develop water from any and all sources whatever, whether surface, subterranean, seepage or otherwise, in Strawberry Canyon, and whether within or without the real properties now owned by Arrowhead, and hereby grants to Consolidated (without any warranty whatsoever, except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein) one-half of all water developed from any and all sources whatever in Strawberry Canyon, reserving to itself one-half of all such water.

Third: The pipe line above referred to, that is to say, that portion thereof constructed by Consolidated and that portion thereof constructed in 1929 by Arrowhead and now belonging to it, shall continue to be maintained at all times hereafter by Consolidated, at its own cost and expense, but Consolidated shall not be required to replace the whole, or any portion, of the said pipe line constructed by Arrowhead in 1929 and above referred to. Consolidated shall make all replacements required in that portion of said pipe line constructed or to be constructed by it, and Arrowhead shall make all replacements required in that portion of said line constructed by it. The officers, agents and representatives of each of said parties shall at all times have the right to inspect all springs, pipe lines, structures and measuring devices without interference from the other party.

Fourth: If at any time Consolidated is not using, selling, distributing or storing all of the one-half of the water flowing through said pipe line to which it is entitled hereunder, Arrowhead shall have the right to use for domestic purposes, human consumption, irrigation purposes or such other beneficial use upon its property as it may deem suitable, that portion of said one-half of such water not used, sold, distributed or stored by Consolidated, and whenever the storage facilities of Consolidated are full and can receive no more water without overflow, then Arrowhead shall be conclusively deemed to be entitled to the use, for the purposes aforesaid, of that portion of the water in said pipe line to which Consolidated is entitled hereunder but which Consolidated is not using, selling, distributing or storing, until the storage facilities of Consolidated can receive such water. If at any time Arrowhead is not using for domestic purposes, human consumption, irrigation purposes or such other beneficial use upon its property as it may deem suitable, all of the one-half of the water flowing through said pipe line to which it is entitled hereunder, Consolidated shall have the right to use, sell, distribute and store the portion thereof not used by Arrowhead. Consolidated agrees that it shall not be deemed to be using, selling or distributing water, within the meaning of this Paragraph Fourth or of Paragraph Sixth below, which is used for irrigation purposes outside of the watershed in which such water is obtained or which is used for irrigation purposes within such watershed upon real property not owned by Consolidated at the time of such use.

Fifth: In consideration of the premises, Consolidated does hereby wholly release, surrender and quitclaim unto Arrowhead any right whatsoever which it may have obtained by virtue of said contracts and/or said warranty deed, or otherwise, to any surface or sub-surface water existing in Cold Water Canyon within or outside of the boundaries of the real estate owned by Arrowhead.

Sixth: Consolidated agrees that Arrowhead shall have the right to use for domestic purposes, human consumption, irrigation purposes or such other beneficial use upon its property as it may deem suitable, that portion of the water developed and owned by Consolidated

Exhibit 3, P. 046

Exhibit 5                                                                 Page 242

CaSeS2:542cv-0907283565B-TBTB DoDocument 0653-10 File Filed 01/03/25 25 Page 22 of 836 f 108 ge Page # 22 345

in Waterman Canyon not used, sold, distributed or stored by Consolidated, and whenever the storage facilities of Consolidated are full and can receive no more water without overflow, then Arrowhead shall be conclusively deemed to be entitled to the use, for the purposes aforesaid, of that portion of said water which Consolidated is not using, selling, distributing or storing, until the storage facilities of Consolidated can receive such water.

Seventh: Arrowhead and Consolidated agree that their respective engineers shall as early as practicable determine the exact descriptions for perpetual easements in favor of Consolidated in respect of additional reservoirs, pipe lines, tunnels, collecting basins and similar facilities as may be hereafter needed by Consolidated, its successors or assigns, in so far as it may be feasible to determine such descriptions at this time. When such descriptions shall have been determined, Arrowhead agrees to grant to Consolidated perpetual easements in respect thereof, and to grant such additional perpetual easements, not limited by specific description, as may be reasonable in order to assure to Consolidated, its successors and assigns, the right to develop, collect, store and distribute water in accordance with the warranty deed, as modified by this agreement; and thereupon Consolidated agrees to quitclaim to Arrowhead the perpetual easement granted to Consolidated in said warranty deed in the following words:

"Also a perpetual easement to lay, construct, erect, use, operate, maintain, repair and replace necessary additional reservoirs, pipe lines, tunnels, collecting basins and similar facilities as may be hereafter needed by the grantee, its successors or assigns, in, on and across other property of the grantor, hereinafter described."

reserving and excepting, however, the easements to be granted by Arrowhead to Consolidated as provided in this paragraph Seventh.

Eighth: It is understood and agreed that notwithstanding any expression in said contracts and/or deed to the contrary, Consolidated shall not have the right to use any hot water arising on the property owned by Arrowhead that would interfere in any manner with the use of said water by Arrowhead, whether said water at the time of such use by Arrowhead is hot or cold, and Consolidated does hereby release and quitclaim unto Arrowhead any right to the use of hot water, except as aforesaid, which it may have obtained by virtue of any expression in said contracts and/or warranty deed.

Ninth: Notwithstanding any expression in said warranty deed, Consolidated shall not be entitled to any water flowing from Indian Springs and/or from the tunnels located at and adjoining said springs, except such surplus of said water as may exist after Arrowhead has made use of the same for all drinking and culinary purposes in and about its hotel, bungalows and out-buildings, and Consolidated does hereby release and quitclaim unto Arrowhead any right to the use of said water from Indian Springs and/or tunnels adjacent thereto, which it may have obtained by virtue of said contracts and/or warranty deed, except the right to the surplus above described. Consolidated hereby quitclaims to Arrowhead a perpetual easement to use, operate, maintain, repair and replace the Indian Springs pipe line of Consolidated, and Arrowhead agrees to maintain said pipe line and replace the same in whole or in part when and as often as it or any part thereof becomes worn out.

Tenth: In consideration of the foregoing and of all the contracts and to warranty deed described in the recitals of this agreement, it is hereby expressly covenanted and agreed by and between the parties to this agreement that this final adjustment and modification of the said contracts and warranty deed shall operate as and be the final adjustment of all obligations and liabilities in respect of water rights if anywise arising out of any or all previous negotiations, liabilities and agreements between the parties hereto, or may of their respective predecessors in interest, officers and/or agents, and each of the parties hereto does hereby release and discharge the other of and from any and all causes of action which have arisen between the parties hereto in respect of water rights, or on account of which either of the parties hereto may be liable to the other in respect of water rights, and this final agreement

CaSase 2:42-cv-09072835-GB-TBT B Document 653-10 Filed 01/03/25 Page 30 of 136 Page
Page #D22846

shall and does entirely absolve each of the parties hereto from any suit or claim to be made
or asserted by either of the parties against the other in respect of water rights, except for
matters hereafter arising based on this agreement or on said warranty deed as modified hereby.
Except as modified hereby, however, said warranty deed and each and all of the agreements,
terms and provisions thereof, shall be and remain in full force and effect.

IN WITNESS WHEREOF, the said parties have caused this instrument to be executed by their
respective officers, thereunto duly authorized, and their respective corporate seals to be
hereto affixed the da, and year first above written.

(CORPORATE SEAL)
       ARROWHEAD SPRINGS CORPORATION
       By C. M. Rice, Vice President
       And J. O. Macfarland, Assistant Secy.

(CORPORATE SEAL)
       CALIFORNIA CONSOLIDATED WATER COMPANY
       By T. W. Brown, Vice Pres.
       And C. A. Warne, Asst. Sec'y.

STATE OF CALIFORNIA )
       ss
COUNTY OF LOS ANGELES)

On this 6th day of August, 1930, before me, Mary S. Alexander, a notary public in and
for the said county and state, residing therein, duly commissioned and sworn, personally
appeared C. M. Rice, known to me to be the Vice president and J. C. Masfarland known to me
to be the Assistant Secretary of ARROWHEAD SPRINGS CORPORATION, one of the corporations
that executed the foregoing agreement known to me to be the persons who executed the fore-
going agreement on behalf of such corporation and acknowledged to me that such corporation
executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

(NOTARIAL SEAL)
       Mary S. Alexander
       Notary Public in and for the County of
       Los Angeles, State of California

STATE OF CALIFORNIA )
       ss
COUNTY OF LOS ANGELES)

On this 6th day of Aug. 1930, before me, Olive M. Peters, a notary public in and for
the said county and state, residing therein, duly commissioned and sworn, personally appeared.
T. W. Brown known to me to be the Vice president and C. A. Warne, known to me to be the Ass't.
secretary of CALIFORNIA CONSOLIDATED WATER COMPANY, one of the corporations that executed the
foregoing agreement, known to me to be the persons who executed the foregoing agreement on
behalf of such corporation and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day
and year in this certificate first above written.

(NOTARIAL SEAL)
       Olive M. Peters
       Notary Public in and for the County of
       Los Angeles, State of California

No. 92, "Endorsed" Recorded at request of ATTORNEY, Aug. 21, 1930, at 11:30 A.M. in
book 648, page 122, Official Records, San Bernardino County, Calif. Fulton G. Faraud, County
Recorder, by Eva Demia, Deputy. Fee $3.30.

       Compared
   A.Larmore     N. Smith
     · · · · · ·

Exhibit 3, P. 048
Exhibit 5
Page 244

GRANT DEED

CARRIE THOMAS, a widow, in consideration of Ten Dollars, to her in hand paid, the receipt of which is hereby acknowledged, does hereby GRANT TO Ethel Thomas, a single woman, all that real property in the County of San Bernardino, State of California, described as:

The South half of Lot 185, in Baldwin Lake Tract No. 1979, as per plat of said Tract of record in the office of the County Recorder of said County in Book 25 of Maps, at page 71 thereof.

SUBJECT TO taxes, assessments, conditions, restrictions, reservations, easements, rights and rights of way of record.

TO HAVE AND TO HOLD to the said grantee, her heirs or assigns forever.

WITNESS my hand this 16th day of October, 1934.

Consideration less than $100.                    Carrie Thomas

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES    } ss

On this 16th day of October, 1934, before me, the undersigned, a Notary Public in and for said County, personally appeared Carrie Thomas, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same.

WITNESS my hand and official seal.

(NOTARIAL SEAL)                    Wallace O. Miller

                                   Notary Public in and for said County and State

No. 55. "Endorsed." Recorded at Request of Grantee, Dec 3 1934 at 31d12 A. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif. Wilbur S. Barndt, County Recorder, By A. R. Schultz, Deputy.

                                   Compared

              F. Cooley                 R. Adams

                         o o o o o

THIS AGREEMENT made and entered into this 15th day of September, 1932, by and between ARROWHEAD SPRINGS CORPORATION, LTD., (formerly Arrowhead Springs Corporation), a corporation organized and existing under and by virtue of the laws of the State of California, duly qualified to do business in the State of California, (hereinafter called "Arrowhead") and CALIFORNIA CONSOLIDATED WATER COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California, (hereinafter called "Consolidated"),

WITNESSETH:

WHEREAS, on the 6th day of August, 1930, the parties hereto entered into a certain agreement, which agreement was thereafter recorded in the office of the County Recorder of San Bernardino County, California, in Book 608, at page 122 of Official Records of said County; and

WHEREAS, the parties hereto have determined to enter into a new agreement, whereby each will acquire certain rights and will agree to perform certain obligations distinct and different from the rights and obligations existing under or on account of said agreement of August 6, 1930, (which agreement, for convenience, will be hereinafter referred to as the "principal agreement"),

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the parties hereto do agree as follows:

First: Consolidated agrees that it will forthwith, upon the execution of this agreement, and at its own cost and expense, develop to the fullest reasonable extent all springs,

CaSes2:542cv-0907283JGLGB-TBTB DoDocumen66538-10File File01/03/26/25PagPage 32 of136 f 1P8ge
Page #D23848

304

seepages and other sources of water, if reasonably available, arising in Strawberry Canyon and all lateral canyons opening into the south side, lying north of the westerly line of the south half of Section 31 and of Section 32, Township 2 South, Range 3 West, S.B.B. & M., and produce and continue to furnish with renewed or water sufficient water to fill the pipe line built by Consolidated, subject and in accordance with the terms of said principal agreement, in conformity thereto is continued.

Second: Consolidated shall hereafter at all times develop all water developed and saved by it in Strawberry Canyon, and in the Strawberry Canyon authority of established in paragraph First hereof, through the said pipe line, and agrees that all of the water so developed, saved and produced by it shall then receive of supply shall be conducted through said pipe line, and not otherwise, to the point of delivery hereinbefore referred to. Of all such water so developed and saved and conveyed through said pipe line, Consolidated shall be entitled to eighty per cent (80%) of the constant flow thereof and Arrowhead shall be entitled, without cost, to twenty per cent (20%) of the constant flow thereof. The point of delivery of said 20% of said water to which Arrowhead is entitled (which is the point of delivery referred to hereinbefore in this paragraph) shall be a point in the aforesaid pipe line ten (10) feet north of the rectangular reservoir having dimensions of 50 x 100 feet back of the hotel building of Arrowhead. The method of measurement of said water, so that both Consolidated and Arrowhead shall receive their proportionate part thereof, as hereinafter set out, shall be agreed upon by and between an engineer designated by Arrowhead and an engineer designated by Consolidated. If the two engineers so designated shall fail to agree, then they shall designate a third engineer, who shall be impartial, and the decision of any two of the three engineers thus designated shall be binding upon the parties hereto as to the method of measurement of said water.

Third: Arrowhead grants to Consolidated any and all right, title or interest which Arrowhead now has to develop water from any and all present whatever, whether surface, subterranean, seepage, or otherwise, in Strawberry Canyon and the lateral canyons northerly of the said northerly line of the said South half of said Sections 31 and 32 above described.

