# Exhibit 11
# to Declaration of Rachel Doughty

 

# DECISION MEMO

## NESTLÉ WATERS NORTH AMERICA INC.

## SPECIAL USE PERMIT

## U.S. FOREST SERVICE

## STRAWBERRY CREEK

## FRONT COUNTRY RANGER DISTRICT

## SAN BERNARDINO NATIONAL FOREST

## SAN BERNARDINO COUNTY, CALIFORNIA

## BACKGROUND

Nestlé Waters North America (Nestlé) owns and operates water collection tunnels, horizontal wells, water transmission pipelines and associated improvements on the San Bernardino National Forest. These developments, commonly referred to as the Arrowhead Springs Permit, have been authorized since 1929, with the latest permit issued in 1978. Nestlé has been operating and maintaining the improvements under the terms and conditions of the 1978 permit. These developments are located within the Strawberry Creek watershed, which is tributary to East Twin Creek, which is tributary to the Santa Ana River. The permit area is shown in Figure 1.

## PURPOSE AND NEED FOR ACTION

There is a need to respond to a request to authorize the continued occupancy and use of the existing water development facilities, water transmission pipelines, electronic telemetry equipment, helicopter landing areas, and access trails on National Forest System (NFS) lands. The Forest Service purpose is to authorize the existing facilities under a current Forest Service permit that is consistent with state and federal law, regulations, and the San Bernardino National Forest Land Management Plan (LMP).

Nestlé's project purpose is to continue to operate and maintain the existing system to supply bottled drinking water for retail sale. Nestlé is responsible for the safe and reliable operation of their water system under a variety of federal and state laws, and would operate the system on NFS lands according to the terms of the permit.

 



Figure 1.  Project Area

   

## DECISION

As District Ranger I have the delegated authority to approve special uses for terms that do not exceed 5 years. I have reviewed the project record (including public comments, specialist reports, and consultation with other agencies) and I have decided to approve the continued occupancy and use of NFS lands for the extraction and transmission of water using existing improvements, subject to resource mitigation measures designed to ensure compliance with the LMP. The initial permit term will be three (3) years, with discretionary annual permits for an additional two (2) years. The analysis summarized in this Decision Memo is based on a maximum permit term of five (5) years. In addition to approving the continued use of the existing improvements, Nestlé will conduct hydrologic and riparian area studies and modify operations under an Adaptive Management Plan (AMP) as necessary. The AMP would identify whether incremental changes to the mitigation measures are necessary to reduce effects on National Forest resources.

My decision to approve the continued use and occupancy of existing facilities with conditions is based on the agency objective to authorize and manage special uses of NFS lands in a manner which mitigates natural resources and public health and safety concerns, consistent with the LMP and all other relevant law. The resource mitigation measures, are designed to ensure that the impact to natural resources will be minimal, may improve resource conditions when compared to the existing condition. These resource mitigation measures protect and do not infringe upon water rights for developed spring water held by Nestlé under California state water law, as described by a recent report from the California Water Resources Control Board staff. The AMP provides the permittee with operational flexibility in how those resource measures will be addressed. A complete discussion of water rights associated with this authorization is found on pages 21 to 22 of this decision memo. As described further in this decision, including the analysis of the potential for extraordinary circumstances as supported by the specialist reports, the impacts from the authorized activities, including any adjustments (resource mitigation measures) that may be necessary, will not result in extraordinary circumstances. While the AMP provides operational flexibility for meeting resource mitigation measures, implementing the AMP will not result in increased impacts from approved activities or cause extraordinary circumstances to occur. My decision is consistent with the LMP and meets the present and future needs of the American people.

Based on comments from the public I have made changes and clarifications to the proposed action and the changes are incorporated in the description below and displayed in italics to differentiate information added since scoping.

The right-of-way occupies approximately 4.5 acres of NFS land. This use of National Forest System land is authorized under the authority granted to the Secretary of Agriculture by several laws, including the Federal Land Policy and Management Act of 1976 and the Organic Act of 1897. The authorized activities are further described in the following sections.

The following existing improvements will be authorized:

> 2 water collection tunnels
> 10 horizontal wells located within 4 concrete vaults
> 5 electronic monitoring telemetry sites and associated equipment
> 4 helicopter landing areas




5.7 miles of access trails (4.5 miles of trail are along the water transmission lines)
4.5 miles of 4" steel water transmission pipe and associated valves
> 2.75 miles of above ground pipeline
> 1.75 miles of buried pipeline (along Forest road 1N24)
> 20 pipeline support bridges

The permit would also continue to authorize administrative use and maintenance of Forest Road 1N24 on a shared basis.

The working area is the area needed for temporary use when routine maintenance work is conducted on the existing improvements. This working area is calculated based on set distances from approved facilities, and is used to identify the area that may be used if work is needed during the term of the permit. Those working areas are described in Table 1.

**Table 1. Working Areas.**

| Improvement | Working Area |
|---|---|
| Vault Structures | 5' around structure |
| Above ground pipeline | 2.5' each side |
| Buried pipeline and road 1N24 | 10' each side |
| Trails | 3' each side |
| Helicopter landing areas | 30' radius circle |

**Operation of the system** – This decision approves the continued operation of the current system subject to the terms and conditions of the new permit, including the adaptive management plan requirements. *No expansion of the well system is authorized.* The system is operated to collect water on a year-round basis. Water infiltrates under the influence of gravity into the collection tunnels or horizontal wells and is transported through pipes to storage tanks on private land. Pipeline pressure is regulated through a series of valves located along the pipeline. There is no storage of water on National Forest System lands.

Electronic devices are used to monitor conditions at the vaults. The information is sent via radio signals to a company owned facility on private lands. The power for the devices is provided by solar panels with battery backup.

**Maintenance of the system** – This decision approves the continued maintenance of the existing system subject to the terms and conditions of the new permit. *Maintenance does not include expansion or change to the water system components, but does include replacement or repair of facilities "in kind."* The system is maintained based on periodic inspections by Nestlé. Every piece of equipment is inspected at least annually. The maintenance work includes:

Well and pipeline sanitizing – collection facilities are sanitized annually or more frequently as indicated by weekly tests. Collection areas are treated with a 200 parts-per-million solution of chlorine. Treated water is dechlorinated with Sodium thiosulfate and discharged through the pipeline system on private property. The pipeline system as a whole is sanitized by adding chlorine at the collection points and running that chlorinated water through the pipeline system to a release point on private land. All water released in conjunction with routine maintenance is regulated under National Pollution Discharge Elimination System permit CA #G998001, issued by the Santa Ana Regional Water Quality Control Board.




Horizontal well cleaning – the horizontal wells are cleaned by brushing and water jetting the full length of each boring screen. The wells are typically cleaned once every 10 years.

Equipment maintenance/replacement – all equipment including valves, sensors, and telemetry equipment is inspected monthly for proper operation, and maintained as needed. Maintenance could include cleaning and exercising valves, replacing parts within valves, and replacing defective components as needed. Isopropyl alcohol is used to disinfect any serviced components that are part of the water system.

Pipeline repair – Any sections of pipeline that are damaged or broken by falling rocks, trees or other debris are repaired as soon as possible, typically as emergency work. For the above ground pipeline, the damaged section of pipeline is cut out and a new section is welded in place, with pipe supports replaced as needed. For the buried pipeline located along 1N24, a backhoe will be used to expose the broken section of pipe. Materials will be flown to remote repair sites using helicopters. Equipment powered by generators or gas motors could be used to perform the work, along with common hand tools.

Vegetation management – vegetation is cleared 5 feet around vaults and 2.5 feet around the pipeline using motorized equipment and hand tools on an as-needed basis. Slash is lopped and scattered to minimize fuel loading or concentrations. Under the new permit work would be prohibited during the Limited Operating Periods described in the Resource Mitigation Measures. *No use of herbicides is permitted as part of this authorization.*

***Monitoring Stations*** *– The new permit will require monitoring of resource conditions in locations downstream from the authorized facilities. Some monitoring sites will include some instrumentation such as streamflow stage recorders but all sites will include simple markers for established plots and cross sections.*

*The Hydrologic and Riparian studies described below will require clearing of helispots in the East Twin Creek drainage to provide access for monitoring. Up to three helispots (TC 1 through 3) within Section 36, Township 2 North Range 4 West (refer to the June 14, 2017 map in the project records) may be developed. Helispots would be cleared of brush in a 20' by 20' area, however no trees would be removed. Brush would be cleared along foot trail access routes from the helispots to East Twin Creek monitoring locations. Up to 12 additional helicopter flights may be needed to support monitoring.*

Access – This decision approves the continued use and maintenance of designated access trails (with a tread width of 50" or less), designated helicopter landing areas, and use of Forest road 1N24. Maintenance crews will access work sites by using one of the authorized access points and then traveling cross-country or along the pipeline to reach the work site. Helicopter access is the most common access method used to reach the improvements, and typically 32 helicopter flights to the existing helicopter landing areas are required on an annual basis for routine inspections and maintenance. Helicopter flights for pipeline repair and emergency work would be on an as-needed basis.

Trails are not regularly maintained, allowing vegetation to encroach on the trail. When the trail is needed for access, motorized equipment and hand tools are used to maintain foot access. Helicopter landing areas are maintained as needed to prevent vegetation encroachment using motorized equipment and hand tools.

 

*A minor amount of brushing will be required to access monitoring stations and established plots along Strawberry Creek and in East Twin Creek. Access is typically gained by foot from Forest Road 1N24, or from established helicopter landing areas.*

**Emergency Work** – Work on the system may be required on an emergency basis and emergency repair to pipelines and structures are conditionally authorized under this new permit. The permit holder will be required to notify and request approval from the Forest Service of any emergency work as soon as possible. The holder will be required to utilize previously approved temporary work areas to the extent such use is possible.