Arrowhead also grants to Consolidated all right, title or interest which it now has or heretofore had in or to the title to, or ownership of, any and all water that Consolidated has heretofore or may hereafter develop from any and all sources whatsoever in Strawberry Canyon and lateral canyons northerly of said northerly line of the south half of said Sections 31 and 32; subject, however, to the right of Arrowhead to have delivered to it by Consolidated at the point of delivery aforesaid, twenty per cent (20%) of all such water developed and saved by Consolidated.

The aforesaid grants are without warranty except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein.

If, within three (3) years from the date of this agreement, Consolidated does not develop a flow of water in Strawberry Canyon and/or various lateral to it, southerly of said line above established, additional to the flow of water developed by Consolidated northerly of said established line, then Arrowhead shall be exclusively entitled, so far as Consolidated is concerned, to develop and produce such additional flow of water at any and all places southerly of said established line; provided that such development and production of water shall not affect or impair the right of Consolidated to develop and produce water northerly of said established line. In the event of the development of any water southerly of said established line, by either party hereto, and northerly of the

Case 2:42-cv-09712-GB-JTB   Document 6538-10   Filed 01/03/25   Page 52 of 108   Page ID #23849

south section lines of said Sections 31 and 32, ............ and Consolidated shall ...... be entitled to an equal one-half part thereof. In the event of the development by ......... of any water southerly of the south section line, of Sections 31 and 32, ............ shall be entitled to the whole thereof, so far as Consolidated is concerned.

Fourth: It is understood and agreed that all of the covenants, terms and conditions of paragraph Fourth of said principal agreement are hereby agreed to and ratified, except that the same shall be deemed to have been amended so as to constitute the words ......... per cent (80%) of the water flowing through said pipe line" wherever reference is made to the water to which Consolidated is entitled, in lieu of the words "one-half of the water flowing through said pipe line," and except that the same shall be deemed to have been amended so as to substitute the words "twenty per cent (20%) of the water flowing through said pipe line' wherever reference is made to the water to which Arrowhead is entitled, in lieu of the words "one-half of the water flowing through said pipe line."

Fifth: Consolidated agrees that upon the execution of this agreement it will pay to Arrowhead the sum of fifteen thousand dollars ($15,000.00) towards the development by Arrowhead of water in Cold Water Canyon. Arrowhead agrees that said payment of $15,000.00 was induced by its promise, which it hereby ......... itself to perform, to actually commence the development of water in said Cold Water Canyon within one (1) year from the date hereof, and at its own cost (not exceeding ......... of $25,000.00) to diligently prosecute such work to completion; such work to be done in such manner and to involve the construction of such pipe lines, reservoirs and other ......... as Arrowhead may deem advisable.

Sixth: Except as amended hereby, said principal agreement shall not be affected hereby and each and every sentence, clause or paragraph of said principal agreement not amended hereby, and with which this agreement is not inconsistent, and particularly paragraphs Third, Fifth, Sixth, Seventh and Ninth of said principal agreement, are hereby reaffirmed, and the parties hereto agree that said paragraphs shall not in anywise be affected by anything contained in this agreement.

Seventh: Arrowhead does hereby grant, without ........., to Consolidated the right to use one miner's inch constant flow of the water arising from Penygual Springs, or from other springs in the vicinity thereof, but not for ......... all mineral medicinal water, and does also hereby grant to Consolidated the ......... for a pipe line to use from said Penygual Springs or vicinity to the ......... of Consolidated, the above described and description of such easement to be hereafter ......... upon by the parties hereto. Consolidated does hereby agree that it shall not have the right to the hot ......... existing on the property of Arrowhead Springs Corporation, Ltd., other than the one miner's inch above described in this paragraph.

Eighth: WHEREAS, Consolidated has stated to Arrowhead that certain false and fraudulent representations were made by Arrowhead and/or by certain of its officers, agents and/or employee prior to and at the time of the purchase by Consolidated and/or California Consumers Company, its predecessor in interest, of the properties and business as set forth and described in that certain agreement of the 4th day of December, 1926, the Amendatory Contract of the same date, the Second Amendatory Contract of the 19th day of December, 1926, and the agreement of February 26, 1929, which agreements are recited in the principal agreement of August 6, 1930, and that Consolidated and California Consumers Company, its predecessor, relied upon such false and fraudulent representations in the making of all of such agreements and in the purchase of said properties; and

WHEREAS, Arrowhead has denied that any of such false or fraudulent representations were so made by it, or any of its officers, employees or agents, and the parties hereto desire to fully release and discharge any and all claims and causes of action arising on

506

account of any such alleged false or ~~~~~~~~~

NOW, THEREFORE, for and in con~~~~~~~~~ ~~~ of the ~~~~~~~, ~~~~ and provisions of this agreement, the parties ~~~~~ by ~~~~ fully and ~~~~~~~ ~~~~~ and discharge each other of and from any and all ~~~~~ of action, claims, ~~~~~ or obligations arising out of or on account of any ~~~~~~~~~, false, ~~~~~~~ or otherwise, of any kind or nature, made or alleged to ~~~~ ~~~~ ~~~~ by either ~~~~~ ~~~~~, or any of their respective officers, agents or ~~~~~, in con~~~~ion with or ~~~~~~ ~~, or otherwise affecting or having to do with, the ~~~~~ of the business and property of Arrowhead to Consolidated or to California ~~~~~~~ ~~~~~, a corporation, or in connection with the amount of water developed or to be ~~~~~ ~~~ the prosecution of ~~~~~ or the amount of water sold by it, or the ~~~~ of said ~~~~~, or in connection with the execution of said principal agreement and/or ~~~~~~~~~~, and do hereby release and discharge each other from any and all other ~~~~~~~~, claims of action, claims or demands of every kind or nature whatsoever arising out of, or on account of, or in any manner connected with, the sale by Arrowhead to Con~~~~~~~, or to California Consolidated Company, of its water distribution business and certain ~~~~~ ~~~~~, as provided in said agreement of the 4th day of December, 1923, and ~~~~~~~ ~~~~~~~ hereinafter designated, except such as are contained in, or arise out of, or on ~~~~~ ~~ the following:

(a) The warranty deed of February 27, 19~~, ~~~~~~~ on the 12th day of May, 1920, in Book 476, Page 175 of Official Records of San ~~~~~~~~ County, California, as ~~~~~~ by said principal agreement of August 6, 1923;

(b) The principal agreement of August 6, 19~~, in connection with this agreement;

(c) The agreement dated January 2, 19~~, entitled by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "~~~~~~~ for Agreement," as ~~~~~ by agreement of even date herewith.

(d) The agreement dated August 6, 19_0, entitled by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "~~~~~ Shareholders Agreement," as amended by agreement of even date herewith.

(e) This agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their respective officers, thereunto duly authorized, and their respective corporate seals to be hereto affixed, the day and year first above written.

(CORPORATE SEAL)

   ARROWHEAD SPRINGS CORPORATION, LTD.

By G. M. Rice, Vice-President

And J. S. ~~~~~~~~, Assistant Secretary

(CORPORATE SEAL)

   CALIFORNIA CONSOLIDATED WATER COMPANY

By S. C. ~~~~~~~~, Exec. Vice President

And G. A. Munns, Asst. Secretary

Prepared by _
Attorney's Approval
Pillsbury, Madison & Sutro By _
Other Attorneys _
or Lawier Dennen _
Form previously approved by
Description approved J. Paul Jones
(R. of T. Approval _
Approved _
Approved _
Manager's Approval for Execution _

STATE OF CALIFORNIA }
         } ss
COUNTY OF LOS ANGELES }

On this 26th day of September, 1931, before me, Mary S. Alexander, a notary public in and for the said county and state, residing therein, duly commissioned and sworn, personally appeared G. M. Rice, known to me to be the Vice-President, and J. S. ~~~~~~~~, known to me to be the Assistant Secretary of ARROWHEAD SPRINGS CORPORATION, Ltd., one of

Exhibit 3, P. 052

Exhibit 5        Page 248

CaSe 2:242v-097283563EGB-TBTB Document 6533-10 Filed 01/03/25 Page 436 of 108 Page #23351

F. Cooley                    R. Quinn

O D D O O

TO ALL WHOM IT MAY CONCERN:

NOTICE is hereby given that I, H. H. Eastwood, am the owner of certain premises described as follows, to-wit: Lot 34, Block 50, ... of ... recorded in Book 34, page 76 of Official Records of San Bernardino County, State of California; that I have obtained knowledge that building is in course of construction ... upon that new said; have not elapsed since I obtained this knowledge; ... not be responsible for the construction of said building, or for the material or materials ... used therein, or for any alteration or repair thereof, or for any work done upon said building, or any addition thereto, or which has been performed, furnished or used in any manner or any upon said land, or upon the building thereon, or addition thereto, or which may hereafter be performed, furnished, or used upon said land, or building, or addition thereto, or for any service of any architect.

THAT HAL WILSON and MORTIMER WILSON are the purchasers of said property under a contract of purchase.

THAT ___ is the lessee of said property.

No. and Street ___                    H. H. Eastwood

STATE OF CALIFORNIA       }
                          } ss
COUNTY OF SAN BERNARDINO  }

H. H. Eastwood being duly sworn deposes and says: That the above and within notice is a true copy of a notice posted on lot 34, block 50, tract 3489. Records of San Bernardino County, California, on the third day of December, 1934 by H. H. Eastwood and that the facts therein stated are true of his own knowledge.

H. H. Eastwood

Subscribed and Sworn to before me this 3rd day of December, 1934.
(NOTARIAL SEAL)                    Mac A. C. Fanning

Notary Public in and for said County and State

STATE OF CALIFORNIA       }
                          } ss
COUNTY OF SAN BERNARDINO  }

On this third day of December, A. D., 1934, before me, Mae A. C. Fanning, a Notary Public in and for said County and State, personally appeared H. H. Eastwood known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

the corporations that executed the foregoing dedication, known to me to be the persons who executed the foregoing agreement on behalf of such corporation, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Mary S. Albuquerque

(NOTARIAL SEAL)                              Notary Public in and for the County

of Los Angeles, State of California

No. 70. "Endorsed." Recorded at Request of G. M. Shaw, Dec 3 1954 at 1:01 P. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif. Fulton G. Darrell, County Recorder. By A. R. Schultz, Deputy. Fee $1.10.

# EXHIBIT 4

# San Manuel Band of Mission Indians

July 30, 2024

Danelle Harrison, Forest Supervisor
San Bernardino National Forest
U.S. Forest Service
U.S. Department of Agriculture
602 S Tippecanoe Avenue
San Bernardino, CA 92408

Michael Nobles, Front Country District Ranger
San Bernardino National Forest
U.S. Forest Service
U.S. Department of Agriculture
602 S Tippecanoe Avenue
San Bernardino, CA 92408

**Re:** **Formal Request for Government-to-Government Consultation with USDA, USFS, and San Bernardino National Forest Regarding Termination of Special Use Permit FCD728503 and Formal Request for Recission of Such Termination, or in the Alternative, Stay of the Implementation of Such Termination During Consultation**

Dear Forest Supervisor Harrison and District Ranger Nobles:

It has come to the attention of the Yuhaaviatam of San Manuel Nation, also known as the San Manuel Band of Mission Indians (the "Nation") that the U.S. Department of Agriculture's Forest Service ("Forest Service"), through the San Bernardino National Forest Supervisor's Office, has issued a notice letter to BlueTriton Brands, Inc. ("BlueTriton") denying BlueTriton's Application for Use and Occupancy of National Forest Lands and terminating Special Use Permit FCD728503 (the "Termination Notice"). Such Termination Notice demanded that BlueTriton cease all operations and stop all water diversion, including the water that the Nation relies upon to operate its Arrowhead Springs property ("Arrowhead Springs"), by this Friday, August 2, 2024.

The Nation's ancestral territory encompasses what is now known as the San Bernardino National Forest. When the Nation reacquired Arrowhead Springs, the Nation reclaimed one of the most sacred and culturally significant cultural landscapes to the Nation and the Serrano people. The Nation, contrary to the assertion in the Termination Notice, has active operations at Arrowhead Springs, including government offices, hotel, resort, recreational, cultural and fire protection facilities. The Nation will not be able to fully operate such facilities and, more importantly, will be left without water needed for fire suppression and safety during the dangerous summer fire season if the Termination Notice is implemented. Indeed, the Nation's Fire Department, as well as other local and state fire and emergency response agencies, rely on Arrowhead Springs water to fight fires that frequently occur in the area. The importance of the water to the Nation and the Nation's right to such water was acknowledged by the State Water Resources Control Board's ("SWRCB") in its cease and desist order to BlueTriton adopted September 19, 2023. The SWRCB specifically allowed BlueTriton to continue to deliver the water to the Nation while requiring that BlueTriton cease its commercial bottling activity. The Termination Notice did not take into consideration such important Tribal uses and rights and was done without proper notice or consultation with the Nation in contradiction of the Forest Services' trust responsibility and policies.

# San Manuel Band of Mission Indians

The Forest Service has a trust responsibility to protect the Nation's resources and assets and an obligation to consult with the Nation prior to taking any action that impacts such resources and assets. In carrying out its obligations with tribes, the federal government "has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with [tribes], should therefore be judged by the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942). Joint Secretarial Order 3403 (2023) "establishes that both the USDA and the DOI will manage Federal lands and waters in a way that protects the treaty, religious, subsistence, and cultural interests of federally recognized Indian Tribes and is consistent with the nation-to-nation relationship between the United States Government and federally recognized Tribes and the U.S. Government's trust obligations." The Forest Service's manual provides that "[t]he Government's trust responsibilities and treaty obligations make it essential that the Forest Service engages with Indian tribes in timely and meaningful consultation on policies that may affect one or more Indian tribes. Consultation alone is not sufficient. In addition to consultation, coordination and collaboration together lead to information exchange, mutual understanding, informed decision-making, and mutual benefit."