**Resource Mitigation** –Permit Sections V and VIII contain standard and supplemental provisions for resource mitigation that cover compliance with environmental laws, and protection of water quality, esthetics, and threatened, endangered and sensitive species habitat. These sections of the permit also include requirements that Nestlé will follow if there is an unanticipated discovery of archeological or paleontological resources, or human remains, funerary objects, sacred objects, or objects of cultural patrimony. Supplemental standard clauses are also included to require a Fire Control Plan and an Invasive Plant Species Prevention and Control Plan. The Operating Plan required by permit section III C will include implementation details of how Nestlé will comply with the permit terms and the required resource mitigation measures. *Nestlé will submit the Operating Plan within 60 days of permit issuance and implement the Operating Plan within 30 days of Forest Service approval.* Resource mitigation measures developed by the Forest Service in accordance with the Federal Land Planning and Management Act (FLPMA) and the LMP during the development of the proposed action and in response to scoping and environmental review include:

- The appropriate site-specific National Best Management Practices (BMPs) for the protection of water quality (USDA USFS, FS-990a, April 2012) will be applied to the operation and maintenance of the pipeline, helispots, trails, roads, etc. such as those BMPs in the Facilities and Nonrecreation Special Uses Management Activities, Operations in Aquatic Ecosystems, Water diversions and conveyances, and Road Management Activities categories.
- Maintain a Limited Operating Period (LOP) for the protection of least Bell's vireo (March 15 through September 15) and southwestern willow flycatcher (May 1 to August 31), both federally listed species, during the breeding season for any disturbance related activities within ¼ mile of suitable habitat.
- Maintain a limited operating period (LOP) prohibiting activities within approximately .25 miles of a California spotted owl nest site (US Forest Service sensitive species), or activity center where nest site is unknown, during the breeding season (February 1 through August 15), unless surveys confirm that the owls are not nesting.
- *Nestle will install suitable shut-off valves or other flow control devices to ensure that water will not be extracted in excess of the holders ability to store or transport water without waste or spillage from local storage. This requirement will be implemented within 30 days of Forest Service approval of the Operating Plans.*
- *Maintain minimum flows in two locations as described in the Adaptive Management Plan as follows:*
  - *Lower spring complex (10, 11, 12) - 20 gallons per minute (gpm) in the drainage area A tributary of Strawberry Creek immediately above the confluence of*





*drainage area A and B as defined in URS 2002. Drainage area A is the watershed influenced by the water extraction.*
- o *Borehole complex 1, 1A, and 8 – 6.25 gpm as measured at water right A6108.*
- *Install, supply water to, and maintain two wildlife "drinkers", one in the vicinity of tunnels 2 and 3, and the other near the well 7 complex. Plans for these features will be submitted to the authorized officer for approval prior to installation.*
- *Continue the addition of water (irrigation) to support success of native special status vegetation and provide for wildlife habitat linkages if determined that less than 70% of expected aquatic life forms and communities are present based on riparian studies.*
- *Implement actions identified in the AMP, such as maintaining surface water flow to support macroinvertebrate populations and riparian vegetation, and determining if benthic macroinvertebrate (providing base of food chain to riparian dependent wildlife resources) diversity and abundance supported by base flows measured in East Twin Creek control watershed are not maintained at the 70% level by the 6.25 gpm and 20 gpm initial minimum flows in the diversion subwatershed*
- *Implement actions identified in the AMP, such as the direction to conduct a paired watershed study to assess the riparian health of East Twin Creek compared to the subwatershed of Strawberry Creek where the extraction points are located. Multiple paired study locations may be used to look at different parts of the watershed. Define current riparian/stream health in each watershed at all comparison study reaches to determine if native vegetation is vigorous, healthy and diverse in age, structure, cover and composition on <75% of the riparian/wetland areas in the diversion subwatershed where extraction is taking place compared to the East Twin Creek control area.*
- *Trash shall be removed daily during all on-site activities for the protection of wildlife.*
- *Provide an annual Project Aviation Safety Plan to the SBNF Unit Aviation Officer (UAO) as part of the Annual Operating Plan for approval. The Plan should include: i) Aircraft company/pilot contact information, ii) Radio Frequencies, iii) Schedule of proposed flights, iv) Base of operations and proposed flight routes in/out of watersheds, v) Emergency protocol for mishap.*
  - o *Provide Notification to Permit Administrator and UAO **two weeks prior to any flight** in order to:  i) Determine if Limited Operating Period (LOP) is needed for nesting/ breeding bird season for flycatcher/vireo if determined to be present during the permit period, ii) Avoid any concerns with other flights in area – de-conflict airspace if needed, ii) Provide FICC/dispatch with information to track flight if needed during fire season.*
  - o *Communicate with FICC/dispatch the day of any flight to ensure positive radio communication with dispatch over assigned frequency at beginning of day/flights into area and to close out last flight/exit from area at end of day.*
- *The authorized officer will approve final locations for any helispots and access routes developed for monitoring in East Twin Creek. Pre-work resource surveys will be conducted if required by the authorized officer.*
- Special status plants and wildlife species:
  - o If occurrences of FS Sensitive or Federally listed plant or wildlife species are found at any time within the project area, they will be reported to the Forest Service immediately. New protection measures may be developed with input from



appropriate specialists, and USFWS (if federally listed species are found). Protection measures will be implemented by the project proponent for all activities that may affect the identified occurrences.

- Invasive Plant Species Management
  - o All off-road equipment will be cleaned **prior to entering NFS land**. The cleaning measures must be practical, verifiable, and not cause other unacceptable environmental problems. Depending on the nature of the debris, the equipment may be cleaned using water or mechanical methods (brushing, scraping, prying), compressed air, high-pressure water, or steam. This includes wheels, tires, buckets, stabilizers, undercarriages and bumpers.
  - o All gravel, fill, erosion control or other materials are required to be weed-free and subject to review and approval by the Forest Service line officer with input from appropriate resource specialists.
  - o Use only weed-free equipment, mulches, and seed sources. Salvage topsoil from project area for use in onsite revegetation, unless contaminated with weeds. All activities that require seeding or planting must utilize locally collected native seed sources when possible. Plant and seed material should be collected from or near the project area, from within the same watershed, and at a similar elevation when possible. This requirement is consistent with the USFS Region 5 policy that directs the use of native plant material for revegetation and restoration for maintaining "the overall national goal of conserving the biodiversity, health, productivity, and sustainable use of forest, rangeland, and aquatic ecosystems." Seed mixes must be approved by a Forest Service botanist.
  - o Minimize the amount of ground and vegetation disturbance during construction and maintenance.
  - o A weed management plan will be prepared in cooperation with the Forest Service for survey, prevention, reporting, controlling and monitoring weed populations in the project area. The plan will be included in the Adaptive Management Plan.
  - o *Take action as described in the weed management plan if the cover, quantity or extent of current infestations are increasing, or new invasive species are identified.*

**Hydrologic and Riparian Studies** – Under the new permit, Nestlé will conduct hydrologic and riparian studies to better understand the relationship between water withdrawals, surface flows, and riparian habitat in order to ensure that water withdrawals under state law are also consistent with the LMP standards. The initial studies provided by the permittee suggest that water extraction is reducing surface flow in Strawberry Creek. The effect of this flow reduction has not been thoroughly studied. The permittee will study comparison sites in adjacent unmanaged drainages to determine what conditions would exist in Strawberry Creek without water extraction in the upper watershed. This approach is typically referred to as a "paired basin" study. This study will also be used to support the Adaptive Management Plan.

The permittee will consult with the Forest Service in the development of the study plan, and will submit a draft study plan to the Forest Service for approval within 30 days of permit issuance. The permittee will implement the plan within 30 days of Forest Service approval. The study period is expected to last for a minimum of three years. The Forest Service has determined that three years is a reasonable term to complete the studies and ensure that adequate information is

 

available to consider a longer-term permit with appropriate terms and conditions. I recognize that additional time (up to two years) may be needed for the studies, so my decision provides for discretionary annual permits for two (2) additional years. The resource mitigation measures for the permit will provide adequate protection and ensure effects are beneath the extraordinary circumstances threshold while the studies are completed.

*The study plan will incorporate the use of "test flows" to determine the response of the streams to reduction in water extractions. These "test flows" may involve suspending extraction for set time periods to evaluate any changes in streamflow. The study plan will also include an analysis of the full hydrograph and evaluate the change in the annual hydrograph from project operations. The studies will include isotope studies/chemical analysis of the extracted water to determine water source and other characteristics.*

**Adaptive Management Plan** (AMP) – The permittee will implement an Adaptive Management Plan that addresses resource mitigation needs, and are consistent with San Bernardino National Forest LMP standards as required by the National Forest Management Act (NFMA). Adaptive management provides an implementation tool that incorporates an "implement-monitor-adapt" strategy that provides flexibility to respond to monitoring information that indicates that desired conditions are not being met. If monitoring demonstrates that the intended effects are not being achieved through the initial management action, the action can be modified using one or more of the adaptive management actions to achieve the intended effects. Each component of the Adaptive Management Plan would include:

1) A Forest Plan objective (standard, requirement, handbook)

2) A monitoring scheme to assess if the objective is being met

3) Trigger point(s) where the Forest Plan objective is not being met

4) Action(s) to meet Forest Plan objective(s)

5) Monitoring to assess success of mitigation and restoration

The Adaptive Management Plan outline is attached to this decision as Appendix 1. The permittee will develop the implementing details of the Adaptive Management Plan using the outline in consultation with the Forest Service and will submit the detailed Final AMP to the Forest Service for approval within 30 days of permit issuance, unless the authorized officer extends the time for submission. *The permittee will implement the plan within 30 days of Forest Service approval.* The Final Adaptive Management Plan will be active for the term of the permit, and may be amended based on the results of the paired basin studies described above.