Accordingly, the Nation respectfully requests that the Termination Notice be rescinded as to the Nation's water or, in the alternative, the implementation of the Termination Notice be stayed as to the Nation's water to allow the USDA, USFS and the San Bernardino National Forest to have the required consultation regarding the impact of such action on the Nation and its resources and assets. The Nation believes that through such consultation a collaborative solution can be found that is in keeping with the trust responsibility to protect the Nation and its assets and resources and the resources of the San Bernardino National Forest.

We respectfully ask that you provide a response to the Nation's above request no later than 12noon Pacific on Thursday, August 1, 2024.

Sincerely,

*Daniel J Little*

———————————————————
Dan Little, Chief Government Affairs Officer
Yuhaaviatam of San Manuel Nation

26569 Community Center Drive • Highland, CA 92346 • Office: (909) 864-8933 • FAX: (909) 864-3370
P.O. Box 266 • Patton, CA 92369

Exhibit 4, P. 057

Exhibit 5

Page 253

# EXHIBIT 5

# *Yuhaaviatam of San Manuel Nation*

November 15, 2024

Danelle Harrison, Forest Supervisor
San Bernardino, National Forest
U.S. Forest Service
U.S. Department of Agriculture
602 S Tippecanoe Avenue
San Bernardino, CA 92408

**Re:    Yuhaaviatam of San Manuel Nation's Need for United States Forest Service to Continue Allowing Delivery of Water to Sacred Ancestral Land Known as the Arrowhead Property**

Dear Forest Supervisor Harrison:

I would like to thank you and the other representatives of the San Bernardino National Forest ("SBNF") for meeting with me and other Tribal Council Members of the Yuhaaviatam of San Manuel Nation, also federally recognized as the San Manuel Band of Mission Indians (the "Nation"), to discuss the Nation's expectations for government-to-government consultation to ensure the Nation has access to critically needed water for its Arrowhead property until the Nation can connect to municipal water.  Such expectations were outlined in the attached November 4, 2024 letter I sent to you (Attachment 1).  The Nation has continually informed the leadership of the SBNF of the Nation's critical need for and the dependence upon water delivered from Strawberry Canyon to the Arrowhead property.  Under the current SBNF order, the SBNF plans to cut off the delivery of such water to the Arrowhead property on January 15, 2025.

The Arrowhead property and Strawberry Canyon are located in the Nation's ancestral territory, and both constitute culturally significant sacred sites, as defined in Executive Order 13007.  These lands feature prominently in the Nation's oral history and were once the site of ancient village known as Apuiva't that was occupied by the Nation's ancestors.  The Nation re-acquired the Arrowhead property in 2016 to protect the important cultural and natural resources on the property.

The Arrowhead property is not only featured in the Nation's history but constitutes a foundational resource for its people as well as future generations.  These lands remain a key spiritual site for medical and cultural practices and government operations.  The Nation has

government administrative offices, a fire station, tribal cultural facilities and grounds, event spaces, and a native plant propagation area located on the Arrowhead property.  Please see the map of the facilities located on the property that was previously provided to you, which is Exhibit 6 to Attachment 2 of this letter.  These facilities are used daily by Tribal citizens, employees, and others, including local, state, and federal firefighters and other first responders.  In 2024, over 60 events have occurred in the event spaces.  This does not include the daily use by the Nation and its employees and the training events, where fire fighters and other first responders from more than 20 city, state, federal and other agencies receive training.

Moreover, the approximately 2,000 acres that make up the Arrowhead property are essential for the growth of the Nation's land base to house and provide community spaces for its citizens.  This is especially true as the Nation's adjacent Reservation is small, consisting of approximately 1,100 acres, most of which is steep and rugged hillside not suitable for additional community spaces or housing.

The Nation understands SBNF described the Arrowhead property as "not operating" and not used by the Nation, a misimpression the agency expressed in SBNF's June 24, 2024 Notice of Denial of Application for Use and Occupancy of National Forest Lands; Termination of Special Use Permit FCD728503 that originally terminated the delivery of water to the Arrowhead property.  We hope that our meetings over the past three months, the tours of the property and other information the Nation has provided have corrected such mistaken impression and demonstrated the importance of the Arrowhead property to the Nation's daily life and future.

Attached please find a summary memorializing our discussions to date regarding the critical need for continued delivery of water to the Arrowhead property (Attachment 2).  Specifically, the enclosed summary addresses: (1) the Nation's rights to Strawberry Canyon water; (2) the Arrowhead property's water needs and limited current water delivery; (3) the Nation's responsible stewardship of the Arrowhead property and use of water; and (4) the Nation's willingness to connect its Arrowhead property to other water sources and the challenges to implementing such solution.  This letter and the attachments, including the summary, may contain proprietary information of the Nation.  As such, if SBNF, United States Forest Service ("USFS") or United States Department of Agriculture ("USDA") is requested to share this letter via the Freedom of Information Act ("FOIA") or other federal law, the Nation requests advance notification and an opportunity to consult on whether some of the information meets one of the exceptions in FOIA.

The Nation expresses its appreciation to the agency for meeting with the Nation over the past few months, but we regret that no solution has been identified to provide the water critically needed for the Arrowhead property by the SBNF set deadline of January 15, 2025.  The Nation hopes that providing this information to you again in writing will help find solutions, to achieve a

2

balance that would protect both the Strawberry Creek environment as well as the Nation's vital interests in the water that it needs for its Arrowhead property, and thereby avoid disastrous consequences that would come from ceasing water delivery effective January 15, 2025.

Sincerely,

*Lynn R. Valbuena*

Lynn R. Valbuena
Chairwoman
Yuhaaviatam of San Manuel Nation

cc:     Randy Moore, Chief, U.S. Forest Service
        Reed Robinson, Director, Office of Tribal Relations, U.S. Forest Service
        Rudy Soto, Deputy Assistant Secretary, External and Intergovernmental Affairs, USDA
        Senator Alex Padilla
        Senator Laphonza Butler
        Representative Jay Obernolte
        Representative Pete Aguilar
        Yuhaaviatam Tribal Council of San Manuel

3

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Attachment 1

# *Yuhaaviatam of San Manuel Nation*

November 4, 2024

Danelle D. Harrison, Forest Supervisor
San Bernardino National Forest
U.S Forest Service
602 S. Tippecanoe Ave.
San Bernardino, CA 92408

RE:   Government-to-Government Consultation Regarding Yuhaaviatam of San Manuel Nation's
Continued Access to Water from Strawberry Canyon

Dear Supervisor Harrison,

The purpose of this letter is to set forth the expectations of the Yuhaaviatam of San Manuel Nation ("Nation"), also federally recognized as the San Manuel Band of Mission Indians, regarding the process for meaningful government-to-government consultation with San Bernardino National Forest officials (collectively as local agency officials referenced herein as "SBNF") about the Nation's continued access to needed  water from Strawberry Canyon for use on our adjacent Arrowhead property until we can secure a long-term water supply solution, including potential connection to the local municipal water system. As you are aware, the San Bernardino National Forest (as the federally-designated natural resource, referenced herein as the "Forest") is within our ancestral territory, and we have many sacred sites and cultural resources within the Forest. Our Reservation is adjacent to the Forest, and we plan to place our Arrowhead property into trust status with the federal government. The Nation has rights to water in the area, including but not limited to, riparian rights, state pre-1914 appropriative water rights, and federal Tribal water rights.

As such, the federal government, including SBNF, has a trust responsibility to the Nation and we expect government-to-government consultation to occur in a manner consistent with Executive Order 13175 issued November 6, 2000; Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships issued on January 21, 2021; the United States Department of Agriculture (USDA) Forest Service Action Plan issued February 2023 and United States Forest Service (USFS) Tribal Consultation policies and handbooks; and Joint Secretarial Order 3403 issued November 15, 2023. Additionally, since 1970, the federal government has had an overarching policy of eliminating federal paternalism towards tribal governments and instead promoting self-determination for tribes, including transferring federal programs to tribal governments for administering. This policy of self-determination was most recently reinforced by President Biden when he issued Executive Order 14112 in December 2023, which prioritizes partnerships with tribal leaders, respect for tribal sovereignty, trust in tribal priorities, and dignity for tribal nations.  We ask that our consultation on continued access to water from Strawberry Canyon be conducted in a manner consistent with these various federal policies.

Supervisor Harrison, San Bernardino National Forest
p. 2

Any action that will cut off water to the Nation cannot be made without the SBNF, USFS and USDA consulting with the Nation and considering the impact of such action on the Nation. Indeed, we believe it is the duty of the SBNF, USFS and USDA to safeguard the Nation's rights and access to such water. As set forth in the Joint Secretarial Order 3403, the SBNF, USFS and USDA are charged with the "highest trust responsibility" to protect Tribal interests and must "ensure that all decisions by the Departments relating to Federal stewardship of Federal lands, waters, and wildlife under their jurisdiction include consideration of how to safeguard the interests of any Indian Tribes such decisions may affect." Furthermore, Joint Secretarial Order 3403, recognizes that "Tribal consultation and collaboration must be implemented as components of, or in addition to, Federal land management priorities and direction for recreation, range, timber, energy production, and other uses, and conservation of wilderness, refuges, watersheds, wildlife habitat, and other values" and that "the Departments will benefit by incorporating Tribal expertise and Indigenous knowledge into Federal land and resources management."

The Nation and our representatives would like to have a dialogue with you, and any other appropriate USFS and USDA officials, about the specific issues that need to be discussed during this consultation period and the process and timeline for discussing those issues. We are putting this communication in writing to ensure that SBNF and the Nation are on the same page regarding the issues that need to be focused on for the next 30 days and the process of consultation on those issues. Please let me know if you disagree with anything contained in this letter, and please feel free to share this letter with any appropriate officials within USFS and USDA. However, this communication may contain proprietary information of the Nation. As such, if SBNF, USFS or USDA is requested to share this letter via the Freedom of Information Act (FOIA) or other federal law, the Nation requests advance notification and an opportunity to consult on whether some of the information meets one of the exceptions in FOIA.

**Background and Recent Meetings with SBNF**

For over one hundred years, Strawberry Canyon has served as the primary water source for our 2,000-acre Arrowhead property adjacent to the Forest. Since at least the 1930s, water has been conveyed from Strawberry Canyon to our Arrowhead property through a diversion and delivery system developed and maintained by a commercial bottled water company, which is now owned by BlueTriton Brands. On July 26, 2024, the SBNF terminated BlueTriton's Special Use Permit FCD728503 and directed the company to immediately cease operation and maintenance of the water diversion and delivery system. This decision by the SBNF was made without any consultation with the Nation and would have immediately shut off the Nation's access to water for our Arrowhead property. However, after vigorous outreach by the Nation and our representatives to the federal government, we were pleased that you modified the July 26 order to allow for the Nation to continue to receive water through the diversion and delivery system until January 15, 2025.

The Nation's representatives began conducting weekly meetings with you and other SBNF representatives in mid-August of this year. During our initial meeting, you and your staff indicated that the environmental health of Strawberry Creek (the "Creek") is poor. We indicated that the environmental health of the Creek is important to the Nation given that the Creek and the

Exhibit 5, P. 064

Exhibit 5
Page 260

surrounding area are a part of our ancestral territory and contain cultural resources. Although the Nation has rights to water in that area, including but not limited to, riparian rights, state pre-1914 appropriative water rights and federal Tribal water rights, we care deeply about the environmental health of the Creek and entire Forest. Our people have been on this land and utilized its resources since time immemorial, and we will continue to be here for generations to come. We want the Creek and Forest to be healthy and committed to you at that meeting that we would prioritize finding a solution to provide water for our Arrowhead property that protected the health of the Creek and would work with the Forest to improve the environmental health of the Creek.

The Nation has determined that the best long-term solution to provide water for our Arrowhead property is to connect the property to the nearest municipal water system. However, the closest connection is miles from the Arrowhead property's gravity-fed system that currently delivers water to facilities throughout the property.  It will take time and substantial funding to build the necessary infrastructure. The Nation's initial analysis indicates that it will take a minimum of 3 years to build but possibly longer, and we will need federal assistance to help cover the cost of construction of the infrastructure. Such infrastructure would benefit the area, not just the Arrowhead property, as it would allow others in the area to connect to municipal water. However, as indicated above, such widespread benefits will take time and resources to establish, and as such, we asked the SBNF to work with us to ensure that our Arrowhead property can continue to access water from Strawberry Canyon until we can connect to a municipal water system.

On several occasions, the Nation's representatives have orally provided information to SBNF officials about the amount of water our Arrowhead property needs and the purposes for which the water is used. Additionally, the Nation has indicated that we could work with SBNF to reduce our water usage during this transition period, so long as any reduction does not increase the likelihood of wildfires from the Forest harming the Nation's lands or surrounding areas.  The Nation has been in communication with our Congressional delegation about potential legislative language to ensure our continued access to water, and we have been speaking with SBNF officials about the development of a co-stewardship agreement that could cover our access to water until we connect to a municipal water system.

It has now been over two months since the weekly meetings began, and the SBNF is still planning to shut off our access to water on January 15, 2025. There has not been any mechanism identified by the SBNF, other than the Congressional action proposed and sought by the Nation, that will provide the Nation with continued access to its longstanding water source until we connect to municipal water. Mostly recently, SBNF officials suggested the use of a co-stewardship agreement, which the Nation supports, but our research so far indicates that a co-stewardship agreement cannot be put in place by January 15. Given this, the Nation would like to memorialize some of our views shared during these meetings and share our views on the next steps which we would like to discuss with you in our next meeting.