So long as monitoring indicates that the environmental effects of the adaptive management approach do not exceed the scope of those anticipated in the this decision, and the actions serve to move the project toward the intended effects, implementation continues using the "implement-monitor-adapt" cycle without the need for new or supplemental NEPA review. If any changes are proposed that are outside the scope of this decision, the provisions of Forest Service Handbook 1909.15 Section 18 would apply.




## DECISION CATEGORICALLY EXCLUDED FROM ADDITIONAL DOCUMENTATION

For the reasons summarized in the following section, this action is categorically excluded from documentation in an environmental impact statement (EIS) or an environmental assessment (EA). The decision fits an identified category and no extraordinary circumstances are present which would require further analysis in an EA or EIS.

### Applicable Category

This decision on the permit application fits within the category of actions is identified in agency procedures as "Issuance of a new special use authorization for a new term to replace an existing or expired special use authorization when the only changes are administrative, there are not changes to the authorized facilities or increases in the scope or intensity of authorized activities, and the applicant or holder is in full compliance with the terms and conditions of the special use authorization" (36 CFR 220.6(e)(15)). This category of action(s) is applicable because my decision to approve the issuance of a new permit replaces an existing or expired permit, specifically Nestlé's 1978 permit for the same facilities. Nestlé is in full compliance with their existing permit.

The new permit would not change any of the authorized facilities nor would it increase the scope or intensity of Nestlé's authorized water extraction activities. The additional monitoring is necessary to determine compliance with current law, policy, the LMP, and permit conditions, and the additional monitoring of helicopter landing areas are temporary and have minimum impacts. I am adding additional resource mitigation measures to ensure that the permit complies with the Land Management Plan as required by the National Forest Management Act. The Land Management Plan post-dates Nestlé's 1978 permit. I'm also correcting and updating the administrative use codes, and the number of occupied acres due to more accurate mapping. The terms and conditions of the new permit reflect those that have become standard since Nestlé was last issued a permit. These administrative changes are necessary to ensure the new permit is consistent with current law, regulation, policy and direction.

The category identified as "Approval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land" (36 CFR 220.6(e)(3)) would also apply to this action. This category includes actions such as approving utility right-of-ways and approving the continued use of land where the use has not changed since authorized and no change in the physical environment or facilities are proposed. The existing facilities would not be expanded or changed, and the area occupies less than five contiguous acres.

### Finding of No Extraordinary Circumstances

I find that there are no extraordinary circumstances that would warrant further analysis and documentation in an EA or EIS. This conclusion is based on implementation of the required resource mitigation measures as supported by the Adaptive Management Plan. The resource mitigation measures are designed to provide for consistency with the LMP. Implementation of the Adaptive Management Plan will allow for operational adjustments along the way to ensure the permitted actions remain consistent with the resource mitigation measures that prevent extraordinary circumstances. While the method used to achieve those resource conditions may

USDA 

vary as described by the Adaptive Management Plan, meeting those resource conditions removes uncertainty as to the expected outcome.

I took into account the resource conditions identified in agency procedures that should be considered in determining whether extraordinary circumstances might exist:

1.  There are no extraordinary circumstances associated with federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat, or Forest Service sensitive species based on the biological analysis for the proposed permit.

    **Federally listed wildlife species -** Protocol surveys for species were conducted in suitable habitat in and around the project area. There were no detection of any federally listed species in the project area during these surveys. The Wildlife Biological Assessment documents the following determinations:

    A *No Effect (NE)* determination has been made for the implementation of the issuance of a permit for up to 5 years for the conveyance of water across NFS lands for the following species:

    > Coastal California gnatcatcher, Western yellow-billed cuckoo, Santa Ana sucker, San Bernardino kangaroo rat

    A *May Affect – Not Likely to Adversely Affect (NLAA)* determination has been made for the implementation of a permit for up to 5 years for the conveyance of water across NFS lands for the **California condor** due to possible disturbance from helicopter operations on condor that may be foraging in the project area in the next 5 year period.

    A *May Affect – Not Likely to Adversely Affect (NLAA) with Beneficial Effect (BE)* determination has been made for the implementation of a permit up to 5 years for the conveyance of water across NFS lands, including implementation of the Adaptive Management Plan and resource mitigation measures for minimum flow requirements, for the following species:

    > Mountain yellow-legged frog, Arroyo toad, California red-legged frog, Southwestern willow flycatcher, least Bell's vireo

    Endangered Species Act Section 7 consultation was completed June 27, 2017 with the US Fish and Wildlife Service, with a Letter of Concurrence on the determination calls for threatened and endangered species.

    **Forest Service sensitive wildlife species -** Surveys for species were conducted in suitable habitat in and around the project area. There were detections of two-striped garter snake and willow flycatcher (migrant); both are Forest Service sensitive species. The wildlife Biological Evaluation documents the following determinations for Forest Service wildlife sensitive species:

 

The proposed permit will have no direct or indirect impacts **(NI)** for the following sensitive species:

> Arrowhead blue butterfly, northern goshawk, Townsend's big-eared bat, San Gabriel Mountains elfin butterfly, bald eagle, white-eared pocket mouse, San Gabriel Mountains – Nelson's desert big horn sheep, arroyo chub, Western pond turtle, gray vireo, Orange-throated whiptail snake, three-lined boa, San Bernardino flying squirrel, Fringed myotis bat, pallid bat, California spotted owl, Willow flycatcher migrant

The proposed permit will have ***May Impact Individuals or Habitat – Beneficial Impacts (MIIH-BI)*** at spring sites 1, 2, 3, 4, 8 and the FS spring site for the following species (or habitat) due to the increase in surface water at these sites required by the new permit:

> Large-blotched Ensatina salamander, San Gabriel Mountains slender salamander, Yellow-blotched Ensatina salamandersouthern, California legless lizard

The proposed permit will have ***May Impact Individuals or Habitat – Beneficial Impacts (MIIH-BI)*** for the following species at spring sites 10, 11, and 12 and associated riparian habitat on the main stem of Strawberry Creek due to the required minimum flows:

> Willow flycatcher (migrant), two-striped garter snake, Santa Ana speckled dace

**Federally listed plant species -**The Botany Biological Assessment (as documented in the Botany Report) documents the determination that there are no currently-listed threatened or endangered plant species known to occur within the project area. There is also no suitable habitat for any Threatened and Endangered plant species that has been identified or any designated Critical Habitat for plants within the project area. The proposed reissuance of the existing permit will not affect any federally listed plant species.

**Forest Service sensitive plant species -** A search of existing records and project related field surveys conducted from 2015-2017 found no occurrences of FS Sensitive plant species within the project area, however for the species listed in the table below there are known occurrences of some found nearby and/or suitable habitat for some may be present within the project area.

The resource mitigation measures require that additional plant surveys be completed in the project area, as well as the paired watershed and if special status plants are found, other measures will be implemented. Therefore the determination detailed in the Botany Biological Evaluation (as documented in the Botany Report) is that due to the design criteria (resource mitigation measures), the proposed reissuance of the existing permit may affect individuals (if present but undetected), but is not likely to result in a trend toward Federal listing or loss of viability for any FS Sensitive plant species as listed in the following summary table:





### Summary of Effects Determinations for TES Species

| Common Name | Occurrence Information[1] | Determinations [2] |
|---|---|---|
| **Threatened & Endangered Plants** | | |
| *Berberis nevinii* (E) | H/U | NA |
| *Brodiaea filifolia* (T) | Y/U | NA |
| *Dodecahema leptoceras* (E) | P/U | NA |
| **Forest Service Sensitive Plants** | | |
| *Calochortus palmeri* var. *palmeri* | Y | MAI |
| *Castilleja lasiorhyncha* | Y/U | MAI |
| *Chorizanthe parryi* var. *parryi* | Y/U | MAI |
| *Imperata brevifolia* | Y/U | NA |
| *Lilium parryi* | P | MAI |
| *Monardella macrantha* subsp. *hallii* | P | MAI |
| *Plagiobothrys collinus* var. *ursinus* | P | MAI |
| *Schoenus nigricans* | Y/U | NA |
| *Sidalcea hickmanii* subsp. *parishii* | P | MAI |
| *Sidalcea malviflora* subsp. *dolosa* | P | MAI |
| *Sidotheca caryophylloides* | P | MAI |
| *Symphyotrichum defoliatum* | H/U | MAI |

[1]Occurrence Codes:
 Y = Species is known to occur in or near the project area.
 P = Occurrence of the species is possible; suitable habitat exists (or could exist with restored hydrology) and it is within the known distribution of the species.
 H = Historic record.
 U = Unlikely to be present in project area due to lack of appropriate habitat
 N = Outside known distribution/range of the species.
[2]Determination Codes:
 NA = No effect expected
 NLAA = not likely to adversely affect for T/E species;
 MAI = may affect individuals but not likely to lead to a trend to Federal listing for Sensitive species.

2. There are no extraordinary circumstances associated with flood plains, wetlands, or municipal watersheds. The Surface Water Hydrology Report and the Geo-Sciences Specialist Report (available in the project record) describe the effects of issuing the proposed permit on watershed resources.

Based on this analysis, the overall watershed condition for the East Twin Creek watershed (which includes Strawberry Creek) is currently "Impaired Function". Studies completed by Nestlé and validated by Forest Service field work have demonstrated that the current water extraction is drying up surface water resources (springs and streams) that would have normally been perennial water resources. This extraction of water under the existing permit is not in accordance with the subsequent adoption of Standard 46 of the Forest LMP.