Exhibit 5, P. 065

Exhibit 5                    Page 261

**San Manuel Band's Connection to Strawberry Creek**

The Forest and surrounding territory are the ancestral lands of the Nation. Long before the Forest was established, our people lived on the lands, utilized the resources, and did so in a sustainable manner. We lost control and access to much of our ancestral territory after colonization, the mission system, California statehood, and failed federal policies that sought to assimilate and terminate our people. Our current Reservation, which is adjacent to the Forest, comprises a little more than 1,000 acres and is inadequate to encompass our government and community needs. We have been working to re-acquire some of our homelands so we can provide housing and fully develop our government for our citizens. To this end, we were able to re-acquire our Arrowhead property, which is also adjacent to the Forest, and have been in the process of exchanging additional lands with the SBNF since 2017. We will be considering seeking to place our Arrowhead property into federal trust status so that it can expand our existing Reservation.

The re-acquisition of these lands is significant to our people because we need more land to live on and because these lands hold sacred sites and cultural artifacts and resources. The hot and cold water springs, flora and other resources located throughout these lands and the Forest are culturally significant to our community. The Arrowhead rock formation on these lands is of particular importance to our people because it provided direction for safety and water and other natural resources for our people prior to and at a time when we were being run off our lands and terminated by settlers in the 1800s. Strawberry Canyon, which is located near the Arrowhead, also contains many sites that meet the definition of Indian Sacred Sites contained in Executive Order 13007. The Nation continues subsistence and cultural practices in this area, including gathering of plants and ancestral ceremonies.

Protection of our ancestral territory, regardless of whether we currently own the land or not, has always been a priority for us and it will continue to be a priority. The Nation and our people are not going anywhere. As such, the lands and their resources need to be cared for to ensure the survival of the San Manuel people for generations to come. That is why the Nation wants to connect our Arrowhead property to a municipal water system and begin co-managing Strawberry Creek to improve its environmental health.

**The Government-to-Government Consultation Process Moving Forward**

Given that the USFS still plans to shut off our water access on January 15, 2025, the Nation wants to set forth the issues and information that we believe need to be discussed over the next 30 days and the laws and policies that govern such consultation. Additionally, the Nation wants to ensure that the SBNF understands who is authorized to speak on behalf of the Nation when it comes to government-to-government consultation. Although I am the Chairwoman of the Nation, any member of our Tribal Council has the authority to speak on behalf of the Nation. Additionally, for purposes of discussions with the SBNF regarding the continuation of water access for our Arrowhead property, members of the Nation's Office of Intergovernmental Affairs are authorized to convene meetings and the Nation's staff attending such meetings may speak and work with SBNF on this topic on behalf of the Nation, but with the understanding that as is required by the Nation's laws, the Tribal Council will make any final decisions on behalf of the

Nation. Please let me know if you have any questions as to who is an authorized representative of the Nation.

The Nation would like to continue weekly consultation with SBNF officials but would like to identify and invite additional representatives from the USFS and USDA to discuss the next round of specific issues to be addressed, as identified below:

- Water needs and usage of Nation's Arrowhead property. SBNF officials repeatedly have asked for information regarding the amount of water the Nation needs for its Arrowhead property and how the water we currently receive is used. Tribal representatives believe they have orally provided this information during prior weekly meetings, but Forest officials seem to still have questions. In an effort to provide consistent and clear information to the SBNF, the Nation will be providing via a separate communication our water needs and usage for our Arrowhead property. The Nation's expectation is that any information shared on water usage is done within the context of consultation and should be protected and held in confidence.

- Documentation of current environmental health of Strawberry Creek. SBNF officials indicated that the environmental health of Strawberry Creek is in poor condition. The Nation has requested that the SBNF share with us the data and information regarding the environmental health of the Creek and the causes of and any proposed solutions to address any impairment. Additionally, the Nation has requested that our water and cultural team, and other Tribal representatives, be provided with access to the Forest, including the Creek, so that we can also assess the environmental health of the Creek and determine if any of our cultural resources and sites are being impaired. The Creek and Canyon are our ancestral lands, and they contain important cultural resources and sites. The health of the Creek and Forest are significantly important to the Nation and impact our adjacent lands and overall cultural health. SBNF should not be making any decisions about the Creek without first consulting with the Nation. Indeed, as recognized in Joint Secretarial Order 3403, the Nation's indigenous knowledge is invaluable to the preservation of the natural and cultural resources in the Forest, and the SBNF, USFS and USDA should consult the Nation's experts, including but not limited to, individuals from the Nation's Environmental Management and Cultural Resource Management Departments.

- Legal authorities of the Forest Supervisor, USFS, and USDA to extend water access for the Nation. During our discussions, SBNF officials have conveyed that they have concerns about extending the Nation's access to water. However, the Nation has not been provided with any legal analysis or other information explaining this concern. We would like to identify a meeting at which USFS and USDA lawyers can be available to discuss the various

Exhibit 5

authorities of the SBNF, USFS, and USDA regarding making water available beyond January 15, 2025, to the Nation from our ancestral territory.

- <u>Decommissioning Plan from BlueTriton Brands</u>. To be clear, the Nation's relationship with the SBNF is a government-to-government relationship that is separate and distinct from any ongoing litigation or process involving the SBNF and BlueTriton Brands ("BlueTriton") or other parties. SBNF's termination of BlueTriton's Special Use Permit has a significant negative impact on the Nation, and we should have been consulted on it and the impact to the Nation considered prior to taking this action. Pursuant to SBNF's requirements, we understand that BlueTriton has filed its decommissioning plan to remove its water diversion and delivery system from Strawberry Canyon with the SBNF. The Nation is requesting that a copy be shared with us and that we be consulted on the plan and its impact on the Nation. We also request that the SBNF consult with the Nation about mitigating any harm that implementation of the plan may have on the Nation. Again, our consultation with the SBNF about the removal plan is separate and distinct from any ongoing proceeding between the SBNF and BlueTriton, or other parties, and we will work with you to make sure that we only consult on those matters that directly impact the Nation as required by Executive Order 13175, Joint Secretarial Order 3403, USFS' Action Plan and other federal policies.

The Nation looks forward to discussing the issues and process outlined in this letter with you at our next meeting.

Sincerely,

Lynn R. Valbuena
Chairwoman
Yuhaaviatam of San Manuel Nation

cc:     Randy Moore, Chief, U.S. Forest Service
        Reed Robinson, Director, Office of Tribal Relations, U.S. Forest Service
        Rudy Soto, Deputy Assistant Secretary, External and Intergovernmental Affairs, USDA
        Senator Alex Padilla
        Senator Laphonza Butler
        Representative Jay Obernolte
        Representative Pete Aguilar
        Yuhaaviatam Tribal Council of San Manuel

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Attachment 2

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION

# SUMMARY OF INFORMATION ON THE CRITICAL NEED FOR CONTINUED DELIVERY OF WATER TO THE YUHAAVIATAM OF SAN MANUEL NATION'S ARROWHEAD PROPERTY
## (November 15, 2024)

In furtherance of its effort to engage in government-to-government consultation with the United States Forest Service ("USFS"), the United States Department of Agriculture ("USDA") and the San Bernardino National Forest ("SBNF"), the Yuhaaviatam of San Manuel Nation, also federally recognized as San Manuel Band of Mission Indians (the "Nation"), hereby memorializes information the Nation has provided to the SBNF regarding the Nation's critical need for continued delivery of water to the Nation's sacred ancestral land known as the Arrowhead property. Specifically, the summary addresses: (1) the Nation's rights to Strawberry Canyon water; (2) the Arrowhead property's water needs and limited current water delivery; (3) the Nation's responsible stewardship of the Arrowhead property and use of water; and (4) the Nation's willingness to connect its Arrowhead property to other water sources and the challenges to implementing such solution.

Notably, this summary distills information provided to the SBNF but does not represent all the information provided to the agency. Such information may contain proprietary information of the Nation. As such, if SBNF, USFS or USDA is requested to share this summary via the Freedom of Information Act ("FOIA") or other federal law, the Nation requests advance notification and an opportunity to consult on whether some of the information meets one of the exceptions in FOIA. The Nation is amenable to providing additional information the agency may need and to working collaboratively with the agency to find feasible solutions.

**Section 1 - The Nation's Rights to Strawberry Canyon Water:** The Nation and its ancestors have relied upon the water from Strawberry Canyon since time immemorial. Indeed, the Nation's ancestors used such water at the ancient village known as Apuiva't located in what is today known as the Arrowhead property. Hotel and other facilities that were built on the Arrowhead property starting in the 1800s also relied upon such water. To this day, the primary source of water for the Arrowhead property is the water from Strawberry Canyon. Not surprisingly, the Nation and its Arrowhead property have broad water rights claims to water in Strawberry Canyon that authorize the current and future use of such water, including, but not limited to, the following:

- State riparian water rights, as Strawberry Creek and East Twin Creek flow across the Arrowhead property owned by the Nation. Such rights were acknowledged by the State Water Resources Control Board ("SWRCB") in its now-stayed Cease and Desist Order (https://www.waterboards.ca.gov/water_issues/programs/administrative_hearings_office/

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

docs/2023/wro2023-0042_corrected.pdf , *see* pages 89-90). The Nation has the right to use water diverted under its riparian water right for a variety of beneficial uses, including temporary storage.  It is also entitled to divert from structures on separate, upstream lands so long as doing so does not injure intervening owners' rights.  *See, e.g.*, *Lodi v. East Bay Municipal Utility Dist.*, 60 P.2d 439 (Cal. 1936).

- State pre-1914 appropriative water rights, based on: (1) the Arrowhead property's diversions of water from Strawberry Canyon for use at the hotel and other facilities on such land prior to 1914, which were recorded with the County of San Bernardino on November 30, 1887, and can be located at Book C pages 296-299, and (2) the Nation's appropriative rights in East Twin Creek, which the Nation may divert further upstream, including from Strawberry Canyon, pursuant to state law, including California Water Code Section 1706, which allows pre-1914 users to move a point of diversion further upstream.  These rights are senior to all other rights as recognized in the *Del Rosa* judgment regarding water rights (*see* Exhibit 1, paragraph (a) on pages 9-10).  Indeed, the *Del Rosa* judgement acknowledges that the Arrowhead property had been using and relying on water from East Twin Creek and its tributaries, including Strawberry Creek, for over 50 years prior to the 1931 date the judgment was entered and decrees almost the entire flow of East Twin Creek and its tributaries to the Arrowhead property.  This right predates all other state water rights, and the USFS lacks authority to modify the priority and administration of a recognized state water right.  The Nation also possesses other pre-1914 rights in East Twin Creek and its tributaries by virtue of being the sole shareholder of the Del Rosa Mutual Water Company.

- Federal aboriginal water rights, rooted in the fact that Strawberry Canyon lies in the Nation's aboriginal territory.  In fact, as discussed above, the Nation's ancestors had a village on and around the Arrowhead property.

As is evident, the Nation's water rights outlined above are separate from and not dependent on BlueTriton's water rights.  Under a 1931 Agreement (*see* Exhibit 2), BlueTriton, as a successor in interest, is required to provide 20% of the water it obtains from the water infrastructure located within the SBNF to the Arrowhead property.  For nearly a century, the property has relied on this infrastructure to receive water from Strawberry Canyon to which the Nation has its own broad water rights claims, as described in further detail in the preceding paragraph.

Exhibit 5, P. 071

Exhibit 5                    Page 267

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

<u>**Section 2 - The Arrowhead Property Water Needs and Limited Current Water Delivery**</u>:

The Nation's consultants have determined that approximately 100 acre-feet per year ("AF/Y") are needed to maintain the current uses at the approximately 2,000 acre Arrowhead property.  As shown on the chart below, the water need varies by month and weather conditions with more being used during the hot fire season months.

| PRELIMINARY ESTIMATE OF ARROWHEAD PROPERTY WATER NEED FOR CURRENT USES* | |
|---|---|
| **MONTH** | **Acre-Feet** |
| January | 4.46 |
| February | 5.58 |
| Marc | 7.43 |
| April | 9.68 |
| May | 10.40 |
| June | 12.17 |
| July | 13.70 |
| August | 12.17 |
| September | 9.76 |
| October | 7.67 |
| November | 5.50 |
| December | 4.05 |
| **Total Acre-Feet Per Year** | **102.59** |

**\*This chart provides preliminary numbers representing the current best estimate of water need at the Arrowhead property and is subject to change based on seasonal rainfall and changes in the use and operations of such lands.  The chart and the water quantities on this chart do not represent and are not a waiver of the Nation's water rights, and the Nation reserves the right to assert such rights.**

The Nation has not asked for and is not using all the water that the BlueTriton facilities can deliver.  Instead, the Nation is currently receiving water from three of the twelve diversion points in the BlueTriton facilities (Diversion Points 2, 3 and 8).  This is a fraction of the total amount that the twelve diversion points can produce (*see* <u>Exhibit 3</u> showing the various diversion points).  The amount of water produced by these diversion points varies significantly from month to month and year to year depending on the amount of precipitation received.  2023 and 2024

Exhibit 5, P. 072

Exhibit 5                    Page 268

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

were very wet years, and the water received through the diversion points exceeds drought year flows. Any water not used on the property is released back into the watershed. The Nation values conservation and is always striving to improve its water use efficiency. The Nation inquired as to whether or not the existing system could be automatically controlled to deliver water as needed by the Nation. Unfortunately, the Nation was informed that the system is operated manually and there is currently no mechanism by which the diversion points can be automatically shut off or reduced in volume, and that any shutting down of the system requires flushing and sanitizing the facilities, which can take weeks. In addition, the Nation understands that it is difficult to make changes in the system, as the operator must physically go to the facilities, some of which can only be accessed by helicopter, to make changes to the amount of water being diverted and delivered through the facilities.