Surface water diversions and groundwater extractions, including wells and spring developments may only be authorized when it is demonstrated by the user, and/or agreed to by the Forest Service, that the water extracted is excess to the current and reasonably foreseeable future needs of forest resources as required by the LMP. Implementation of resource mitigation measures will allow for Nestlé's water extraction activities consistent with applicable state water rights and the LMP. Overall these changes will move the





watershed condition up one level to "Functioning At-Risk" as described further in the
Specialists' reports. This change in watershed condition is consistent with LMP direction
and will help move the watershed towards the desired condition.

3. There are no extraordinary circumstances associated with congressionally designated
   areas such as wilderness, wilderness study areas, or national recreation areas. There are
   no wilderness areas, wilderness study areas, or national recreation areas in the permit
   area.

4. There are no extraordinary circumstances associated with inventoried roadless areas or
   potential wilderness areas. The permit is partially located within the City Creek Roadless
   Area. Roadless areas are managed under the requirements of the 2001 Roadless Area
   Conservation Rule (36 CFR 294 Subpart B, 2001). The purpose of the rule is to provide,
   within the context of multiple use management, lasting protection for inventoried
   roadless areas within the National Forest System. That is accomplished by the
   prohibition on road construction and timber cutting, sale, or removal.

   As described in the Roadless Area Report (available in the project records), the
   authorized activities and improvements will not change the existing roadless character of
   the area. No roads (either constructed, reconstructed, or maintained) are proposed under
   the new permit. There is no timber cutting or sale associated with the new permit. The
   new permit will be consistent with the Roadless Area Conservation Rule.

5. There are no extraordinary circumstances associated with research natural areas. There
   are no research natural areas in the permit area.

6. There are no extraordinary circumstances associated with American Indians and Alaska
   Native religious or cultural sites. There are no religious or cultural sites present.

7. There are no extraordinary circumstances associated with Archaeological sites, or historic
   properties or areas. The Heritage Program Manager has documented by memo (available
   in the project records) that this undertaking may be treated as a Screened Undertaking
   (Regional PA 2013), which has no or little potential to cause effects to historic properties
   if they are present in an Area of Potential Effects.

   This project complies with Section 106 of the National Historic Preservation Act of 1966,
   as amended in accordance with provisions of the Programmatic Agreement among the
   U.S.D.A. Forest Service, Pacific Southwest Region (Region 5), the California State
   Historic Preservation Officer, the Nevada State Historic Preservation Officer, and the
   Advisory Council on Historic Preservation Regarding Processes for Compliance with
   Section 106 of the National Historic Preservation Act for Management of Historic
   Properties by the National Forest of the Pacific Southwest Region (Regional PA 2013).

   Standard permit conditions (Section V, conditions D and E) describe the requirements for
   protecting any discoveries of cultural resources.

In addition to considering the resource conditions listed in the Forest Service regulations, I
considered impacts on LMP land use zones/desired conditions; general wildlife species and
habitat connections; fire management; and air quality and noise impacts as requested by public
comments received in response to the proposed action. None of these additional areas of concern
present circumstances that require further analysis in an EA or EIS. I have included a brief

USDA 

summary of those resource concerns in the Public Involvement section of this decision, and further information is located in the project record.

## PUBLIC INVOLVEMENT

This action was originally listed as a proposal in the San Bernardino National Forest Schedule of Proposed Actions on January 1, 2016, and updated periodically during the analysis. I began the public scoping process for the proposed Nestlé Waters Special Use Permit on March 18, 2016. Letters were sent to over 2,000 individuals, groups, agencies, tribes, local governments, elected officials and media contacts, including land owners adjacent to the project area. Information about the project was, and continues to be, delivered over the internet through the project webpage at:

http://go.usa.gov/cGyXH (please note - this URL is case sensitive)

A public meeting was held on April 14, 2016 at the San Bernardino National Forest Supervisors Office in San Bernardino California. Over 100 people attended the meeting. The scoping comment period ended on Monday, May 2, 2016.

For this project, comments were accepted by email, mail, at the public meeting, and on the project web page. Over 40,000 comments were received during the scoping period (including over 3,800 duplicate submittals). The majority of individual comments (39,895) came through email, 360 comments were submitted through the project web portal, and 22 written comments were received at the public meetings. With the exception of material with offensive language, all of the comment documents are available on the web in the public reading room at the following web address:

https://cara.ecosystem-management.org/Public//ReadingRoom?Project=48530

Of these comments, about 30,000 were form letters, 4,200 were expanded form letters (a form letter with expanded text) and close to 1,700 were unique comment letters or emails. All of the unique letters, form letters, and expanded form letters were reviewed as part of the scoping process, and over 5,300 comments were recorded. Those comments were grouped and then categorized as either outside the scope of the analysis or within the scope of the analysis. A full description of the process is included in the Scoping Report that is part of the project record.

I incorporated several changes and clarifications to the Forest Service proposed action based on those comments and suggestions. These changes and clarifications to the proposed action include:

- No use of herbicides will be authorized (clarification)
- No expansion of the system will be authorized (clarification)
- The discussion of maintenance activities has been expanded (clarification)
- Several resource mitigation measures were added, including measures to reduce water diversions in excess of storage capacity, require minimum flows, protect wildlife, require coordination of helicopter flights, and to prevent the spread of invasive species (change).
- A discussion of the standard clauses for noxious species control plans and fire control plans was added (clarification).





- Incorporate the use of "test flows" as part of the riparian studies to determine the response of the streams to reduction in water extractions. These "test flows" may involve suspending extraction for set time periods to evaluate any changes in streamflow (change).
- Include an analysis of the full hydrograph and evaluate the change in the annual hydrograph from project operations (change).
- Include Isotope studies/chemical analysis to determine the source of water and connections between the springs and surface water (change).

These changes and clarifications are incorporated in my decision and are displayed in italics as indicated above.

I appreciate the public interest in this project and I wanted to provide further clarification on key concerns brought forward during scoping. In particular, many commenters asked for: specific analysis to be completed; questions to be answered, and alternative actions to be taken. The following section provides a summary of my consideration of the concerns expressed during the scoping comment period.

**Resource analysis suggested during scoping** – Commenters suggested several resource areas that should be included in the analysis of the project effects. Those resource topics and my consideration of them are presented in the following section.

**Land Management Plan Land Use Zones and Place Desired Conditions** - The upper portion of the proposed permit area is in a Developed Area Interface (DAI) land use zone, the lower wells and the majority of the above ground pipeline is in a Back Country Non-Motorized (BCNM) land use zone, while the balance of the above ground pipeline and the buried pipeline is within the Back Country (BC) land use zone. A map of the permit area compared to land use zones is available in the project record.

Non-Recreation special uses (low intensity land use) are listed as suitable uses (LMP Table 2.4.3) in the DAI and BC land use zones, and allowed by exception in the BCNM land use zone.

I am approving continued occupancy and use by exception in the BCNM land use zone. Roaded access in this land use zone is not authorized by the new permit and motorized access is provided by helicopter by exception (LMP Table 2.4.2). The LMP states that access to authorized facilities and private land may occur by exception when there are existing rights to such access. Nestlé's use is of long-standing and precedes the adoption of the LMP standards. The activities and improvements authorized under the new permit will have minimal effect on the character of this zone and I have concluded that approving the continued use in this area by exception is consistent with the LMP direction.

The permit area is located within the San Bernardino Front Country Place. The desired condition for the area is to maintain a natural appearing landscape while managing vegetation to provide fire protection for adjacent urban communities, recreation areas and wildlife habitat. Habitat conditions for threatened, endangered, and sensitive species are improving over time. Heritage properties and Native American gathering areas are identified and protected. The program emphasis is on community protection from wildland fire and conservation of habitat for





threatened, endangered, and sensitive species, such as the southwestern willow flycatcher, mountain yellow-legged frog and speckled dace.

I have concluded that the resource mitigation requirements included in project design and reflected in permit terms and conditions, and the resulting effects of the authorized activities and improvements, are consistent with the direction for the San Bernardino Front Country Place.

**Wildlife** – As documented in the Wildlife Specialist Report (located in the project record), the new permit would not change the function of existing wildlife habitat connection corridors and would not create an impassible barrier to wildlife movement across the landscape. The new permit would not adversely impact migratory land birds or their habitats through implementation of the required resource mitigation measures. Issuing the new permit would not change the risk for the introduction of non-native terrestrial or aquatic wildlife species.

**Fire and Fire Risk** – As documented in the Fire and Fuels Specialist Report (located in the project record), the new permit would not present a significant impact on the San Bernardino National Forest Fire Management Program. Local fire managers are accustomed to mitigating for the presence of infrastructure that goes with fire suppression operations in an urban environment.

The public raised a concern during scoping that water extraction may alter the riparian ecosystem such that fuels, species composition, and microclimate become similar to uplands, diminishing their value in fire control as firefighter safety zones and suppression control lines. The biological reports address the nature of the vegetation within the riparian zones. The Wildfire Specialist Report considered the use of riparian areas as suppression control lines and fire fighter safety zones.

The Strawberry Creek drainage is located within a south facing watershed along the San Bernardino front country. The stream channels are steep and located within narrow canyons. Historical fire data running back to the early 1900's was analyzed for the specific drainages identified in either the proposed action or reference study area and the fire perimeters were found to have shown little regard to the watershed boundaries or stream channels. Several large fires, including the Old Fire of 2003, have burned across the entire slope. Under no circumstances were the final fire perimeter boundaries established in drainages.