To address any environmental concerns, the Nation is amenable to the diversion of water from diversion points lower in Strawberry Canyon (Diversion Points 10, 11 and 7) that the California State Water Resources Control Board acknowledged show no or less connectivity to the surface water flow in Strawberry Creek, instead of the current diversion points (Diversion Points 2, 3 and 8). In addition, the Nation's consultants have opined that maintaining instead of decommissioning the BlueTriton infrastructure could allow it to be used to enhance the Strawberry Creek environment by delivering water along the course of the creek during times of drought or other times of need. The Nation presented this information and suggested that this be studied before decommissioning and dismantling the infrastructure.

**Section 3 - The Nation's Responsible Stewardship of the Arrowhead Property and Use of Water:** Since the 2016 purchase of the sacred Arrowhead property, the Nation has exercised responsible stewardship based on its mission, traditional values, and indigenous knowledge of protecting natural and cultural resources. As discussed below, these efforts include significantly reducing water use, instituting wildfire protection, restoring native plants and other natural resources, and returning any unused water to the surrounding watershed.

The estimated 100 acre-feet per year water demand is necessary to maintain the approximately 2,000 acres that make up the Arrowhead property, including the Nation's administrative offices, fire station, Department of Public Safety facilities, tribal cultural facilities and grounds, event spaces, and a native plant propagation area located on the Arrowhead property and defensible green spaces and fire hydrants around the numerous structures. Please refer to the attached map of the facilities located on the property (*see* Exhibit 4). As shown on the map, there are two tanks that hold the water received from Strawberry Canyon to be used in the numerous facilities and fire hydrants on the property. The system is gravity fed and, thus, the tanks are located near the highest point of the property.

The numerous facilities located on the Arrowhead property are used daily by Tribal citizens, employees, and others, including local, state, and federal firefighters and other first responders. In addition to the daily use by Tribal Citizens and employees, over 60 events have occurred in

Exhibit 5, P. 073

Exhibit 5      Page 269

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

the event spaces alone in 2024. In addition to these events, fire fighters and other first responders from more than 20 city, state, federal and other agencies have attended training events in the property's other facilities in 2024, including, but not limited to, Cal-Fire, San Bernardino County, City of San Bernardino, City of Ontario, City of Rancho Cucamonga, City of Chino, Fontana Police Department, City of Barstow, City of Big Bear, City of Apple Valley, City of Rialto, City of Colton, City of Redlands, City of Loma Linda, San Bernardino County Sheriffs, Riverside County Sheriffs, LA County Sheriffs, California State Park Rangers, US Marshalls, San Bernardino Police Department, Redlands Police Department, USFS, and San Bernardino Department of Corrections.

The defensible green spaces constitute approximately 1% of the entire 2,000-acre property and are concentrated next to important facilities. In a marked departure from the previous owner's practices, the Nation instituted water conservation measures. Specifically, the Nation ceased watering planted areas by approximately 40%. The Nation also curtailed the evaporative loss of water by not filling pools that are not in use (*see* Exhibit 5 showing the areas that the Nation has stopped watering but that were watered by the previous owner).

The Nation has set about restoring areas at the Arrowhead property and elsewhere, including removing invasive non-native species and replanting areas with native species. To support such efforts, and to provide for gathering and use of such plants by the Tribal community, the Nation has started a native plant propagation area on Arrowhead property. The Nation's Cultural Resource Management and Environmental Departments manage this work, and the Nation employs a full-time ethno-botanist and other experts to assist. In addition, recognizing the high wildfire risk in the area, the Nation conducts fuel reduction and creates defensible spaces (including green spaces) around facilities. Fuel reduction is accomplished using large herds of goats while larger fuel is removed by Tribal employees and San Bernardino County and Cal-Fire pursuant to contract.

The Nation was surprised that SBNF questioned and asked for proof that water is needed at the Arrowhead property to fight fires since the SBNF recognizes the danger of wildfires in the area and uses the Arrowhead property water and the lands for training to prepare for and fight such fires. As stated by the SBNF on their website, "the San Bernardino National Forest is historically one of the most wildfire prone forests in the country" and "fire seasons are longer and fire behavior often more extreme." (*See* https://www.fs.usda.gov/main/sbnf/fire). In response to such request for information on the wildfire risk to the Arrowhead property and the need for water to fight such wildfire risk, the Nation provides the following information.

The hotel facilities on the property were destroyed three times prior to 1940s by fires, requiring the hotel facilities to be rebuilt. In addition to these fires, the 1980 Panorama, 2002 Arrowhead and the 2003 Old Fire burned Strawberry Canyon and portions of the Arrowhead property, including buildings and facilities. Additional notable fires around the Arrowhead property include the 1986 Glenwood, 1994 Highway 18, 1996 Waterman 3, 1996 Badger, 2017 Mile, and

Page **5** of **7**

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

2019 Hillside Fires.  This does not include the smaller fires over the years within the area.  In all the recent large and small fires, the Arrowhead property's hydrants have been used by local, state, and federal resources assigned to fight these fires.  In addition, the rotary wing resources utilize the Arrowhead property's pond, the only dipping pond available on the "front country" between Hwy. 18 and Hwy. 330.  You can find a history of wildfires in the area at https://projects.capradio.org/california-fire-history/#11.02/34.1932/-117.3816 and the designation of the area as a Fire Hazard Severity Zone (FHSZ) in the State Responsibility Area (SRA) at https://experience.arcgis.com/experience/03beab8511814e79a0e4eabf0d3e7247/.

To combat potential wildfire, the Arrowhead property maintains a strategically located fire station and a system of fire hydrants supplied by the Strawberry Canyon water to fight fires.  The Nation provides water through its fire hydrants to local, state, and federal firefighters.  Every firefighting agency in the region connects to the hydrants to fight fires in the area.  Although every fire season and year is different, the Nation estimates that other agencies use the water approximately 4 to 6 times a year.  The County of San Bernardino and the City of San Bernardino have both submitted letters discussing the importance of the Arrowhead property's water in fighting fires in the area (*see* Exhibit 6).  As noted in the County letter, "Without readily available water at the Nation's Arrowhead Springs property, County firefighting operations for our foothill communities would be severely crippled."

**Section 4- The Nation's Willingness to Connect to Other Water Sources and Challenges to Implementing Such Solution:**  Before the termination of BlueTriton's rights to deliver water to the Arrowhead property, the Nation started working with the local municipal water district, the City of San Bernardino Municipal Water District ("CSBMWD"), and the City of San Bernardino to approve the construction of a portion of the infrastructure needed to connect the Arrowhead property and its facilities to a municipal water system for delivery of potable water.  The Nation's experts estimate that such infrastructure will involve at least three years to construct and require extensive capital.  The nearest water connection is over 6,000 linear feet away down the mountain, and so will require the laying of pipe and pumping stations to reach the appropriate elevation for tanks that can store water to be gravity - delivered throughout the property.

SBNF suggested the Nation consult with San Bernardino Valley Municipal Water District ("SBVMWD"); to that end, the Nation has discussed these issues and provided a tour of the Arrowhead property to SBVMWD representatives.  SBVMWD representatives are working with the Nation on determining the feasibility and time and costs of an interim solution to connect to SBVMWD facilities that could deliver untreated non-potable water to the Arrowhead property in above ground pipes, but such pipes would again need to extend over 6,000 liner feet and would require at least one pumping station.  Such water could not be used for drinking unless further treated.

As noted, connecting to a municipal water system will require extensive capital expense and time to construct, and will require the Nation to pay for municipal water –  further burdening the

Page **6** of **7**

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

Nation. Obtaining the entitlements and constructing a permanent connection to a municipal water system to provide potable water to the Arrowhead property is simply impossible to accomplish by the January 15, 2025 – the date the agency set for shutting down the only existing infrastructure that provides the Nation with sufficient water for its Arrowhead property. The Nation will continue to work with SBVMWD on the interim solution for non-potable water to determine if this is feasible.

The Nation has also continued to explore the use of water wells and is committed to using wells to the extent practicable. However, the Nation's consultants have determined based on the information obtained to date that it is not practicable to provide all of the property's water needs with wells at this time. Water quality tests from the existing wells have revealed trace metals that are toxic to vegetation and make filtration difficult for potability. In addition, many of the wells span over a geothermal field and quickly degrade any infrastructure used for pumping and distribution. In addition, the capacity and recharge rate of existing wells prohibits meeting existing water demand.

The Nation has relied on the water from Strawberry Canyon for centuries, and as discussed above, there are no alternative sources that can be quickly developed and implemented. Nevertheless, the Nation remains committed to finding an alternative source of water as soon as practicable.

Page **7** of **7**

**CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION**

# Exhibit 1

JCM/IR 8 9/24/31.

C

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

IN AND FOR THE COUNTY OF SAN BERNARDINO.

DEL ROSA MUTUAL WATER COMPANY,
a corporation,

               Plaintiff,

          vs.

D. J. CARPENTER, ISABEL C. TURNER,
J. B. JEFFERS, GEORGE S. MASON,
NATIONAL THRIFT CORPORATION OF
AMERICA, a corporation, JOHN DOE
McKASON, MARY GLEASON, G. M. CHRIST,
GREAT VIEW WATER COMPANY, NETTIE
D. PHILLIPS, PACIFIC-SOUTHWEST TRUST
& SAVINGS BANK, a corporation,
ARTHUR R. PECK, CARRIE A. PECK,
ELLEN A. McLAUGHLIN, ARROWHEAD
SPRINGS CORPORATION, a corporation,
ARROWHEAD SPRINGS COMPANY, a cor-
poration, J. N. BAYLIS, CALIFORNIA
CONSOLIDATED WATER COMPANY, a
corporation, CALIFORNIA CONSUMERS
CORPORATION, a corporation, et al.,

               Defendants.

No. 31798

J U D G M E N T

    The above entitled action coming on regularly to be
heard before the Court without a jury, a trial by jury having been
waived by the respective parties, Messrs. Swing & Wilson and Ralph
E. Swing appearing as attorneys for the plaintiff, Messrs. Lawler &
Degnan appearing for and as attorneys for defendants, California
Consolidated Water Company and California Consumers Company (sued
herein as "California Consumers Corporation"), respectively, and
Messrs. Gibson, Dunn & Crutcher appearing for and as attorneys for
defendants Arrowhead Springs Company and Arrowhead Springs Corpora-
tion, Ltd. (sued herein as "Arrowhead Springs Corporation"), and
Messrs. O'Connor & Findlay appearing for and as attorneys for the
other defendants above mentioned, and this cause being at issue and
~~except the defendant J. K. McKesson~~
the parties having entered into a stipulation in writing for the
entry of this judgment, and findings of fact and conclusions of law,
except as set out and contained in this judgment, having been duly

-1-

*and oral evidence having been introduced*

waived by the respective parties, and the Court being fully advised
in the premises, and good and sufficient cause appearing therefor;

NOW, THEREFORE, in accordance with said stipulation, *and the evidence*

IT IS HEREBY ADJUDGED:

1.  That plaintiff is, and defendants California Con-
solidated Water Company, Arrowhead Springs Corporation, Ltd. (sued
herein as "Arrowhead Springs Corporation"), Arrowhead Springs Com-
pany and California Consumers Company (sued herein as "California
Consumers Corporation") are corporations duly organized and existing
and duly qualified and authorized to do and transact business within
the State of California.

2.  That neither the California Consumers Company nor
the Arrowhead Springs Company have at this time any right, title or
interest in or to any of the water or in or to the right to take,
divert, use or transport any of the water referred to in the com-
plaint in said action or in this judgment.

3.  That East Twin Creek is a natural stream of water
situated in the County of San Bernardino, State of California, and
has its source in the San Bernardino Mountains lying and being to
the north of the City of San Bernardino. That all of the waters of
what is known as East Twin Creek watershed, except as diminished by
use by defendant Arrowhead Springs Corporation, Ltd., and its prede-
cessors in interest and by use by defendant California Consolidated
Water Company and its predecessors in interest, and except as the
waters thereof are lost by evaporation, transpiration, seepage and
other natural causes, drain into and become a part of said East
Twin Creek above the point of plaintiff's diversion hereinafter
referred to. That the principal tributaries of said East Twin Creek
are Strawberry Creek, Coldwater Creek, Hot Springs Creek, and other
named and unnamed tributaries and springs, all of which flow and
percolate into and, except as diminished as aforesaid, become a part
of said East Twin Creek; also waters seep and percolate into said

-2-

East Twin Creek and its tributaries from the adjacent hills and
lands draining into said East Twin Creek and its various tributaries
and the canyons draining into said stream. That Strawberry Creek
and its tributaries are the easterly branch of East Twin Creek above
the junction of Strawberry Creek and Coldwater Creek; Coldwater
Creek and its tributaries are the westerly branch of East Twin Creek
above the junction of Strawberry Creek and Coldwater Creek; Hot
Springs Creek and its tributaries are the lowest branch of East Twin
Creek. That at the time of the appropriation, as hereinafter set
forth, of the waters of said East Twin Creek by plaintiff's predeces-
sors in interest all of the waters of said East Twin Creek and of
its tributaries, except that part thereof then being used by defen-
dant Arrowhead Springs Corporation, Ltd. and its predecessors on
lands in Section 7, Township 1 North, Range 3 West, S.B.B.& M., and
on lands in Sections 11 and 12, Township 1 North, Range 4 West,
S.B.B.& M., above the point of plaintiff's intake, and that part
lost by evaporation, transpiration, seepage and other natural causes,
flowed in a southerly direction in a natural stream to and into the
San Bernardino Valley, and at the time of the appropriation of the
right to use such water by plaintiff's predecessors in interest none
of said water had been appropriated, diverted, or used except by
said Arrowhead Springs Corporation, Ltd. and its said predecessors
for use upon said lands above plaintiff's point of appropriation.