Fire managers in Southern California typically look to prominent ridge systems for both direct and indirect firefighting efforts that include aerial attack supported by heavy equipment and line personnel on the ground. Drainages along south aspects are avoided and would never be considered safe areas for personnel to take shelter from an advancing fire. Based on these factors, the new permit would have no effect on the ability to suppress fires in the affected watersheds, nor would it diminish fire fighter safety.

**Noise** – The new permit would authorize the continued access to the permit area by helicopter. Approximately 32 flights per year are typically conducted in support of operation and maintenance activities, with additional flights needed to support monitoring. The public raised a concern regarding the noise related to use of helicopters. The Forest Service does not have requirements or LMP standards related to noise. San Bernardino County ordinances exempt temporary operation between 7 a.m. and 7 p.m., except for Sundays and Federal Holidays, from

 

the County regulations. The permittee is required to comply with local regulations, and would have to operate within the timeframes outlined by County regulations.

**Air Quality** - Maintenance of the existing facilities authorized by the new permit would generate emissions from helicopter use to transport staff to the remote site. As documented in the Air Resource Specialist Report (located in the project record), the total emissions of criteria pollutants from the operations authorized by the new permit are less than the federal general conformity de minimis threshold emission rates. Therefore, the general conformity requirements do not apply, and the decision to approve continued occupancy and use of the existing water development facilities, water transmission pipelines, electronic telemetry equipment, helicopter landing areas, and access trails on National Forest System (NFS) lands complies with the Federal Clean Air Act. The total emissions of criteria pollutants from the operations authorized by the new permit would be less than South Coast Air Quality Management District's significance thresholds and therefore complies with local rules and regulations.

**Additional Questions Raised During Scoping** – Many of the comments received were presented as questions regarding a broad range of topics, including questions about how the analysis would be conducted and how the decision would be made. The questions and my responses are presented in the following section.

**Questions related to the general use of Science/Baseline for analysis** – Many of the commenters questioned whether the proposed action relies on the use of a credible scientific approach for the required resource surveys and the Adaptive Management Plan. They also questioned the role of the permittee (Nestlé) in completing resource studies as required by the new permit. Concerns raised by the public include:

- Lack of study plan details
- Need for unbiased studies
- Need to define baseline

**Forest Service Response** - My decision incorporates both clarification and changes to the hydrologic studies and adaptive management plan. Although Nestlé will complete the studies, a burden that typically falls to permittees, the qualifications of the scientists and resource specialists completing the work will be reviewed and approved by Forest Service staff. In all cases the results of the studies will be independently reviewed by staff before being accepted as completed work.

Baseline is a concept that helps evaluate environmental effects from a specific condition or point in time. In this case, baseline for the environmental analysis is the current condition as it exists today, while recognizing that this baseline condition is influenced by the past and present water extraction that is authorized under the existing permit. Using the current condition as the baseline does not imply that the existing condition is producing acceptable environmental effects or is consistent with the LMP. The analysis of effects in the specialist reports for each resource area discloses the changes to baseline that will result from implementing the new permit. The specialist reports are included in the project record.

**Questions about the Decision Process** – Some commenters raised questions about the application of the NEPA definition of "significantly" found at 40 CFR 1508.27. Other commenters suggested that the proposed restrictions are arbitrary and capricious, questioning the

 

jurisdiction of the Forest Service to regulate water diversions and challenging the applicability of the Land Management Plan to the operations.

**Forest Service Response** - My decision and the process I used to support my decision are consistent with the Forest Service NEPA regulations found at 36 CFR Part 220, and Forest Service directives found in the Forest Service manual (FSM 1950) and Forest Service handbook (FSH 1909.15). My decision to issue a special use permit qualifies under the categorical exclusion regulations as discussed above. I have documented my finding that the degree of the effects on the listed resources did not result in extraordinary circumstances. The record also reflects the need for, and benefit of, the resource mitigation measures to comply with LMP standards which apply to this decision. The question regarding the jurisdiction of the Forest Service is addressed below.

**Questions about roles and authorities** – There was widespread concern about the relationship between the Forest Service and Nestlé, particularly as it relates to the role of the permittee in conducting resource studies used in the AMP. Many commenters suggested stronger roles for other agencies, or suggested an independent review of the proposed action.

**Forest Service Response** - While the Forest Service special use regulations allow applicants/permittees to complete studies related to the impacts of their proposed use, I am responsible for ensuring that the Forest Service completes an independent review of the submitted material. Forest Service staff reviewed the studies provided by Nestlé, and if the studies met Forest Service standards they were referenced in the appropriate specialist reports. Staff has also spent time in the field to spot check the survey work submitted by Nestlé, and to support their own independent assessment of the environmental effects. Staff has also coordinated with other agencies, and hosted an interagency field trip early in the review process and completed the necessary regulatory consultation and/or compliance. That is the role of the Forest Service as the land management agency, and my decision is consistent with that responsibility. It is not a responsibility that can be assigned to an independent review group.

**Questions about consistency with law, regulation, and policy** – Numerous comments were related to the consistency of the proposed action with law, regulation, and policy. Specific comments included questions whether:
- The existing permit issued to a corporation that was dissolved through merger in 1987 was valid
- The Forest Service followed policy when it accepted the application
- The Forest Service followed policy when it changed the scope of the proposed permit without consulting Nestlé
- The Forest Service properly applied the special use screening criteria
- The proposed action is consistent with the Organic Act requirements for the use of water on the National Forest (16 USC 481)
- The Forest Service analysis should be limited to the impacts of the right-of-way, and whether the impacts of water extraction related to any impacts from the right-of-way and subject to mitigation requirements imposed by the Forest Service.
- Nestlé water rights are valid existing rights exempt from the requirements of the National Forest Management Act (NFMA) or the Federal Land Management Policy Act (FLPMA)
- The proposed action must be consistent with the LMP standards





- Nestlé needs other federal or state permits
- The proposal violates other federal, state, or local plans

**Forest Service Response -** I appreciate the level of interest and focus on management of the San Bernardino National Forest represented by these questions. I certainly agree with many of the comments. My decision must be consistent with existing law, regulation, and policy. My decision addresses those questions in the section that discusses findings required by other laws. Rather than repeat that discussion here, I will emphasize that the Forest Service has both the authority and obligation to regulate the occupancy and use of National Forest System lands in a manner that is consistent with all applicable laws, regulations, and policy. That authority includes the ability to impose terms and conditions needed to comply with applicable law, regulation, and policy, and I believe the terms and conditions that I have adopted are within my authority and will meet my statutory obligations.

**Questions regarding the use of water** – Several commenters pointed out that the existing 1978 permit incorrectly categorizes the use of water as irrigation.

**Forest Service Response** – The comment is correct. This will be corrected in the new permit. The use will be categorized under the Forest Service special use manual direction (FSM 2720) as having a primary use code of 915, which applies to water transmission lines smaller than 12", and a secondary use of 931, which applies to wells.

**Questions regarding "Spring Water"** – Several commenters suggested that the designation of "Spring water" by Nestlé is not consistent with the federal Food and Drug Administration (FDA) regulations found at 21 CFR 165.110.

**Forest Service Response** – This is not an area within my jurisdiction, but permittees are required to comply with all applicable laws and regulations. I contacted the FDA and passed along the public concern. The FDA reviewed the information that was supplied by the Forest Service as well as what was in their own records and was able to affirm that several of the tunnels and bore holes meet the standards in the FDA regulations. They did not have sufficient information to determine the status for several other bore holes, but did not conclude that there was any violation of the regulations. I directed Nestlé to work with the FDA to resolve any outstanding questions and Nestlé provided additional information regarding these other bore holes to the FDA, In a letter dated August 21, 2017, FDA concluded that the remaining bore holes in question could be "labeled as "spring water" as long as the current conditions are as you (Nestlé) have described (i.e., the water flows from the bore hole using the same natural forces that cause the spring to flow to the natural orifice) and all other applicable provisions of the bottled water standard are met." Nestlé is in compliance with the existing permit on that basis.

This question is not related to a potential environmental impact, and does not change the expected effects of implementing the new permit, nor would any actions that the FDA may take alter or increase the environmental effects of the new permit. There is no potential that any change in the resolution of this question would lead to extraordinary circumstances.

**Questions about continued use** – Many commenters felt that allowing continued use during the analysis is inconsistent with the NEPA regulations that limit actions taken during the analysis.

**Forest Service Response -** Allowing use under an existing permit is not inconsistent with the NEPA regulation at 40 CFR 1506.1, which applies to limitations on actions taken on a proposal

 

during the NEPA process. Nestlé has an existing permit that allows them to occupy and use National Forest System land, and may continue to operate and maintain their improvements as the new permit is evaluated.

**Questions about consistency with state water rights law** – Questions were raised regarding the California state water rights held by Nestlé. Specific comments include questions whether:

- Nestlé has a valid state water right, and their use is consistent with the California water codes
- Regulating water extraction exceeds Forest Service jurisdiction in conflict with California water rights law

**Forest Service Response** – I recognize that the state of California regulates water rights through the State Water Resources Control Board (SWRCB). The SWRCB staff offered to assist the Forest Service in our review, and the Forest Supervisor accepted their offer in May of 2016.

The SWRCB, Division of Water Rights also received several water rights complaints against Nestlé starting on April 20, 2015, including a complaint that Nestlé was diverting water without a valid state water right. The SWRCB released their Report of Investigation ("investigation" or "report") on December 20, 2017. The full report with attachments is available online at:

https://www.waterboards.ca.gov/waterrights/water_issues/programs/enforcement/complaints/nestle.html

The SWRCB staff concluded that:

- **Nestlé is diverting water without a basis of right** – the investigation concluded that a significant portion of the water currently diverted by Nestlé appears to be diverted without a valid basis of right, after examining a variety of water rights claims put forward by Nestlé and finding them flawed.