That subsequent to the time when defendant, Arrowhead
Springs Corporation, Ltd., or its predecessors in interest, acquired
title to all the lands described in paragraph 4 below, except the
north half of the northwest quarter ($N\frac{1}{2}$ of $NW\frac{1}{4}$) of Section 12, Town-
ship 1 North, Range 4 West, S.B.B.& M., plaintiff or its predeces-
sors in interest entered into and upon said East Twin Creek at about
one mile north of the mouth of said East Twin Creek and appropriated
and diverted all of the water of said stream flowing at said point
and thereafter, except as hereunder provided, diverted all of the

-3-

water of said stream flowing at said point into a ditch and conduit
and conveyed the same away to nonriparian lands for beneficial uses
thereon.

That the point on said stream where said appropriation and
diversion was so made by plaintiff, or its predecessors in interest,
was below the confluence of all of said branches of said East Twin
Creek and below where all of the waters of said East Twin Creek
watershed converge, except as diminished as aforesaid.  That ever
since said appropriation and diversion of said stream all of the
waters of said stream flowing at said point have been and now are
taken and used for irrigation and other beneficial uses and purposes
by plaintiff and its predecessors in interest, and by defendants and
cross complainants named in paragraph 6 hereof, except as diminished
from time to time by the use by defendant Arrowhead Springs Corpora-
tion, Ltd. and its predecessors in interest and by natural causes
as aforesaid, and except that said California Consolidated Water
Company and its predecessors in interest have for more than five
years prior to the commencement of this action diverted into reser-
voirs and tanks and have diverted, taken and transported to Los
Angeles and other places for bottling purposes and other commercial
uses, water from said watershed adversely to said plaintiff, and to
all other defendants, except Arrowhead Springs Corporation, Ltd.

4.   That in the year 1863 David Noble Smith, predecessor
in interest of defendant Arrowhead Springs Corporation, Ltd., set-
tled on the East half of the Southeast quarter and the Southeast
quarter of the Northeast quarter of Section Eleven (11) and the
Northwest quarter of the Southwest quarter of Section Twelve (12),
Township 1 North, Range 4 West, S.B.B. & M., which lands were then
and until 1878 unsurveyed, and thereafter, on the 1st day of Febru-
ary, 1882, patent was issued therefor; that on the 3rd day of April,
1871, pursuant to the Acts of Congress approved July 27, 1866, and
March 3, 1871, there was granted to Southern Pacific Railroad Company

-4-

of California, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., all of Section Seven (7), Township 1 North, Range 3 West, S.B.B.& M., and thereafter, on the 1st day of November, 1897, patent was issued therefor (which patent contained no reservation of water rights whatsoever); that on the 3rd day of April, 1871, pursuant to the Acts of Congress approved July 27, 1866, and March 3, 1871, there was granted to Southern Pacific Railroad Company of California, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., the west half of the southeast quarter (W½ of SE¼) and the southwest quarter of the northeast quarter (SW¼ of NE¼) of Section 11, Township 1 North, Range 4 West, S.B.B.& M., and thereafter, on the 9th day of January, 1885, patent was issued therefor (which patent contained no reservation of water rights whatsoever); that on the 3rd day of May, 1877, A.B.Chapman and others, predecessors in interest of the defendant Arrowhead Springs Corporation, Ltd. made application to the United States Land Office to purchase the following described land as timberland:

> The northeast quarter of the southwest quarter (NE¼ of SW¼), the north half of the southeast quarter (N½ of SE¼) and the southeast quarter of the northeast quarter (SE¼ of NE¼) of Section 12, Township 1 North, Range 4 West, S.B.B.& M.;

that thereafter, on the 15th day of August, 1889, patent was issued therefor; that in the year 1880 Thomas B. Elder, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., entered into possession of the south half of the northwest quarter (S½ of NW¼) and the west half of the northeast quarter (W½ of NE¼) of Section 12, Township 1 North, Range 4 West, S.B.B.& M., and that thereafter, on the 6th day of October, 1888, patent was issued therefor; that on the 29th day of October, 1891, Herbert J. Royer, predecessor in interest of the defendant, Arrowhead Springs Corporation, Ltd., entered upon the north half of the northwest quarter (N½ of NW¼) of Section 12, Township 1 North, Range 4 West, S.B.B. & M., and that thereafter, on the 12th day of November, 1897, patent was issued therefor; that all

-5-

of the lands described in this paragraph are contiguous and, except
such portions thereof as lie outside of the watershed of East Twin
Creek, are bordering on and have access to, and are riparian to,
said East Twin Creek, and all of said lands are now the property of
defendant, Arrowhead Springs Corporation, Ltd., and all that portion
of said lands which lie within the watershed of said East Twin Creek
are hereinafter referred to as the Arrowhead Springs property. That
the whole of said land is located above plaintiff's point of ap-
propriation and intake.

That said defendant, Arrowhead Springs Corporation, Ltd.,
is now and it and its predecessors in interest have, for more than
fifty (50) years last past, been conducting and operating on said
Arrowhead Springs property a health and pleasure resort, consisting
of a hotel building, cottages, bungalows and all usual and customary
outbuildings, swimming pools, baths and other accessories, which es-
tablishment is now, and for many years last past has been, known as
"Arrowhead Springs Hotel", and, adversely to the said plaintiff and
said defendants and cross-complainants, has taken and diverted water
from said East Twin Creek and its tributaries above plaintiff's point
of diversion for use in said hotel, cottages, bungalows and out-
buildings for domestic purposes and for baths, swimming pools and other
purposes in connection therewith and for irrigation of said Arrow-
head Springs property, and has also, for more than five (5) years
prior to the commencement of this action, taken and diverted water
from said East Twin Creek and its tributaries, above plaintiff's
point of appropriation and diversion, for use in its steam cave baths
situated in Waterman Canyon adversely to the said plaintiff and de-
fendants and cross-complainants named in paragraph 6 hereof, and has
also, for more than five (5) years prior to the commencement of this
action, used adversely to the said plaintiff and said defendants and
cross-complainants, the waters of Penyugal Spring, Granite Spring and
other hot springs, all of which are located in Hot Springs Canyon on

-6-

said Arrowhead Springs property and are tributary to Hot Springs
Creek, which Creek is the lowest branch of East Twin Creek, for the
purpose of bottling the same and shipping the same outside of the
watershed of East Twin Creek and selling the same in bottles and
other containers for human consumption as mineral water, and has the
right, except as limited by the provisions of paragraph (1) hereof,
as such riparian owner and as appropriator and by prescription to
continue so to take and use water from said East Twin Creek and its
tributaries and to take and use said water on said Arrowhead Springs
property for all beneficial and riparian uses and to whatever extent
may be required for such uses and to take and use water from said
source for use in its steam cave baths in Waterman Canyon and to take
and use water from said Penyugal Spring, Granite Spring and other hot
springs and to bottle and ship the same outside of the watershed in
East Twin Creek, and to sell the same in bottles and other containers
for human consumption as mineral water.

5.   That the defendant, California Consolidated Water
Company, now is and it and its predecessors in interest have been en-
gaged in the business of diverting water from East Twin Creek and/or
its tributaries into reservoirs and tanks and from thence transport-
ing the same by means of cars and other conveyances to the City of
Los Angeles, where said water is bottled for domestic use and used
for the manufacture of beverages and other purposes; that said defen-
dant, California Consolidated Water Company, has entered in and upon
the springs at the headwaters of said Strawberry Creek and developed
the water at said Springs that would not naturally flow to plain-
tiff's said point of diversion, and diverted the water of said
springs including the water so developed into a pipe line and by
means thereof conveyed a part thereof to its said tanks and reser-
voirs and transported said part thereof from such tanks and reser-
voirs to Los Angeles where such water has been and is now being used
by said defendant in its said business.  That said defendant has ex-

-7-

1   panded large sums of money in so developing said springs and convey-
2   ing said water, and has developed an extensive business dependent
3   entirely upon such supply of water, and it would be inequitable to
4   enjoin said defendant from continuing to so take and use said water;
5   that said defendant requires the use of all the water now flowing
6   and hereafter developed and flowing from said springs tributary to
7   said Strawberry Creek lying north of the north line of the south half
8   of Section 31 and north of the north line of the south half of Sec-
9   tion 32, both in Township 2 North, Range 3 West, S.B.B.& M., and, ex-
10  cept as limited by the provisions of paragraph (i) hereof, is entitled
11  to take and use said water; that the taking of such water will be
12  injurious to plaintiff's right, but such injury can be compensated
13  in damages and such damage is hereby determined to be and is the sum
14  of twenty thousand dollars ($20,000.00).  That such diversion by
15  defendant, California Consolidated Water Company, will not, subject
16  to the terms of paragraph (i) hereof, impair any right of any other
17  party hereto.

18          6.    That defendants and cross-complainants, D. J.
19  Carpenter, Isabel C. Turner, J. E. Jeffers, George S. Mason, L. R.
        E. C. Jeffers (sued herein as John Hoe)
20  McKesson and National Thrift Company of America, were at the time of
21  the commencement of this action and they and their successors in
22  interest now are the owners of the right to take and use the first
23  ten (10) inches of the flow of the water of East Twin Creek reach-
24  ing plaintiff's point of diversion; that said ten inch right is part
25  of the right appropriated by plaintiff's predecessors in interest;
26  that all of said ten inches, or fraction thereof, when reaching
27  plaintiff's point of diversion, has been diverted by plaintiff and
28  its predecessors in interest into its pipe line and delivered to said
29  defendants at a diversion box at a point about one mile easterly from
30  plaintiff's said point of diversion, and said defendants and cross-
31  complainants are hereby determined to be the owners of said first
32  ten (10) inches of the flow of said creek reaching plaintiff's point

-8-

of diversion and entitled to have said ten (10) inches of water reaching plaintiff's point of diversion delivered to them by plaintiff at the said diversion box, and said plaintiff shall continue to take and divert and deliver the same.

7.    That the taking of such water as set forth in paragraph 5 above may be injurious to the rights of defendants and cross-complainants, D. J. Carpenter, Isabel C. Turner, J. B. Jeffers, George S. Mason, L. R. McKesson and National Thrift Company of America, unless said water from said Hot Springs Creek and said East Twin Creek be diverted at a point at or adjacent to the point of confluence of said Hot Springs Creek and East Twin Creek and from thence conveyed into plaintiff's present pipe line, the northerly terminus of which is plaintiff's diversion box located about one mile northerly from the mouth of said East Twin Creek Canyon, and that said defendants and cross-complainants are entitled to have said ten (10) inches thereof belonging to them so diverted and conveyed and delivered to them by plaintiff at the present diversion box located about one mile easterly from plaintiff's said present point of diversion.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

(a)    That defendant, Arrowhead Springs Corporation, Ltd., is, subject to the provisions of subdivision (1) hereof, the owner of the right to take water from said East Twin Creek and its tributaries and to use said water upon its said Arrowhead Springs property riparian to East Twin Creek, to the extent that such water is or may be required for any beneficial or riparian use upon said property, and to use said water to the extent of five (5) miner's inches, measured under a four inch pressure, in its steam cave baths and for domestic purposes in Waterman Canyon during the period from the first day of November to the first day of May of

-9-

each year at all times during said period when the taking thereof
will not reduce the water flowing at plaintiff's intake below
ten (10) inches, and to use said water to the extent of one (1)
miner's inch, measured under a four inch pressure, in its steam
cave baths and for domestic purposes in Waterman Canyon at all
other times, and is also, subject to the provisions of sub-
division (i) hereof, the owner of the right to bottle and ship,
out of the said East Twin Creek watershed, waters of Penyugal
Spring, Granite Spring and other hot springs tributary to Hot
Springs Creek, provided, however, that said defendant, Arrowhead
Springs Corporation, Ltd., shall not so use the waters of Hot
Springs Creek, for shipment, irrigation or otherwise, as to re-
duce the flow of the waters of Hot Springs Creek at the point of
its confluence with East Twin Creek below ten (10) miner's
inches, measured under a four inch pressure, provided further,
however, that no part or portion of any of the water of East Twin
Creek, or any of its tributaries, except as otherwise herein
provided, shall ever be taken to or used upon lands not riparian to
said East Twin Creek.

(b)  That defendant, California Consolidated Water Com-
pany,is, subject to the provisions of subdivision (i) hereof, the
owner of the right to take, impound, divert, transport and carry
away water of that certain spring known as "Indian Spring" and any
and all of the water of all springs situated or obtainable in that
part of East Twin Creek known as "Strawberry Creek and Canyon" and
canyons lateral thereto lying north of a line drawn east and west
through Sections 31 and 32, Township 2 North, Range 3 West, S.B.B.
& M., coincident with the northerly line of the south half of Sec-
tion 31 and the south half of Section 32, Township 2 North, Range
3 West, S.B.B. & M., and it may enter in and upon that portion of

-10-

said Strawberry Creek and Canyon and lateral canyons thereto lying north of said line and develop, by means of tunnels or otherwise, any and all springs or water situated or obtainable from said area north of said line, and may take and divert all of said water flowing and to flow in and from said springs and/or obtainable in said area into a pipe line and divert and carry the same, by and through such pipe line, to tanks and reservoirs upon said Arrowhead Springs property, and may take and transport the same beyond and out of said watershed for bottling or other purposes or uses.

(c) Defendant, Arrowhead Springs Corporation, Ltd., shall at all times maintain suitable and proper septic and treating tanks upon its lands and shall cause all sewage to pass through such septic and treating tanks and be properly treated before returning the same to or permitting the same to return to or flow into said East Twin Creek, and said tanks shall be so constructed and located that all water flowing from said septic tanks, not used on the premises, shall return and flow into said East Twin Creek above plaintiff's point of diversion.