- **Nestlé's claim to a pre-1914 water right is not valid** – Nestlé's claims of senior water rights that originate from an 1865 possessory claim by David Noble Smith is limited to riparian uses and is not valid for Nestlé's current appropriative diversion and use of water from the San Bernardino National Forest.

- **The Del Rosa judgment did not award water rights** - Nestlé claims to have pre-1914 water rights originating from its predecessor, which was awarded access to water from the upper reaches of the Strawberry Canyon Watershed under the Del Rosa Judgment. The judgement was a stipulated settlement agreement between private parties resulting from a judicial proceeding, and could not supersede requirements to comply with the 1913 Water Commission Act, which established the exclusive means of appropriating water in California through a comprehensive permitted scheme.

- **Nestlé may be able to claim a pre-1914 water right to Indian Springs** – the investigation concluded that Nestlé may have an appropriative right to 26 acre-feet (8.5 million gallons) of water per year from Indian Springs, which is a spring located on the national forest but in a different tributary from the current water system. Nestlé has never claimed this right, but the staff report concluded that it could be applied to the current





operation. The state assumed that this water right was used as part of Nestlé's water diversions.

- **Nestlé may be appropriating ground water** – the investigation concluded that Nestlé is withdrawing percolating groundwater from several horizontal wells. California does not grant the SWRCB permitting authority over groundwater, so Nestlé's diversion of groundwater may continue with permission of the overlying landowner.

**Corrective Actions:** the staff report identified several recommended actions that Nestlé would have to complete to be in compliance with state law, including:

- **Immediately cease any unauthorized diversions**
- **Within 30 days** file notices for both the authorized and unauthorized diversions
- **Within 60 days** submit an interim compliance plan for review and approval by the SWRCB
- **Within 90 days** submit an investigation and monitoring plan for SWRCB approval
- **Within 18 months** submit a final report and compliance plan, including a model for determining how diversions impact surface flows

**Other recommendations:** the staff report recommended that no action be taken on the claims of injury to public trust resources pending the implementation of the Forest Service special use process and adaptive management plan.

The staff recommendations are prospective and they indicated Nestlé's claim of water rights was reasonable if mistaken. Under these circumstances Nestlé is in compliance with the terms of their existing permit so long as they comply with the lawful orders of the SWRCB. This same standard applies to the permit approved in this decision.

As with any area where jurisdiction is shared with another agency, the Forest Service authority to regulate occupancy and use is independent of the SWRCB. Nestlé is subject to this shared jurisdiction, and will be required to follow any final direction from the state, as well as the conditions of their Forest Service permit. There is nothing in the SWRCB staff recommendations that would require the Forest Service to reduce or alter the resource mitigation measures outlined in this decision or allow for an increase in the environmental impact of the authorized actions that would result in extraordinary circumstances.

There is overlap with the SWRCB requirement for an investigation and monitoring plan and the Forest Service required hydrologic studies and Adaptive Management Plan. I will ensure that Forest Service staff coordinates with the SWRCB to the extent possible so that the studies are conducted in an efficient manner that is consistent with LMP standards and the permit requirements. Nestlé is currently conducting monitoring as part of the current permit, and that monitoring will continue under the new permit. Nestlé will need written Forest Service approval for any additional monitoring on the National Forest and must secure that approval prior to conducting any additional monitoring work on the Forest.

Nothing in my decision requires transfer of any state water right from Nestlé to the United States. Surface water in California is a public resource that is regulated by the State Water Resources Control Board, which determines the basis for Nestlé's right to use water. With full recognition of those rights, the San Bernardino National Forest Land Management Plan allows





for water extraction from National Forest System lands, but does require that permitted uses protect forest resources and operate in compliance with all applicable laws and regulations.

The Forest Service controls the use of the National Forest System lands.  If a water rights holder wants to install and maintain infrastructure to access water on the National Forest, they must obtain a land-use authorization from the Forest Service and follow any terms and conditions included.  If the Land Management Plan requirements can be met, and the applicant has a valid state water right, then the access and infrastructure that facilitates water extraction can be authorized.

**Questions about the public involvement process** – Several commenters suggested that public involvement should have included a different approach, including:
- Public field trips
- Meetings with technical work groups
- A public meeting format where agency official made a presentation and took questions from the audience
- A public meeting format where the audience could make verbal comments on the record

**Forest Service Response** - I used an approach that included direct mail notification to over 2,000 contacts, including property owners within the affected watershed, and held a public meeting where the public could discuss the project directly with Forest Service staff.  The Forest Public Affairs Officer responded to numerous media requests, and the permit review has been widely covered in both the local and national news.  I chose not to hold public field trips due to safety concerns.  The permit area is located in steep, rugged terrain that is accessed by foot.  Parking in the vicinity is limited and along a busy state highway with narrow road shoulders.  Given those constraints it would not be practical to offer a public field trip under those conditions.  I would note, as reported in the media, that small groups of interested public have accessed the site.  There are no forest orders or other limits on public access to the area.

I also did not see the need to hold technical workshops.  The staff that I have assigned to the project are qualified, experienced and capable of providing me with technical analysis and professional advice.  Those same staff were available to discuss the project directly with the public during our public meeting.  I find the informal public meeting setting more productive, efficient, and less confrontational than the suggested hearing format.  People that attended the public meeting could and did submit written comments, and staff had material available to facilitate that process.

<u>**Alternative actions**</u> - I also evaluated a number of alternative actions suggested during scoping.  I incorporated several changes and clarifications to the Forest Service proposed action based on public comments and suggestions (see pages 15 and 16).  I have briefly summarized my considerations of these alternative actions.

**Suspend Operations while studies are conducted -** Many commenters who generally oppose the new permit as proposed by the Forest Service requested I consider suspending all Nestlé's operations while studies are completed.  Under this approach, the Forest Service would not authorize the extraction of water while studies were being completed on Strawberry Creek, however the improvements would be authorized and Nestlé would be allowed to maintain the improvements for eventual use.  Further, there would be no need for a paired basin study or adaptive management plan as all required studies would be conducted within the affected



watershed.  Under this alternative action it is likely that operations would be suspended for three
to five years to allow for adequate study time.

**Forest Service Response -** Nestlé's operations on the National Forest are of long-standing, and
have been permitted since 1929.  Nestlé's operations have been consistent with prevailing Forest
Service law, regulation and policy through the intervening decades.  Nestle has undergone
multiple permit renewals prior to the current review. In such circumstances, suspending
operations to study the effects of issuing a new permit for an existing use is not necessary in the
judgment of the Forest Service as long as the permittee is operating consistent with the terms and
conditions of the existing authorization, as is the case here.  There is no compelling evidence
before the agency that suspension of the permitted activities is necessary to determine terms and
conditions of a new permit for the activity that will adequately protect the federal resources.

**Issue a 1 year or 10-year Permit -** Several commenters suggested issuing shorter term permits.
Another commenter suggested a 10-year permit would be appropriate.  Forest Service
regulations (36 CFR 251.56(b)(1) require, in part, that "The duration shall be no longer than the
authorized officer determines to be necessary to accomplish the purpose of the authorization and
to be reasonable in light of all circumstances concerning the use…".  Forest Service policy (at
Forest Service Manual section 2703.3) states "Limit the use to the minimum area and period of
time required to accommodate the use."

**Forest Service Response -** In this case the Forest Service has selected a three (3) year initial
term in light of all circumstances concerning the use as an appropriate length of time to
accommodate the use and associated studies, with a provision for discretionary annual permits
for an additional two (2) years.  The Forest Service has determined that three years is a
reasonable term to complete the studies and ensure that adequate information is available to
consider a longer-term permit with appropriate terms and conditions while recognizing that
additional time may be needed to complete the studies prior to the expiration of the initial three-
year permit.  The resource mitigation measures for the 5 year timeframe will ensure effects are
beneath the extraordinary circumstances threshold while the studies are completed.  A short term
permit would not allow enough time to complete meaningful studies.  While extending the term
may be more advantageous to the permittee, it does little to ensure that the operations and water
extraction are conducted in a manner that protects national forest resources within the shortest
amount of time.

**Implement Voluntary Measures –** Nestlé proposed a voluntarily Adaptive Management Plan
during scoping and offered a detailed plan as an alternative action to the Forest Service proposed
Adaptive Management Plan.  Under this proposed approach, implementation of the Adaptive
Management Plan would be discretionary on the permittees part.  Under such a voluntary
approach, the Forest Service would have no regulatory recourse if the permittee were to change
its commitment to the plan.

Nestlé submitted an unsolicited "Final Draft Adaptive Management Plan" (Final Draft AMP) to
the Forest Service on December 20, 2017.  According to Nestlé, this Final Draft AMP is based on
their proposed AMP submitted on May 2, 2016.  Nestlé stated that this latest version of their
Draft AMP reflects communications with the USFS on the appropriate elements of an AMP.

The proposed alternative Adaptive Management Plan would study the same objectives as the
Forest Service proposed plan, but the triggers and actions for riparian area objectives would be

 

different. Triggers for streamflow would be based on the Palmer drought index as a trigger for reduction in water extraction. Reductions would be implemented by reducing extraction using a fixed percentage of the extracted flow. Under the original proposed Adaptive Management Plan submitted in 2016, water extraction would be reduced, potentially up to 50% in extreme drought conditions. Under the December 2017 Final Draft AMP, the proposed reductions in extraction have been modified so that the range is now potentially up to 30% decrease in extreme drought, or 40% if photo monitoring shows a 30% loss of riparian canopy from the prior year.