Defendant, Arrowhead Springs Corporation, Ltd., shall also cause all water that may be diverted for use by said Arrowhead Springs Corporation, Ltd., not actually consumed in the exercise of the rights hereinbefore decreed to Arrowhead Springs Corporation, Ltd., to return and flow into said East Twin Creek above plaintiff's point of diversion.

(d) That plaintiff have and recover of and from the defendant, California Consolidated Water Company, the sum of fifteen thousand dollars ($15,000.00), and from defendant, Arrowhead Springs Corporation, Ltd., the sum of five thousand dollars ($5,000.00).

(e) That plaintiff is the owner of the right to have all the water of East Twin Creek and its tributaries which flows to its said intake, subject only to the rights of defendants Arrowhead Springs Corporation, Ltd., California Consolidated Water Company,

-11-

Case 2:42-cv-00728-JGB-DTB Document 6635-10 Filed 01/03/25 Page 90 of 108 Page
Page #12887

and defendants and cross-complainants designated in paragraph 6, as herein set forth.

(f) Plaintiff shall have the right to enter in and upon the lands of the defendant, Arrowhead Springs Corporation, Ltd. and construct a diversion weir and box and submerged dam upon said East Twin Creek at a point three hundred (300) feet northerly of the confluence of Hot Springs Creek and East Twin Creek, and also at the confluence of said streams, and may construct a pipe line or conduit from such point to plaintiff's present diversion box and may take and divert all of the water ordinarily flowing in said East Twin Creek at such diversion point subject only to the rights of defendants Arrowhead Springs Corporation, Ltd. and California Consolidated Water Company, and defendants and cross-complainants designated in paragraph 6, as herein set forth. The right of ingress and egress for construction and maintenance of said diversion weir and box, dam and pipe line or conduit shall be exercised in such a manner as to do the least possible damage to land, improvements, plantings and natural trees and shrubbery upon said Arrowhead Springs property, and said pipe line, if constructed, shall be maintained as free from leaks as possible and shall at all times have a depth of cover of at least two feet over the top of the pipe.

(g) Cross-complainants, D. J. Carpenter, Isabel C. Turner, E.C. Jeffers (sued herein as John A oe) J. A. Jeffers, George S. Mason, L. R. McKesson and National Thrift Company of America, and their successors in interest, are the owners of the right to take and use the first ten (10) inches of water, or fraction thereof, reaching the point of diversion referred to in paragraph 6 hereof, and diverted by plaintiff into its pipe line from East Twin Creek and may take and divert said first ten (10) inches of water, or fraction thereof, reaching said point of diversion, from plaintiff's said pipe line at the diversion box now in place and used for such purpose.

-12-



Exhibit 5, P. 089

Exhibit 5

Page 285

That plaintiff shall immediately hereafter, at its own expense and cost, undertake and thereafter diligently prosecute the construction of such pipe line and such diversion dams, weirs, and boxes as may be necessary to divert and convey the water to which plaintiff and/or cross-complainants are entitled hereunder, from Hot Springs Creek and East Twin Creek from a point at or adjacent to the point of confluence of said Hot Springs Creek and East Twin Creek to and into plaintiff's present diversion box and pipe line, and said plaintiff shall complete said construction work on or before the 1st day of May, 1932, and shall thereafter maintain the same at its own expense, and shall thereafter convey through said pipe line and structure at least ten (10) miner's inches of said water of Hot Springs Creek and East Twin Creek if that amount be flowing therein from said point at or adjacent to the confluence of Hot Springs Creek and East Twin Creek to and into its present diversion box and pipe line, and convey such ten (10) inches thereof from thence to the point of the present diversion box of plaintiff from which diversion box defendant and cross-complainants are now taking their said ten (10) inches of said water, it being the intent and purpose hereof that said plaintiff shall deliver the first ten (10) inches of the flow of East Twin Creek at plaintiff's present point of diversion or the first ten (10) inches of water flowing in Hot Springs Creek and East Twin Creek at their point of confluence to defendants and cross-complainants at the present diversion box located at a point on plaintiff's pipe line about one mile easterly from plaintiff's present point of diversion.

(h) Each of the parties hereto is perpetually enjoined from taking, using or interfering with the use of the waters of East Twin Creek and its tributaries except as herein decreed.

(i) This judgment shall not in anywise affect, amend, or otherwise impair any contracts now in existence, or which may be

-13-

executed as of the date of this judgment, by and between defendant Arrowhead Springs Corporation, Ltd. and defendant California Consolidated Water Company, relating to the water of East Twin Creek or any of its tributaries.

(j) That pursuant to said stipulation, this judgment shall be final upon the entry thereof, and not subject to appeal or review in any manner by any of the parties to said ~~cause~~ stipulation.

(k) Each of the parties hereto shall pay its own costs.

Done in open court this 19th day of October, 1931.

_____
Judge



THE DOCUMENT TO WHICH THIS CERTIFICATION IS ATTACHED, CONSISTING OF ___ PAGE(S), IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.

ATTEST
Clerk of the Superior Court of the State of California, in and for the County of San Bernardino.

Date _____

By _____ Deputy

-14-



THE DOCUMENT TO WHICH THIS CERTIFICATION
IS ATTACHED, CONSISTING OF _14_ PAGE(S), IS A
FULL, TRUE AND CORRECT COPY OF THE ORIGINAL
ON FILE AND OF RECORD IN MY OFFICE.

ATTEST __CHRISTINA M. VOLKERS__
Clerk of the Superior Court of the State of California,
in and for the County of San Bernardino.

Date __FEB 17 2015__

By _____ Deputy

TERRIE JOHNSON

Exhibit 5, P. 092

Exhibit 5         Page 288

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION

# Exhibit 2

Case 2:24-cv-09283-FLB-DTB Document 6535-10 Filed 01/03/25 Page 97 of 108 Page ID #27892

## GRANT DEED

CARRIE THOMAS, a widow, in consideration of Ten Dollars, to her in hand paid, the receipt of which is hereby acknowledged, does hereby GRANT TO Ethel Thomas, a single woman, all that real property in the County of San Bernardino, State of California, described as:

The South half of Lot 185, in Baldwin Lake Tract No. 1724, as per plat of said Tract of record in the office of the County Recorder of said County in Book 25 of Maps, at page 71 thereof.

SUBJECT TO taxes, assessments, conditions, restrictions, reservations, easements, rights and rights of way of record.

TO HAVE AND TO HOLD to the said grantee, her heirs or assigns forever.

WITNESS my hand this 16th day of October, 1934.

Consideration less than $100.

                                        Carrie Thomas

STATE OF CALIFORNIA    } SS
COUNTY OF LOS ANGELES  }

On this 16th day of October, 1934, before me, the undersigned, a Notary Public in and for said County, personally appeared Carrie Thomas, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same.

WITNESS my hand and official seal.

(NOTARIAL SEAL)                Vance C. Kibbe
                               Notary Public in and for said County and State

No. 55.  "Endorsed."  Recorded at Request of Grantee, Dec 3 1934 at 11:12 A. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif.  Fulton G. Feraud, County Recorder, By A. R. Schultz, Deputy.  Fee $1.00.

                               Compared

       F. Cooley              E. Quinn

                    o o o o o


THIS AGREEMENT made and entered into this 26th day of September, 1931, by and between ARROWHEAD SPRINGS CORPORATION, LTD., (formerly Arrowhead Springs Corporation), a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California, (hereinafter called "Arrowhead") and CALIFORNIA CONSOLIDATED WATER COMPANY, a corporation organized and existing under and by virtue of the laws of the State of Delaware, duly qualified to do business in the State of California, (hereinafter called "Consolidated"):

WITNESSETH:

WHEREAS, on the 6th day of August, 1930, the parties hereto entered into a certain agreement, which agreement was thereafter recorded in the office of the County Recorder of San Bernardino County, California, in Book 648, at page 122 of Official Records of said County; and

WHEREAS, the parties hereto have determined to enter into a new agreement, whereby each will acquire certain rights and will agree to perform certain obligations distinct and different from the rights and obligations existing under or on account of said agreement of August 6, 1930, (which agreement, for convenience, will be hereinafter referred to as the "principal agreement"),

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the parties hereto do agree as follows:

First:  Consolidated agrees that it will forthwith, upon the execution of this agreement, and at its own cost and expense, develop to the fullest reasonable extent all springs,

Case 5:24-cv-07284-EKL Document 65-10 Filed 01/03/25 Page 96 of 108 Page ID #27809

seepages and other sources of water, if reasonably available, existing in Strawberry Canyon and all lateral canyons opening into Strawberry Canyon, lying north of the northerly line of the south half of Section 31 and of Section 32, Township 2 North, Range 3 West, S.B.B. & M., and produce and continue to produce from said sources of water sufficient water to fill the pipe line built by Consolidated, under and in accordance with the terms of said principal agreement, in ordinary seasons of dry weather.

Second: Consolidated shall hereafter at all times conduct all water developed and saved by it in Strawberry Canyon, and in the lateral canyons northerly of said line established in paragraph First hereof, through the said pipe line, and agrees that all of the water so deveoped, saved and produced by it from said sources of supply shall be conducted through said pipe line, and not otherwise, to the point of delivery hereinafter referred to. Of all such water so developed and saved and conveyed through said pipe line, Consolidated shall be entitled to eighty per cent (80%) of the constant flow thereof and Arrowhead shall be entitled, without cost, to twenty per cent (20%) of the constant flow thereof. The point of delivery of said 20% of said water to which Arrowhead is entitled (which is the point of delivery referred to hereinabove in this paragraph) shall be a point in the aforesaid pipe line ten (10) feet north of the rectangular reservoir having dimensions of 50 x 100 feet back of the hotel building of Arrowhead. The method of measurement of said water, so that both Consolidated and Arrowhead shall receive their proportionate part thereof, as hereinabove set out, shall be agreed upon by and between an engineer designated by Arrowhead and an engineer designated by Consolidated. If the two engineers so designated shall fail to agree, then they shall designate a third engineer, who shall be impartial, and the decision of any two of the three engineers thus designated shall be binding upon the parties hereto as to the method of measurement of said water.

Third: Arrowhead grants to Consolidated any and all right, title or interest which Arrowhead now has to develop water from any and all sources whatever, whether surface, subterranean, seepage, or otherwise, in Strawberry Canyon and the lateral canyons northerly of the said northerly line of the said South half of said Sections 31 and 32 above described.

Arrowhead also grants to Consolidated all right, title or interest which it now has or heretofore had in or to the title to, or ownership of, any and all water that Consolidated has heretofore or may hereafter develop from any and all sources whatsoever in Strawberry Canyon and lateral canyons northerly of said northerly line of the south half of said Sections 31 and 32; subject, however, to the right of Arrowhead to have delivered to it by Consolidated at the point of delivery aforesaid, twenty per cent (20%) of all such water developed and saved by Consolidated.

The aforesaid grants are without warranty except the warranty that Arrowhead has not conveyed or transferred to any other person the same right, or any right, title or interest therein.

If, within three (3) years from the date of this agreement, Consolidated does not develop a flow of water in Strawberry Canyon and/or canyons lateral to it, southerly of said line above established, additional to the flow of water developed by Consolidated northerly of said established line, then Arrowhead shall be exclusively entitled, so far as Consolidated is concerned, to develop and produce such additional flow of water at any and all places southerly of said established line, provided that such development and production of water shall not affect or impair the right of Consolidated to develop and produce water northerly of said established line. In the event of the development of any water southerly of said established line, by either party hereto, and northerly of the

Case 2:24-cv-09720-GW-TB Document 635-10 Filed 01/03/25 Page 69 of 108 Page ID #27634

south section lines of said Sections 31 and 32, Arrowhead and Consolidated shall each be entitled to an equal one-half part thereof. In the event of the development by Arrowhead of any water southerly of the south section lines of Sections 31 and 32, Arrowhead shall be entitled to the whole thereof, so far as Consolidated is concerned.

Fourth: It is understood and agreed that all of the covenants, terms and conditions of paragraph Fourth of said principal agreement are hereby agreed to and reaffirmed, except that the same shall be deemed to have been amended so as to substitute the words "eighty per cent (80%) of the water flowing through said pipe line" wherever reference is made to the water to which Consolidated is entitled, in lieu of the words "one-half of the water flowing through said pipe line," and except that the same shall be deemed to have been amended so as to substitute the words "twenty per cent (20%) of the water flowing through said pipe line" wherever reference is made to the water to which Arrowhead is entitled, in lieu of the words "one-half of the water flowing through said pipe line."

Fifth: Consolidated agrees that upon the execution of this agreement it will pay to Arrowhead the sum of fifteen thousand dollars ($15,000.00) towards the development by Arrowhead of water in Cold Water Canyon. Arrowhead agrees that said payment of $15,000.00 was induced by its promise, which it hereby obligates itself to perform, to actually commence the development of water in said Cold Water Canyon within one (1) year from the date hereof, and at its own cost (not exceeding said sum of $15,000.00) to diligently prosecute such work to completion; such work to be done in such manner and to involve the construction of such pipe lines, reservoirs and other facilities as Arrowhead may deem advisable.

Sixth: Except as amended hereby, said principal agreement shall not be affected hereby and each and every sentence, clause or paragraph of said principal agreement not amended hereby, and with which this agreement is not inconsistent, and particularly paragraphs Third, Fifth, Sixth, Seventh and Ninth of said principal agreement, are hereby reaffirmed, and the parties hereto agree that said paragraphs shall not in anywise be affected by anything contained in this agreement.