**Forest Service Response -** FLPMA requires that "Each right-of-way shall contain (a) terms and conditions which will (i) carry out the purposes of this Act and rules and regulations issued thereunder; (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment…", and Forest Service regulations (36 CFR 251.56(a)(1) require that "Each special use authorization must contain: (i) Terms and conditions which will: (A) Carry out the purposes of applicable statutes and rules and regulations issued thereunder; (B) Minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment;…". Voluntary adoption of a plan to protect riparian resources is not consistent with the requirement that each permit must contain such conditions. Voluntary measures are not reasonable when the regulatory structure requires mandatory conditions.

Further, the proposed alternative Adaptive Management Plan and the updated Final Draft AMP are inconsistent with the Land Management Plan (LMP) and FLPMA requirements and therefore do not meet the Purpose and Need for this Forest Service action. LMP Standard 46 requires that water extraction will only be authorized when the user demonstrates that the water extracted is excess to the needs of National Forest resources. Under the LMP standards, if the riparian resource needs are met, any water in excess of that need is available for extraction. While the alternative approach would reduce extraction by 10%, 20%, 30%, or 40% there is no mechanism proposed to assure that the various levels of reduction will provide adequately for riparian resources. In addition, the approach proposed does not provide a measurable basis for a starting point from which flows would be reduced. While this approach provides for a greater degree of certainty for water extraction operations, it does not satisfy the LMP requirements. This alternative AMP was not considered further because it is not consistent with the LMP.

**Reissue a New Permit Under the Same Terms as the 1978 Permit** –One comment suggested that the Forest Service should evaluate an alternative action that would issue a permit for a 10 year term that does not contain permit terms that differ from the existing 1978 permit. More specifically, the comment suggested that the Forest Service should evaluate a new permit that does not include conditions that would restrict the extraction of water from National Forest System lands.

**Forest Service Response -** New permits must use the most current standard form, and from an administrative standpoint it would not be feasible to issue a new permit based on the old permit form, which is now obsolete. In addition, as explained in the purpose and need section, any new permit issued must comply with Forest Service law, regulation, policy, and LMP standards, all of which have changed since Nestlé was last issued a permit. The LMP, first adopted in 1989 and revised in 2005, places an increased focus on balancing development with environmental protection, and imposes specific direction for protecting watershed function. The 1978 permit, which was issued 11 years prior to the first LMP, does not include conditions that reflect this management direction.

 

When a permit does not provide for renewal, as is the case here, the decision to reauthorize the use is discretionary. Consistent with Forest Service regulations (36 CFR 251.64), the authorized officer may modify the terms, conditions, and special stipulations to reflect new requirements in current land use plans. The proposal to maintain terms and conditions from the expired permit does not meet the project purpose and need, which includes the need to respond to a request to authorize a permit that is consistent with state and federal law, regulation, policy, and with the San Bernardino National Forest LMP.

**Actions outside the scope of the analysis -** A few comments suggested actions that are outside the scope of this analysis, including reducing plastic waste, changing the diversion to the lower watershed, and evaluating the area for wild and scenic designation.

Several comments suggested an alternative action that reduces plastic waste. According to those comments, Nestlé may produce up to 13 billion bottles of water from the water extracted from the San Bernardino National Forest. The proposed alternative action presumes that many of these bottle end up as waste and or litter. No specific reduction is proposed.

There is no question that reducing waste and recycling plastic bottles is an important societal issue. California has an extensive recycling program that includes producers, distributors, recycling facilities, along with a redemption program. Nestlé must participate in this program as a producer. Developing an alternative action that goes beyond the existing framework is beyond the scope of this analysis and outside of Forest Service jurisdiction.

Several commenters suggested moving the extraction point to the lower end of the Strawberry Creek / East Twin Creek watershed. This alternative action is based on the premise that extracting water in the lower watershed would have less impact on Strawberry Creek surface water flows within the National Forest. One comment suggested that Nestlé relocate to another location with more plentiful supply of water such as headwaters of the Mississippi river.

As this is an existing use of long-standing, the decision framework is whether or not I will approve continued use and occupancy and authorize a new permit for the existing facilities at the request of the permittee, and if so what conditions apply. My decision does not include a need to find a new location for the facilities if I chose not to approve the continued use of NFS lands. It would be up to Nestlé to determine if they wanted to pursue a new permit for a different location. Therefore, an alternative action to relocate the facilities is outside the scope of this analysis.

One comment suggested an alternative action that would consider and evaluate Wild and Scenic River eligibility for Strawberry Creek. Wild and Scenic River eligibility was evaluated as part of the LMP revision in 2005. As described in Appendix E of the LMP Final Environmental Impact Statement, free flowing streams with outstandingly remarkable characteristics were evaluated. Strawberry Creek did not make the eligible rivers list. Since this alternative action was already considered in the LMP, it is outside the scope of this analysis.

## CONSULTATION WITH OTHER GOVERNMENT AGENCIES

The March 18, 2016 scoping notice was distributed to federal, state, and local agencies. Written replies were received from the US Environmental Protection Agency, the US Fish and Wildlife Service, the State Water Resources Control Board (SWRCB), the Santa Ana Regional Water Quality Control Board, the California Department of Fish and Wildlife, and San Bernardino County. Copies of the correspondence are available in the project record.

 

The SWRCB is conducting their own investigation into the water rights held by Nestlé, and the Forest Service has worked directly with the SWRCB staff on that matter, including participation in a June 15, 2016 site visit. As I've described earlier in the decision, the SWRCB staff issued their Report of Investigation on December 20, 2017. Although the SWRCB staff has made numerous recommendations in their report, the SWRCB has not taken formal action. The Forest Service will continue to work with the SWRCB as requested.

The Forest Service is also working directly with the US Fish and Wildlife Service (FWS) and the California Department of Fish and Wildlife (CDFW). I have incorporated the FWS suggestion that our watershed studies measure the isotopes in the water to help determine travel time and source locations. I have consulted with the FWS as required by Section 7 of the Endangered Species Act, requesting informal consultation for the findings documented in the Wildlife Biological Assessment. The FWS concurred with the findings by letter of June 27, 2017.

As discussed above, the Forest Service corresponded with the FDA to relay public concerns relating to Nestlé's labeling of its bottled water.

## TRIBAL CONSULTATION

The Forest Service initiated government to government consultation with the San Manuel Band of Mission Indians by letter of January 23, 2016. The Front Country District Ranger and Forest Tribal Liaison met with tribal leaders and staff in August of 2016 to discuss the proposed permit in more detail. Government to Government consultation is on-going.

## OTHER PERMITS REQUIRED

Nestlé, as the permittee, is subject to the jurisdiction of other federal agencies, as well as state and local agency requirements. Nestlé must comply with federal and state drinking water standards, follow state and local requirements for their wells, hold a valid state water right, and comply with any Regional Water Quality Control Board discharge requirements. The California Department of Fish and Wildlife may also require permits related to stream alteration.

## FINDINGS REQUIRED BY OTHER LAWS AND REGULATIONS

The findings related to the Endangered Species Act, the National Historic Preservation Act, the Migratory Bird Treaty Act, the Clean Water Act, and the Clean Air Act were addressed in my evaluation of extraordinary circumstances or in response to resource topics suggested by the public during scoping. I also considered the following laws, regulations and policy as they relate to my decision.

### The Organic Act

The Organic Act established the forest reserves and continues to provide the basic authority for the management of those lands. Part of the act states that "All waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, or under the laws of the United States and the rules and regulations established thereunder." (16 USC 481). The State of California Water Resources Control Board regulates water rights and beneficial uses of water within the state. The Santa Ana Regional Water Quality Control Board (a subdivision of the SWRCB) has identified beneficial uses for the Santa Ana watershed, including the use of surface waters of




Strawberry Creek as "Municipal and Domestic Supply" (MUN), which are waters that are used for community, military, municipal or individual water supply systems. These uses may include, but are not limited to, drinking water supply. Based on my review of the basin plan, I have concluded that the authorized use of the water is consistent with the requirements of the Organic Act.

## Multiple-Use Sustained-Yield Act (MUSYA)

The MUSYA provides that:

> "It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."(16 USC 528)

My decision is consistent with the purposes for which the San Bernardino National Forest was established. The resource mitigation measures include provisions for the protection of watershed, wildlife, and fish (aquatic) resources.

## The Federal Land Policy and Management Act (FLPMA)

Under FLPMA, the Secretary of Agriculture has authority to issue rights-of-way for:

> "…reservoirs, canals, ditches, flumes, laterals, pipes, pipelines, tunnels, and other facilities and systems for the impoundment, storage, transportation, or distribution of water… "(43 USC 1761)

Provided:

> "Each right-of-way shall contain--
>
> (a) terms and conditions which will (i) carry out the purposes of this Act and rules and regulations issued thereunder; (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment; (iii) require compliance with applicable air and water quality standards established by or pursuant to applicable Federal or State law; and (iv) require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights-of-way for similar purposes if those standards are more stringent than applicable Federal standards… "(43 USC 1765)

My decision adopts resource mitigation measures, terms, and conditions that will protect the environment and require compliance with applicable federal, state, and local laws. My decision is consistent with the requirements of FLPMA.