Seventh: Arrowhead does hereby grant, without warranty, to Consolidated the right to use one miner's inch constant flow of the water arising from Penyugal Springs, or from other springs in the vicinity thereof, but not for sale as mineral medicinal water, and does also hereby grant to Consolidated the necessary easement for a pipe line to run from said Penyugal Springs or vicinity to the reservoirs of Consolidated, the exact course and description of such easement to be hereafter agreed upon by the parties hereto. Consolidated does hereby agree that it shall not have any right to the hot water arising on the property of Arrowhead Springs Corporation, Ltd. other than the one miner's inch above described in this paragraph.

Eighth: WHEREAS, Consolidated has stated to Arrowhead that certain false and fraudulent representations were made by Arrowhead and/or by certain of its officers, agents and/or employes prior to and at the time of the purchase by Consolidated and/or California Consumers Company, its predecessor in interest, of the properties and business as set forth and described in that certain agreement of the 4th day of December, 1928, the Amendatory Contract of the same date, the Second Amendatory Contract of the 19th day of December, 1928, and the agreement of February 28, 1929, which agreements are recited in the principal agreement of August 6, 1930, and that Consolidated and California Consumers Company, its predecessor, relied upon such false and fraudulent representations in the making of all of such agreements and in the purchase of said properties; and

WHEREAS, Arrowhead has denied that any of such false or fraudulent representations were so made by it, or any of its officers, employes or agents, and the parties hereto desire to fully release and discharge any and all claims and causes of action arising on

account of any such alleged false or fraudulent representations,

NOW, THEREFORE, for and in consideration of the premises and of the covenants, terms and provisions of this agreement, the parties hereto do hereby fully and completely release and discharge each other of and from any and all causes of action, claims, demands or obligations arising out of or on account of any representations, false, fraudulent or otherwise, of any kind or nature, made or alleged to have been made by either party hereto, or any of their respective officers, agents or employes, in connection with or preliminary to, or otherwise affecting or having to do with, the transfer of the business and properties of Arrowhead to Consolidated or to California Consumers Company, a corporation, or in connection with the amount of water developed or to be developed upon the properties of Arrowhead or the amount of water sold by it, or the source of said water, or in connection with the execution of said principal agreement and/or this agreement, and do hereby release and discharge each other from any and all other obligations, causes of action, claims or demands of every kind or nature whatsoever arising out of, or on account of, or in any manner connected with, the sale by Arrowhead to Consolidated, or to California Consumers Company, of its water distribution business and certain water rights, as provided in said agreement of the 4th day of December, 1928, and subsequent agreements hereinbefore designated, except such as are contained in, or arise out of, or on account of the following:

(a)  The warranty deed of February 27, 1929, recorded on the 12th day of May, 1929, in Book 476, Page 175 of Official Records of San Bernardino County, California, as amended by said principal agreement of August 6, 1930;

(b)  The principal agreement of August 6, 1930, as amended by this agreement;

(c)  The agreement dated January 2, 1931, executed by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "Memorandum of Agreement," as amended by agreement of even date herewith.

(d)  The agreement dated August 6, 1930, executed by Arrowhead Springs Corporation and California Consolidated Water Company, entitled "Special Distributors Agreement," as amended by agreement of even date herewith.

(e)  This agreement.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their respective officers, thereunto duly authorized, and their respective corporate seals to be hereto affixed, the day and year first above written.

(CORPORATE SEAL)

ARROWHEAD SPRINGS CORPORATION, LTD.

By  C. M. Rice, Vice-President

And J. C. Macfarland, Assistant Secretary

(CORPORATE SEAL)

CALIFORNIA CONSOLIDATED WATER COMPANY

By  S. C. MacPherson, Exec. Vice President

And C. A. Werne, Asst. Secretary

```
(Prepared by _
(Attorney's Approval
  Pillsbury, Madison & Sutro By _
  Other Attorneys _
  or Lawler Degnan _
  Form previously approved by
(Description approved  J. Paul Jones
(R. of W. Approval _
(Approved _
(Approved _
(Manager's Approval for Execution _
```

STATE OF CALIFORNIA        }
                           } SS
COUNTY OF LOS ANGELES       }

On this 28th day of September, 1931, before me, Mary S. Alexander, a notary public in and for the said county and state, residing therein, duly commissioned and sworn, personally appeared C. M. Rice, known to me to be the Vice-President, and J. C. Macfarland, known to me to be the Assistant Secretary of ARROWHEAD SPRINGS CORPORATION, LTD., one of

the corporations that executed the foregoing agreement, known to me to be the persons who executed the foregoing agreement on behalf of such corporation, and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Mary S. Alexander

(NOTARIAL SEAL)      Notary Public in and for the County of Los Angeles, State of California

No. 70. "Endorsed." Recorded at Request of O. M. Rice, Dec 3 1934 at 1:01 P. M. in Book 1016, Page 303, Official Records, San Bernardino County, Calif. Fulton G. Feraud, County Recorder, By A. R. Schultz, Deputy. Fee $3.80.

Compared

F. Cooley          E. Quinn

o o o o o

### NOTICE
### NON-RESPONSIBILITY

TO ALL WHOM IT MAY CONCERN:

NOTICE is hereby given that I, H. H. EASTWOOD, am the owner of certain premises described as follows, to-wit: Lot 34, Block 50, Tract 2439, of _ recorded in Book 34, page 78 of Official Records of San Bernardino County, State of California; That I have obtained knowledge that building is in course of construction on said property; that ten days have not elapsed since I obtained this knowledge; and that I will not be responsible for the construction of said building, or for the material or labor used or to be used therein, or for any alteration or repair thereof, or for any work done upon said building, or any addition thereto, or which has been performed, furnished or used in any manner or way upon said land, or upon the building thereon, or addition thereto, or which may hereafter be performed, furnished, or used upon said land, or building, or addition thereto, or for the service of any architect.

THAT HAL WILSON and HORTENCE WILSON are the purchasers of said property under a contract of purchase.

THAT _ is the lessee of said property.

No. and Street _          H. H. Eastwood

STATE OF CALIFORNIA  } SS
COUNTY OF SAN BERNARDINO }

H. H. Eastwood being duly sworn deposes and says: That the above and within notice is a true copy of a notice posted on lot 34, block 50, tract 2439, Records of San Bernardino County, California, on the third day of December, 1934 by H. H. Eastwood and that the facts therein stated are true of his own knowledge.

H. H. Eastwood

Subscribed and Sworn to before me this 3rd day of December, 1934.

(NOTARIAL SEAL)      Mae A. C. Fanning

Notary Public in and for said County and State

STATE OF CALIFORNIA  } SS
COUNTY OF SAN BERNARDINO }

On this third day of December, A. D., 1934, before me, Mae A. C. Fanning, a Notary Public in and for said County and State, personally appeared H. H. Eastwood known to me to be the person whose name is subscribed to the within Instrument, and acknowledged to me that he executed the same.

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION

# Exhibit 3



Case 5:24-cv-02203-SB-DTB   Document 55-10   Filed 03/26/25   Page 6 of 51   Page ID #:1598

Well #: 1, 1A, 8
Telemetry Station (1)
Vault (2)

Helispot (1)
Telemetry Station (1)
Tunnel #2
Vault (1)

Arrowhead
Highlands

Bridge (1)
Telemetry Station (1)
Tunnel #3
Vault (1)

Helispot (1)
Well #: 10, 11, 12
Bridge (1)
Telemetry Station (1)
Telemetry Pad (1)
Vault (1)

Helispot (1)

Trail

Helispot (1)
Well #: 7, 7A, 7B, 7C
Telemetry Station (1)
Vault (1)

PIPELINE IS LOCATED WITHIN ROADWAY

The Permit Area covers 4.51 acres or 6.5 miles in Sec. 30,
T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 31,
T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 6,
T. 1 N., R. 3 W., SAN BERNARDINO MERIDIAN,
SE1/4SE1/4 Sec. 1, T. 1 N., R. 4 W., SAN BERNARDINO
MERIDIAN, NE1/4 Sec. 12. T. 1 N., R. 4 W.,
SAN BERNARDINO MERIDIAN

| Use | Code | Acres | Description |
|---|---|---|---|
| Water Trans. Pipeline (4.6 mi) | 915 | 2.8 | 5 ft. wide |
| Access Trails (1.9 mi.) | 753 | 1.4 | 6 ft. wide |
| Helicopter Landing | 715 | 0.25 | 30 ft. radius |
| Wells/Vaults/Telemetry Sta. | 931 | 0.06 | 5 sq. ft |

## Appendix A
## The Permit Area
### Nestle Waters of America
Permit #: FCD728501

San Bernardino National Forest
Front Country Ranger District

October 3, 2017
1:24,000

0     ¼     ½ Mile

▲ Well (12)          ■ Telemetry Station (5)
⊙ Helispot (4)       ▣ Telemetry Pad (1)
● Tunnel (2)         — Pipeline
● Valve (27)         ▬ Bridge(20)
◆ Vault (8)          •–• Trail

Exhibit 5, P. 100

Exhibit 5

Page 296

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT
CONSULTATION

# Exhibit 4

San Manuel Band of Mission Indians



**Arrowhead Springs**

Village Dorm Complex

Cultural Grounds

Arrowhead Bowl

Water Tanks

Event/Meeting Space

Fire Station

Administrative Building

● Fire Hydrants

Fire Hydrants

Feet
0    200   400   600   800   1,000

N

SAN ⬥ MANUEL
BAND OF MISSION INDIANS

Exhibit 5, P. 102

Exhibit 5

Page 298

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION

# Exhibit 5

Exhibit 5, P. 103

Exhibit 5

Page 299

Case 2:14-cv-02235-ODW-PLR  Document 658-10 Filed 01/03/25  Page 105 of 108  Page ID #28402



Irrigated area by Previous Owner

Non-Irrigated area by SMBMI

Exhibit 5, P. 104

Exhibit 5                                    Page 300

CONFIDENTIAL INFORMATION PROVIDED PURSUANT TO GOVERNMENT-TO-GOVERNMENT CONSULTATION

# Exhibit 6



www.SBCounty.gov

## County Administrative Office
### Governmental & Legislative Affairs

**Bradley Jensen**
Director

August 1, 2024

Daniel Little, Chief Intergovernmental Affairs Officer
Yuhaaviatam of San Manuel Nation
26569 Community Center Drive
Highland, CA 92346

**RE: Loss of Water Supply at Arrowhead Springs Property**

Dear Mr. Little,

On behalf of the San Bernardino County Board of Supervisors, I am greatly concerned about a potential loss of water supply to the Yuhaaviatam of San Manuel Nation (the Tribe). The County depends on the Tribe as a key regional partner to assist our efforts in fighting wildfires and responding to natural disasters. Without readily available water at the Tribe's Arrowhead Springs property, County firefighting operations for our foothill communities would be severely crippled.

The County was not informed by the U.S. Forest Service about the agency's decision to cut the Tribe's Arrowhead Springs water supply. This lack of communication is completely unacceptable, especially at the height of fire season. The County's firefighters and emergency personnel have already fought two major wildfires in July – one near Apple Valley and the other in the mountains north of Rancho Cucamonga – that have burned thousands of acres, required the evacuation of hundreds of residents, and cost the County millions to contain. The snap decision to cut off water to a community in a dangerous fire-prone area is an obvious hazard to the homes and lives of San Bernardino County residents. Wildfires are burning across California and our County needs all available resources – including the Tribe's water at Arrowhead Springs – to quickly respond to these emergencies.

As Chair of the San Bernardino County Board of Supervisors, I ask that the Tribe's Arrowhead Springs water supply be delivered to the property through the end of the year. This will allow the County Fire District to have access to this vital water supply while the legal issues are resolved. If you have any questions about this request, please contact Brad Jensen, Director of Legislative Affairs, at (909) 387-4821 or by email at Bradley.Jensen@cao.sbcounty.gov. He can direct any requests to the appropriate County department or my staff.

Sincerely,

Dawn Rowe
Third District Supervisor
Chair, San Bernardino County Board of Supervisors

**BOARD OF SUPERVISORS**

COL. PAUL COOK (RET.)
Vice Chairman, First District

JESSE ARMENDAREZ
Second District

DAWN ROWE
Chair, Third District

CURT HAGMAN
Fourth District

JOE BACA, JR.
Fifth District

Luther Snoke
Chief Executive Officer

Exhibit 5, P. 106
Exhibit 5
Page 302



City of
# San Bernardino

**Office of the Mayor | Helen Tran**

August 6, 2024

Daniel Little
Chief Intergovernmental Affairs Officer
Yuhaaviatam of San Manuel Nation
26569 Community Center Drive
Highland, CA 92346

**RE: Loss of water supply at Arrowhead Springs Property**

Dear Mr. Little,

As Mayor of the City of San Bernardino, I am very concerned with the potential loss of water at the Yuhaaviatam of San Manuel Nation's (the "Tribe") Arrowhead Springs property located in the City of San Bernardino. Arrowhead Springs is ideally situated to assist in wildfire suppression measures that benefit the entire region. Many fires throughout the history of San Bernardino have quickly swept across our foothills and destroyed *entire neighborhoods*.

If the Tribe is unable to provide such water because its water supply for Arrowhead Springs is cut-off, the ability to respond to wildfires at Arrowhead Springs and the surrounding area in a timely manner would be reduced. We did not receive any notice of the United States Forest Service's decision to cut off the Tribe's water supply to the Arrowhead Springs property and are deeply concerned about its potential devastating impact it could have should a wildfire occur in the region. Wildfire emergencies are occurring across all of California and San Bernardino County needs all resources, including the Tribe's water at Arrowhead Springs, to be ready to respond.

As Mayor of the City of San Bernardino, I ask that water be allowed to be delivered to the Arrowhead Springs property through the end of the California wildfire season, at a minimum.

Sincerely,

Helen Tran
Mayor, City of San Bernardino

290 North D St, San Bernardino, CA 92401 | P: 909-384-5133 | mayor@sbcity.org

Exhibit 5, P. 107

Exhibit 5

Page 303