## The National Forest Management Act (NFMA)

The NFMA provides the statutory direction for the development of Land and Resource Management Plans (commonly called Land Management Plans). It also requires that:

> "Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." (16 USC 1604(i))




The current LMP was adopted by the Regional Forester on April 3, 2006. The Record of
Decision that adopted the LMP required that re-issuance of existing authorizations be treated as
new decisions, which must be consistent with the new direction described in the revised LMP.
The various specialist reports include an evaluation of the consistency with the San Bernardino
National Forest LMP requirements, and based on that analysis my decision is consistent with
LMP direction. Two standards in particular were important to my decision. Those standards
are:

- **S45:** All construction, reconstruction, operation and maintenance of tunnels on National
  Forest System lands shall use practices that minimize adverse effects on groundwater
  aquifers and their surface expressions.
- **S46:** Surface water diversions and groundwater extractions, including wells and spring
  developments will only be authorized when it is demonstrated by the user, and/or agreed
  to by the Forest Service, that the water extracted is excess to the current and reasonably
  foreseeable future needs of forest resources.
  - o Consideration of beneficial uses, existing water rights, and the absence of other
    available water sources will be part of the water extraction application.
  - o Approved extractions and diversions will provide for long-term protection and
    reasonable use of surface water and groundwater resources.
  - o Feasibility and sustainability assessments should be appropriately scaled to the
    magnitude of the extraction or diversion proposed.

Based on the record and the analysis provided by staff, I have concluded that minimum flows are
required to meet the current and foreseeable needs of forest resources during the term of the new
permit. The paired basin study and adaptive management plan provide practices to adjust those
minimum flows during the permit term to ensure that resource mitigation measures are met,
which then ensure that the degree of potential adverse effects on the surface expression of the
water associated with Nestlé's tunnels and horizontal wells are minimized.

## Executive Order 13112 of February 3, 1999

This order directs federal agencies to prevent the introduction of invasive species, detect and
respond rapidly to and control such species, not authorize, fund, or carry out actions that it
believes are likely to cause or promote the introduction or spread of invasive species unless the
agency has determined and made public its determination that the benefits of such actions clearly
outweigh the potential harm caused by invasive species; and that all feasible and prudent
measures to minimize risk of harm will be taken in conjunction with the actions.

I have adopted standard permit conditions that address the requirements of this Executive Order,
and have adopted additional resource mitigation measures that provide additional detail as to
how invasive species will be detected and controlled. My decision to authorize this use is
consistent with this Executive Order.

## Executive Order 13790 of April 25, 2017

The "Promoting Agriculture and Rural Prosperity in America" executive order establishes policy
that states:

> "A reliable, safe, and affordable food, fiber, and forestry supply is critical to America's

 

national security, stability, and prosperity.  It is in the national interest to promote American agriculture and protect the rural communities where food, fiber, forestry, and many of our renewable fuels are cultivated. It is further in the national interest to ensure that regulatory burdens do not unnecessarily encumber agricultural production, harm rural communities, constrain economic growth, hamper job creation, or increase the cost of food for Americans and our customers around the world."

The order also creates a Task Force and includes direction for that Task Force to "identify legislative, regulatory, and policy changes to promote in rural America agriculture, economic development, job growth, infrastructure improvements, technological innovation, energy security, and quality of life."   Among the changes that the Task Force is directed to consider are "changes that would… ensure that water users' private property rights are not encumbered when they attempt to secure permits to operate on public lands… ."

The executive order is a prospective approach creating a Task Force to consider possible changes on many topics, including any changes that might be warranted to avoid encumbrance of water users' private property rights in federal permitting.  The order does not change applicable current law, regulation, or Forest Service policy, nor does it "impair or otherwise affect" the authority granted by law to executive departments or agencies or the heads thereof.

My decision is consistent with current law, regulation, and policy, which includes requirements for measures for the protection of fish and wildlife resources, and when necessary, measures to comply with Land Management Plans.  My decision does not attempt to encumber, expand, or determine the scope of, any private property rights Nestlé may have in association with their water use.  As discussed above, my decision leaves any issue concerning the extent of Nestlé's water rights to the state agency who has that authority--the SWRCB.

## Executive Order 13807 of August 15, 2017

The "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects" executive order applies to Federal review of certain infrastructure projects.  Policy established by the order includes direction to find more efficient and effective ways to develop infrastructure without sacrificing environmental, health and safety, transparency, and other concerns. The order further establishes a definition for an "infrastructure project" and provides process enhancements to achieve the policies expressed in the order.

The order does not apply to my decision because the decision is not authorizing an infrastructure project.  The Nestlé wells, pipelines, and other support facilities in question already exist and no new pipelines or other improvements are authorized.  In addition, Nestlé's water extraction and transport operations are for purposes of its private commercial bottling operations and are not an infrastructure project "designed to provide or support services to the general public."  My decision also is consistent with the spirit of the order in that it involves a single federal agency decision utilizing a categorical exclusion with conditions based on the agency objective to authorize and manage special uses of National Forest System lands in a manner which protects natural resources and public health and safety and is consistent with the Land Management Plan.




## Special Use Regulations and Policy

Forest Service regulations for special uses found at Title 36 of the Code of Federal Regulations (CFR) Part 251 Subpart B apply to the analysis and decision, as well as Special Use policy in the Forest Service Manual section 2700.

Nestlé's predecessor requested a new permit in 1987. That request was accepted as an application for a new permit, and is being processed under the current regulations. Those regulations at 36 CFR § 251.64 provide:

> (a) When a special use authorization provides for renewal, the authorized officer shall renew it where such renewal is authorized by law, if the project or facility is still being used for the purpose(s) previously authorized and is being operated and maintained in accordance with all the provisions of the authorization. In making such renewal, the authorized officer may modify the terms, conditions, and special stipulations to reflect any new requirements imposed by current Federal and State land use plans, laws, regulations or other management decisions. Special uses may be reauthorized upon expiration so long as such use remains consistent with the decision that approved the expiring special use or group of uses. If significant new information or circumstances have developed, appropriate environmental analysis must accompany the decision to reauthorize the special use.

> (b) When a special use authorization does not provide for renewal, it is discretionary with the authorized officer, upon request from the holder and prior to its expiration, whether or not the authorization shall be renewed. A renewal pursuant to this section shall comply with the same provisions contained in paragraph (a) of this section.

The 1978 permit does not provide for renewal, however the paragraph (b) requirements incorporate the provisions of paragraph (a), including the provision for modifying the terms consistent with new land use plans, and the requirement to conduct appropriate environmental analysis. Consistent with that direction, I have adopted terms and conditions that reflect new requirements imposed by Forest Service regulations and the LMP. I have completed an environmental analysis as documented in this Decision Memo. The new permit itself reflects the latest version of the standard Forest Service special use permit (FS-2700-4), and includes numerous standard administrative conditions as well as project specific terms. My decision is consistent with this regulation.

My decision is also consistent with the terms of the existing permit clause 23, which states in part " a new permit to occupy and use the same National Forest land may be granted provided the permittee will comply with the then existing laws and regulations governing the occupancy and use of National Forest lands…"

## Water Uses and Development Policy

Forest Service Water Uses and Development policy in the Forest Service Manual 2540 provides additional direction for privately held water rights and special use authorizations for water developments. Section 2541.34 states, in part:

> "The establishment of a water right on National Forest System land does not limit the Regional Forester's authority to regulate land use and occupancy, nor to prevent injury to




property of the United States. Although a permittee may make beneficial use of water on National Forest System land, the Regional Forester retains the authority to determine management actions needed to comply with rules and regulations for land use and occupancy."

Section 2541.35 directs:

"Special-use authorizations that involve water storage, transmission, or diversion facilities on National Forest System lands (FSM 2729) authorize occupancy of the land only for the specific development purpose. In no case does the United States necessarily relinquish any water right it may have, or waive the right to use such water. Include stipulations in the authorizing documents to ensure the quantities of water needed to fulfill purposes of the National Forest and for environmental needs will be maintained instream. Clearly inform the permittee that the authorization does not confer any legal right to the use of the water, nor does it provide a basis for acquiring such a right as against the United States (FSM 2782 and 2783.12)."

My decision, which includes resource mitigation measures, is consistent with this policy direction. The Forest Service has developed standard permit terms that further implement this direction, and standard permit clause D-25 will be included in the new permit.

## REFERENCE MATERIAL

All documents referenced in this Decision Memo, such as the various reports and assessments, are available on-line through the project webpage at:

http://go.usa.gov/cGyXH (please note - this URL is case sensitive)

## ADMINISTRATIVE REVIEW (APPEAL) OPPORTUNITIES

This decision is not subject to the 36 CFR Part 218 Project-Level Pre-decisional Administrative Review Process. The Forest Service no longer offers notice, comment and appeal opportunities for categorically excluded projects pursuant to 36 CFR Part 215, which were replaced by the 218 rule.

My decision is not subject to appeal under the 36 CFR Part 214 Post-decisional Administrative Review Process For Occupancy Or Use Of National Forest System Lands And Resources regulations as specified in 36 CFR § 214.4(c). Specifically my decision to issue a new permit is not a decision to modify, suspend, or revoke a special use authorization. The existing special use permit does not provide for renewal and will terminate according to its terms once the new permit is executed or the implementation process described below is complete.

## IMPLEMENTATION

This decision to authorize the continued use, subject to terms and conditions that implement the LMP, concludes the Forest Service review of Nestlé's application for a new permit. The new permit will become effective when signed by both the applicant and me (as the authorized officer). The permit must be signed by Nestlé and returned to me within 60 days of its receipt by Nestlé, unless I extend that time. Refusal by Nestlé to sign and accept a special use authorization within the time allowed, and before its final approval and signature by an authorized officer,





shall terminate an application and constitute denial of the requested use and occupancy (36 CFR 251.62).

## CONTACT

For additional information concerning this decision, contact: Tasha Hernandez, Forest Planner, at nestle_decision_sbnf@fs.fed.us.

Joseph Rechsteiner                                                   JUN 2 7 2018

District Ranger                                                      Date

San Bernardino National Forest

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.