# Exhibit  29
# to Declaration of Rachel Doughty

Authorization ID: FCD728502
Contact Name: BLUETRITON BRANDS, INC.
Expiration Date: 08/24/2022
Use Code: 915, 914, 931, 715, 753

FS-2700-4 (VER. 03/17)
OMB 0596-0082

**U.S. DEPARTMENT OF AGRICULTURE
FOREST SERVICE**

**SPECIAL USE PERMIT**

**AUTHORITY:
ORGANIC ADMINISTRATION ACT June 4, 1897,
FEDERAL LAND POLICY AND MGMT ACT, AS
AMENDED October 21, 1976**

BLUETRITON BRANDS, INC. of 900 LONG RIDGE ROAD BLDG #2 STAMFORD CT USA 06902; locally of 5772 JURUPA STREET; (hereinafter "the holder") is authorized to use or occupy National Forest System lands in the SAN BERNARDINO NATIONAL FOREST, Front Country Ranger District, of the National Forest System, subject to the terms and conditions of this special use permit (the permit).

This permit covers 4.57 acres or 4.61 miles in the SE1/4 SE1/4 Sec. 1, T. 1 N., R. 4 W., SAN BERNARDINO MERIDIAN, Sec. 31, T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 6, T. 1 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 30, T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, NE1/4 Sec. 12, T. 1 N., R. 4 W., SAN BERNARDINO MERIDIAN, ("the permit area"), as shown on the map attached as Appendix A. This and any other appendices to this permit are hereby incorporated into this permit.

This permit issued for the purpose of:

Operating and maintaining a water collection as well as transmission system that consists of tunnels #2 and 3, horizontal wells 1,1A, 7, 7A, 7B, 7C, 8, 10, 11, 12 and their associated vaults, connected through 4.5 miles of 4" pipeline. This permit also authorizes the operation and maintenance of four helicopter landing areas, 5 stream gauge/ monitoring stations with telemetry for data transmission, and 5.7 miles of access trail (4.5 miles of trail is along the pipeline). This permit also authorizes administrative access along Forest Service road 1N24 and maintenance of said road commensurate with use.

See terms and conditions for exact permitted use. The CA State Water Board enforcement hearing in 2022 may clarify the water rights related to the system and/or uphold the draft Cease and Desist Order issued to the holder in 2021.

Occupancy and use is subject to the resource protection measures, monitoring requirements, and adaptive management approach adopted in the final decision document approving this use in 2018 for Nestlé Waters North America. The terms and conditions were updated in 2022 for BlueTriton Brands.

**TERMS AND CONDITIONS**

**I. GENERAL TERMS**

**A. AUTHORITY.** This permit is issued pursuant to Subpart B of 36 CFR Part 251 and the Organic Administration Act, as amended, and is subject to their provisions.

**B. AUTHORIZED OFFICER.** The authorized officer is the Forest or Grassland Supervisor or a subordinate officer with delegated authority.

**C. TERM.** This permit shall expire at midnight on 08/24/2022, 1 year or less, from the date of issuance.

**D. CONTINUATION OF USE AND OCCUPANCY.** This permit is not renewable. Prior to expiration of this permit, the holder may apply for a new permit for the use and occupancy authorized by this permit. Applications for a new permit must be submitted at least 6 months prior to expiration of this permit. Issuance of a new permit is at the sole discretion of the authorized officer. At a minimum, before issuing a new permit, the authorized officer shall ensure that (1) the use and occupancy to be authorized by the new permit is consistent with the standards and guidelines in the

1

applicable land management plan; (2) the type of use and occupancy to be authorized by the new permit is the same as the type of use and occupancy authorized by this permit; and (3) the holder is in compliance with all the terms of this permit. The authorized officer may prescribe new terms and conditions when a new permit is issued.

E. **AMENDMENT.** This permit may be amended in whole or in part by the Forest Service when, at the discretion of the authorized officer, such action is deemed necessary or desirable to incorporate new terms that may be required by law, regulation, directive, the applicable forest land and resource management plan, or projects and activities implementing a land management plan pursuant to 36 CFR Part 215.

F. **COMPLIANCE WITH LAWS, REGULATIONS, AND OTHER LEGAL REQUIREMENTS.** In exercising the rights and privileges granted by this permit, the holder shall comply with all present and future federal laws and regulations and all present and future state, county, and municipal laws, regulations, and other legal requirements that apply to the permit area, to the extent they do not conflict with federal law, regulation, or policy. The Forest Service assumes no responsibility for enforcing laws, regulations, and other legal requirements that fall under the jurisdiction of other governmental entities.

G. **NON-EXCLUSIVE USE.** The use or occupancy authorized by this permit is not exclusive. The Forest Service reserves the right of access to the permit area, including a continuing right of physical entry to the permit area for inspection, monitoring, or any other purpose consistent with any right or obligation of the United States under any law or regulation. The Forest Service reserves the right to allow others to use the permit area in any way that is not inconsistent with the holder's rights and privileges under this permit, after consultation with all parties involved. Except for any restrictions that the holder and the authorized officer agree are necessary to protect the installation and operation of authorized temporary improvements, the lands and waters covered by this permit shall remain open to the public for all lawful purposes.

H. **ASSIGNABILITY.** This permit is not assignable or transferable.

I. **TRANSFER OF TITLE TO THE IMPROVEMENTS.**

1. Notification of Transfer. The holder shall notify the authorized officer when a transfer of title to all or part of the authorized improvements is planned.

2. Transfer of Title. Any transfer of title to the improvements covered by this permit shall result intermination of the permit. The party who acquires title to the improvements must submit an application for a permit. The Forest Service is not obligated to issue a new permit to the party who acquires title to the improvements. The authorized officer shall determine that the applicant meets requirements under applicable federal regulations.

J. **CHANGE IN CONTROL OF THE BUSINESS ENTITY.**

1. Notification of Change in Control. The holder shall notify the authorized officer when a change in control of the business entity that holds this permit is contemplated.

(a) In the case of a corporation, control is an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the business so as to permit the exercise of managerial authority over the actions and operations of the corporation or election of a majority of the board of directors of thecorporation.

(b) In the case of a partnership, limited partnership, joint venture, or individual entrepreneurship, control is a beneficial ownership of or interest in the entity or its capital so as to permit the exercise of managerial authority over the actions and operations of the entity.

(c) In other circumstances, control is any arrangement under which a third party has the ability to exercise management authority over the actions or operations of the business.

2. Effect of Change in Control. Any change in control of the business entity as defined in paragraph 1 of this clause shall result in termination of this permit. The party acquiring control must submit an application for a special use permit. The Forest Service is not obligated to issue a new permit to the party who acquires control. The authorized officer shall determine whether the applicant meets the requirements established by applicable federal regulations.

II. **IMPROVEMENTS**

A. **LIMITATIONS ON USE.** Nothing in this permit gives or implies permission to build or maintain any structure or facility or to conduct any activity, unless specifically authorized by this permit. Any use not specifically authorized by this permit must be proposed in accordance with 36 CFR 251.54. Approval of such a proposal through issuance of a new

permit or permit amendment is at the sole discretion of the authorized officer.

**B. <u>PLANS</u>.** All plans for development, layout, construction, reconstruction, or alteration of improvements in the permit area, as well as revisions to those plans must be prepared by a professional engineer, architect, landscape architect, or other qualified professional based on federal employment standards acceptable to the authorized officer. These plans and plan revisions must have written approval from the authorized officer before they are implemented. The authorized officer may require the holder to furnish as-built plans, maps, or surveys upon completion of the work.

**C. <u>CONSTRUCTION</u>.**  Construction is not authorized.

**III. <u>OPERATIONS</u>**

**A. <u>PERIOD OF USE</u>.** Use or occupancy of the permit area shall be exercised at least 365 days each year

**B. <u>CONDITION OF OPERATIONS</u>.** The holder shall maintain the authorized improvements and permit area to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the authorized officer and consistent with other provisions of this permit. Standards are subject to periodic change by the authorized officer when deemed necessary to meet statutory, regulatory, or policy requirements or to protect national forest resources. The holder shall comply with inspection requirements deemed appropriate by the authorized officer.

**C. <u>OPERATING PLAN</u>.** The holder shall prepare and annually revise by May 1st an operating plan.  The operating plan shall be prepared in consultation with the authorized officer or the authorized officer's designated representative and shall cover all operations authorized by this permit. The operating plan shall outline steps the holder will take to protect public health and safety and the environment and shall include sufficient detail and standards to enable the Forest Service to monitor the holder's operations for compliance with the terms and conditions of this permit. The operating plan shall be submitted by the holder and approved by the authorized officer or the authorized officer's designated representative prior to commencement of operations and shall be attached to this permit as an appendix. The authorized officer may require an annual meeting with the holder to discuss the terms and conditions of the permit or operating plan, annual use reports, or other concerns either party may have.

**D. <u>MONITORING BY THE FOREST SERVICE</u>.** The U.S. Forest Service and its agents have the right to inspect the permit area and transmission facilities at any time for compliance with the terms of this permit. The holder shall comply with inspection requirements deemed appropriate by the authorized officer. The holder's obligations under this permit are not contingent upon any duty of the Forest Service to inspect the permit area or transmission facilities. A failure by the Forest Service or other governmental officials to inspect is not a justification for noncompliance with any of the terms and conditions of this permit.

**IV. <u>RIGHTS AND LIABILITIES</u>**

**A. <u>LEGAL EFFECT OF THE PERMIT</u>.** This permit, which is revocable and terminable, is not a contract or a lease, but rather a federal license. The benefits and requirements conferred by this authorization are reviewable solely under the procedures set forth in 36 CFR 214 and 5 U.S.C. 704. This permit does not constitute a contract for purposes of the Contract Disputes Act, 41 U.S.C. 601. The permit is not real property, does not convey any interest in real property, and may not be used as collateral for a loan.

**B. <u>VALID EXISTING RIGHTS</u>.** This permit is subject to all valid existing rights. Valid existing rights include those derived under mining and mineral leasing laws of the United States. The United States is not liable to the holder for the exercise of any such right.

**C. <u>ABSENCE OF THIRD-PARTY BENEFICIARY RIGHTS</u>.** The parties to this permit do not intend to confer any rights on any third party as a beneficiary under this permit.

**D. <u>SERVICES NOT PROVIDED</u>.** This permit does not provide for the furnishing of road or trail maintenance, water, fire protection, search and rescue, or any other such service by a government agency, utility, association, or individual.

**E. <u>RISK OF LOSS</u>.** The holder assumes all risk of loss associated with use or occupancy of the permit area, including but not limited to theft, vandalism, fire and any fire-fighting activities (including prescribed burns), avalanches, rising waters, winds, falling limbs or trees, and other forces of nature. If authorized improvements in the permit area are destroyed or substantially damaged, the authorized officer shall conduct an analysis to determine whether the improvements can be safely occupied in the future and whether rebuilding should be allowed. If rebuilding is not allowed, the permit shall terminate.

**F. <u>DAMAGE TO UNITED STATES PROPERTY</u>.** The holder has an affirmative duty to protect from damage the land,

property, and other interests of the United States. Damage includes but is not limited to fire suppression costs and damage to government-owned improvements covered by this permit.

1.  The holder shall be liable for all injury, loss, or damage, including fire suppression, prevention and control of the spread of invasive species, or other costs in connection with rehabilitation or restoration of natural resources resulting from the use or occupancy authorized by this permit. Compensation shall include but not be limited to the value of resources damaged or destroyed, the costs of restoration, cleanup, or other mitigation, fire suppression or other types of abatement costs, and all administrative, legal (including attorney's fees), and other costs. Such costs may be deducted from a performance bond required under clause IV.J.

2.  The holder shall be liable for damage caused by use of the holder or the holder's heirs, assigns, agents, employees, contractors, or lessees to all roads and trails of the United States to the same extent as provided under clause IV.F.1, except that liability shall not include reasonable and ordinary wear and tear.

**G.  HEALTH AND SAFETY**. The holder shall take all measures necessary to protect the health and safety of all persons affected by the use and occupancy authorized by this permit. The holder shall promptly abate as completely as possible and in compliance with all applicable laws and regulations any physical or mechanical procedure, activity, event, or condition existing or occurring in connection with the authorized use and occupancy during the term of this permit that causes or threatens to cause a hazard to the health or safety of the public or the holder's employees or agents. The holder shall as soon as practicable notify the authorized officer of all serious accidents that occur in connection with these procedures, activities, events, or conditions. The Forest Service has no duty under the terms of this permit to inspect the permit area or operations of the holder for hazardous conditions or compliance with health and safety standards.

**H.  ENVIRONMENTAL PROTECTION.**

1.  For purposes of clause IV.H and section V, "hazardous material" shall mean (a) any hazardous substance under section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. 9601(14); (b) any pollutant or contaminant under section 101(33) of CERCLA, 42 U.S.C. 9601(33); (c) any petroleum product or its derivative, including fuel oil, and waste oils; and (d) any hazardous substance, extremely hazardous substance, toxic substance, hazardous waste, ignitable, reactive or corrosive materials, pollutant, contaminant, element, compound, mixture, solution or substance that may pose a present or potential hazard to human health or the environment under any applicable environmental laws.

2.  The holder shall avoid damaging or contaminating the environment, including but not limited to the soil, vegetation (such as trees, shrubs, and grass), surface water, and groundwater, during the holder's use and occupancy of the permit area. Environmental damage includes but is not limited to all costs and damages associated with or resulting from the release or threatened release of a hazardous material occurring during or as a result of activities of the holder or the holder's heirs, assigns, agents, employees, contractors, or lessees on, or related to, the lands, property, and other interests covered by this permit. If the environment or any government property covered by this permit becomes damaged in connection with the holder's use and occupancy, the holder shall as soon as practicable repair the damage or replace the damaged items to the satisfaction of the authorized officer and at no expense to the United States.

3.  The holder shall as soon as practicable, as completely as possible, and in compliance with all applicable laws and regulations abate any physical or mechanical procedure, activity, event, or condition existing or occurring in connection with the authorized use and occupancy during or after the term of this permit that causes or threatens to cause harm to the environment, including areas of vegetation or timber, fish or other wildlife populations, their habitats, or any other natural resources.

**I.   INDEMNIFICATION OF THE UNITED STATES**. The holder shall indemnify, defend, and hold harmless the United States for any costs, damages, claims, liabilities, and judgments arising from past, present, and future acts or omissions of the holder in connection with the use or occupancy authorized by this permit. This indemnification provision includes but is not limited to acts and omissions of the holder or the holder's heirs, assigns, agents, employees, contractors, or lessees in connection with the use or occupancy authorized by this permit which result in (1) violations of any laws and regulations which are now or which may in the future become applicable; (2) judgments, claims, demands, penalties, or fees assessed against the United States; (3) costs, expenses, and damages incurred by the United States; or (4) the release or threatened release of any solid waste, hazardous waste, hazardous materials, pollutant, contaminant,oil in any form, or petroleum product into the environment. The authorized officer may prescribe terms that allow the holder to replace, repair, restore, or otherwise undertake necessary curative actions to mitigate damages in addition to or as an alternative to monetary indemnification.

## V. RESOURCE PROTECTION

**A. COMPLIANCE WITH ENVIRONMENTAL LAWS**. The holder shall in connection with the use or occupancy authorized by this permit comply with all applicable federal, state, and local environmental laws and regulations, including but not limited to those established pursuant to the Resource Conservation and Recovery Act, as amended, 42 U.S.C. 6901 et seq., the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq., the Oil Pollution Act, as amended, 33 U.S.C. 2701 et seq., the Clean Air Act, as amended, 42 U.S.C. 7401 et seq., CERCLA, as amended, 42 U.S.C. 9601 et seq., the Toxic Substances Control Act, as amended, 15 U.S.C. 2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. 136 et seq., and the Safe Drinking Water Act, as amended, 42 U.S.C. 300f et seq.

**B. VANDALISM**. The holder shall take reasonable measures to prevent and discourage vandalism and disorderly conduct and when necessary shall contact the appropriate law enforcement officer.

**C. PESTICIDE USE.**

1. Authorized Officer Concurrence. Pesticides may not be used outside of buildings in the permit area to control pests, including undesirable woody and herbaceous vegetation (including aquatic plants), insects, birds, rodents, or fish without prior written concurrence of the authorized officer. Only those products registered or otherwise authorized by the U.S. Environmental Protection Agency and appropriate State authority for the specific purpose planned shall be authorized for use within areas on National Forest System lands.

2. Pesticide-Use Proposal. Requests for concurrence of any planned uses of pesticides shall be provided in advance using the Pesticide-Use Proposal (form FS-2100-2). Annually the holder shall, on the due date established by the authorized officer, submit requests for any new, or continued, pesticide usage. The Pesticide-Use Proposal shall cover a 12-month period of planned use. The Pesticide-Use Proposal shall be submitted at least 60 days in advance of pesticide application. Information essential for review shall be provided in the form specified. Exceptions to this schedule may be allowed, subject to emergency request and approval, only when unexpected outbreaks of pests require control measures which were not anticipated at the time a Pesticide-Use Proposal was submitted.

3. Labeling, Laws, and Regulations. Label instructions and all applicable laws and regulations shall be strictly followed in the application of pesticides and disposal of excess materials and containers. No pesticide waste, excess materials, or containers shall be disposed of in any area administered by the Forest Service.

**D. ARCHAEOLOGICAL-PALEONTOLOGICAL DISCOVERIES**. The holder shall immediately notify the authorized officer of all antiquities or other objects of historic or scientific interest, including but not limited to historic or prehistoric ruins, fossils, or artifacts discovered in connection with the use and occupancy authorized by this permit. The holder shall follow the applicable inadvertent discovery protocols for the undertaking provided in an agreement executed pursuant to section 106 of the National Historic Preservation Act, 54 U.S.C. 306108; if there are no such agreed-upon protocols, the holder shall leave these discoveries intact and in place until consultation has occurred, as informed, if applicable, by any programmatic agreement with tribes. Protective and mitigation measures developed under this clause shall be the responsibility of the holder. However, the holder shall give the authorized officer written notice before implementing these measures and shall coordinate with the authorized officer for proximate and contextual discoveries extending beyond the permit area.

**E. NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT (NAGPRA)**. In accordance with 25 U.S.C. 3002(d) and 43 CFR 10.4, if the holder inadvertently discovers human remains, funerary objects, sacred objects, or objects of cultural patrimony on National Forest System lands, the holder shall immediately cease work in the area of the discovery and shall make a reasonable effort to protect and secure the items. The holder shall follow the applicable NAGPRA protocols for the undertaking provided in the NAGPRA plan of action or the NAGPRA comprehensive agreement; if there are no such agreed-upon protocols, the holder shall as soon as practicable notify the authorized officer of the discovery and shall follow up with written confirmation of the discovery. The activity that resulted in the inadvertent discovery may not resume until 30 days after the forest archaeologist certifies receipt of the written confirmation, if resumption of the activity is otherwise lawful, or at any time if a binding written agreement has been executed between the Forest Service and the affiliated Indian tribes that adopts a recovery plan for the human remains and objects.

**F. PROTECTION OF THREATENED AND ENDANGERED SPECIES, SENSITIVE SPECIES, AND SPECIES OF CONSERVATION CONCERN AND THEIR HABITAT.**

1.  Threatened and Endangered Species and Their Habitat. The location of sites within the permit area needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act (ESA)of 1973, 16 U.S.C. 1531 et seq., as amended, or within designated critical habitat shall be shown on a map in an appendix to this permit and may be shown on the ground. The holder shall take any protective and mitigation measures specified by the authorized officer as necessary and appropriate to avoid or reduce effects on listed species or designatedcritical habitat affected by the authorized use and occupancy. Discovery by the holder or the Forest Service of other sites within the permit area containing threatened or endangered species or designated critical habitat not shown on the map inthe appendix shall be promptly reported to the other party and shall be added to the map.

2.  Sensitive Species and Species of Conservation Concern and Their Habitat. The location of sites within the permit area needing special measures for protection of plants or animals designated by the Regional Forester as sensitive species or as species of conservation concern pursuant to FSM 2670 shall be shown on a map in an appendix to this permit and may be shown on the ground. The holder shall take any protective and mitigation measures specified by the authorized officer as necessary and appropriate to avoid or reduce effects on sensitive species or species of conservation concern ortheir habitat affected by the authorized use and occupancy. Discovery by the holder or the Forest Service of other sites within the permit area containing sensitive species or species of conservation concern or their habitat not shown on the map in the appendix shall be promptly reported to the other party and shall be added to the map.

**G. SURVEY AND MANAGE SPECIES AND THEIR HABITAT** The location of sites within the permit area occupied by survey and manage species or their habitat shall be shown on a map in an appendix to this permit and may be shown on the ground. The survey and manage species and survey and manage standards and guidelines were established in the 1994 Northwest Forest Plan amendments to all Forest Service land and resource management plans in western Oregon and Washington and northern California, as amended by the January 2001 Record of Decision (2001 ROD). The list of survey and manage species in the 2001 ROD has been amended and is subject to periodic amendment by the Forest Service. The holder shall take any protective and mitigation measures specified by the authorized officer as necessary and appropriate to avoid or reduce effects on survey and manage species or their habitat affected by the authorized use and occupancy. The location of sites within the area occupied by survey and manage species or their habitat shall be shown on a map in an appendix to this permit and may be shown on the ground. Discovery by the holder or the Forest Service of other sites within the permit area containing survey and manage species or their habitat not shown on the map in the appendix shall be promptly reported to the other party and shall be added to the map.

**H. CONSENT TO STORE HAZARDOUS MATERIALS** The holder shall not store any hazardous materials at the site without prior written approval from the authorized officer. This approval shall not be unreasonably withheld. If the authorized officer provides approval, this permit shall include, or in the case of approval provided after this permit is issued, shall be amended to include specific terms addressing the storage of hazardous materials, including the specific type of materials to be stored, the volume, the type of storage, and a spill plan. Such terms shall be proposed by the holder and are subject to approval by the authorized officer.

1.  If the holder receives consent to store hazardous material, the holder shall identify to the Forest Service any hazardous material to be stored at the site. This identifying information shall be consistent with column (1) of the table of hazardous materials and special provisions enumerated at 49 CFR 172.101 whenever the hazardous material appears in that table. For hazard communication purposes, the holder shall maintain Material Safety Data Sheets for any stored hazardous chemicals, consistent with 29 CFR 1910.1200(c) and (g). In addition, all hazardous materials stored by the holder shall beused, labeled, stored, transported, and disposed of in accordance with all applicable federal, state, and local laws and regulations.

2.  The holder shall not release any hazardous materials (clause IV.H) onto land or into rivers, streams, impoundments, or natural or man-made channels leading to them. All prudent and safe attempts must be made to contain any release of these materials. The authorized officer in charge may specify specific conditions that must be met, including conditions more stringent than federal, state, and local regulations, to prevent releases and protect natural resources.

3.  If the holder uses or stores hazardous materials at the site, upon revocation or termination of this permit the holder shall provide the Forest Service with a report certified by a professional or professionals acceptable to the Forest Service that the permit area is uncontaminated by the presence of hazardous materials and that there has not been a release or discharge of hazardous materials upon the permit area, into surface water at or near the permit area, or into groundwater below the permit area during the term of the permit. If a release or discharge has occurred, the professional orprofessionals shall document and certify that the release or discharge has been fully remediated and that the permit area is in compliance with all applicable federal, state, and local laws and regulations.

## I.  CLEANUP AND REMEDIATION

1.  The holder shall immediately notify all appropriate response authorities, including the National Response Center and the authorized officer or the authorized officer's designated representative, of any oil discharge or of the release of a hazardous material in the permit area in an amount greater than or equal to its reportable quantity, in accordance with 33 CFR Part 153, Subpart B, and 40 CFR Part 302. For the purposes of this requirement, "oil" is as defined by section 311(a) of the Clean Water Act, 33 U.S.C. 1321(a)(1). The holder shall immediately notify the authorized officer or the authorized officer's designated representative of any release or threatened release of any hazardous material in or near the permit area which may be harmful to public health or welfare or which may adversely affect natural resources on federal lands.

2.  Except with respect to any federally permitted release as that term is defined under Section 101(10) of CERCLA, 42 U.S.C. 9601(10), the holder shall clean up or otherwise remediate any release, threat of release, or discharge of hazardous materials that occurs either in the permit area or in connection with the holder's activities in the permit area, regardless of whether those activities are authorized under this permit. The holder shall perform cleanup or remediation immediately upon discovery of the release, threat of release, or discharge of hazardous materials. The holder shall perform the cleanup or remediation to the satisfaction of the authorized officer and at no expense to the United States. Upon revocation or termination of this permit, the holder shall deliver the site to the Forest Service free and clear of contamination.

## VI. LAND USE FEE AND DEBT COLLECTION

**A.  LAND USE FEES**. The holder shall pay an initial annual land use fee of $1998.48 for the period of 01/01/2022 to 12/31/2022 (or as indicated by USFS billing). The annual land use fee shall be adjusted annually using the implicit price deflator gross national product (IPD-GNP) index as shown in the Linear Right Of Way (LROW) fee schedule.

**B.  MODIFICATION OF THE LAND USE FEE**. The land use fee may be revised whenever necessary to reflect the market value of the authorized use or occupancy or when the fee system used to calculate the land use fee is modified or replaced.

**C.  FEE PAYMENT ISSUES.**

1.  Crediting of Payments. Payments shall be credited on the date received by the deposit facility, except that if a payment is received on a non-workday, the payment shall not be credited until the next workday.

2.  Disputed Fees. Fees are due and payable by the due date. Disputed fees must be paid in full. Adjustments will be made if dictated by an administrative appeal decision, a court decision, or settlement terms.

3.  Late Payments

   (a)  Interest. Pursuant to 31 U.S.C. 3717 et seq., interest shall be charged on any fee amount not paid within 30 days from the date it became due. The rate of interest assessed shall be the higher of the Prompt Payment Act rate or the rate of the current value of funds to the United States Treasury (i.e., the Treasury tax and loan account rate), as prescribed and published annually or quarterly by the Secretary of the Treasury in the Federal Register and the Treasury Fiscal Requirements Manual Bulletins. Interest on the principal shall accrue from the date the fee amount is due.

   (b)  Administrative Costs. If the account becomes delinquent, administrative costs to cover processing and handling the delinquency shall be assessed.

   (c)  Penalties. A penalty of 6% per annum shall be assessed on the total amount that is more than 90 days delinquent and shall accrue from the same date on which interest charges begin to accrue.

   (d)  Termination for Nonpayment. This permit shall terminate without the necessity of prior notice and opportunity to comply when any permit fee payment is 90 calendar days from the due date in arrears. The holder shall remain responsible for the delinquent fees.

4. Administrative Offset and Credit Reporting. Delinquent fees and other charges associated with the permit shall be subject to all rights and remedies afforded the United States pursuant to 31 U.S.C. 3711 et seq. and common law. Delinquencies are subject to any or all of the following:

    (a)  Administrative offset of payments due the holder from the Forest Service.

    (b)  If in excess of 60 days, referral to the United States Department of the Treasury for appropriate collection action as provided by 31 U.S.C. 3711(g)(1).

    (c)  Offset by the Secretary of the Treasury of any amount due the holder, as provided by 31 U.S.C. 3720 et seq.

    (d)  Disclosure to consumer or commercial credit reporting agencies.

## VII. REVOCATION, SUSPENSION, AND TERMINATION

**A. REVOCATION AND SUSPENSION**. The authorized officer may revoke or suspend this permit in whole or in part:

1. For noncompliance with federal, state, or local law.
2. For noncompliance with the terms of this permit.
3. For abandonment or other failure of the holder to exercise the privileges granted.
4. With the consent of the holder.
5. For specific and compelling reasons in the public interest.

Prior to revocation or suspension, other than immediate suspension under clause VII.B, the authorized officer shall give the holder written notice of the grounds for revocation or suspension and a reasonable period, typically not to exceed 90 days, to cure any noncompliance.

**B. IMMEDIATE SUSPENSION**. The authorized officer may immediately suspend this permit in whole or in part when necessary to protect public health or safety or the environment. The suspension decision shall be in writing. The holder may request an on-site review with the authorized officer's supervisor of the adverse conditions prompting the suspension.The authorized officer's supervisor shall grant this request within 48 hours. Following the on-site review, the authorized officer's supervisor shall promptly affirm, modify, or cancel the suspension.

**C. APPEALS AND REMEDIES**. Written decisions by the authorized officer relating to administration of this permit are subject to administrative appeal pursuant to 36 CFR Part 214, as amended. Revocation or suspension of this permit shall not give rise to any claim for damages by the holder against the Forest Service.

**D. TERMINATION**. This permit shall terminate when by its terms a fixed or agreed upon condition, event, or time occurs without any action by the authorized officer. Examples include but are not limited to expiration of the permit by its terms on a specified date and termination upon change of control of the business entity. Termination of this permit shall not require notice, a decision document, or any environmental analysis or other documentation. Termination of this permit is not subject to administrative appeal and shall not give rise to any claim for damages by the holder against the Forest Service.

**E. RIGHTS AND RESPONSIBILITIES UPON REVOCATION OR TERMINATION WITHOUT ISSUANCE OF A NEW PERMIT**. Upon revocation or termination of this permit without issuance of a new permit, the holder shall remove all structures and improvements, except those owned by the United States, within a reasonable period prescribed by the authorized officer and shall restore the site to the satisfaction of the authorized officer. If the holder fails to remove all structures and improvements within the prescribed period, they shall become the property of the United States and may be sold, destroyed, or otherwise disposed of without any liability to the United States. However, the holder shall remain liable for all costs associated with their removal, including costs of sale and impoundment, cleanup, and restoration of the site.

**VIII. MISCELLANEOUS PROVISIONS**

**A. MEMBERS OF CONGRESS**. No member of or delegate to Congress or resident commissioner shall benefit from this permit either directly or indirectly, except to the extent the authorized use provides a general benefit to a corporation.

**B. CURRENT ADDRESSES**. The holder and the Forest Service shall keep each other informed of current mailing addresses, including those necessary for billing and payment of land use fees.

**C. SUPERSEDED PERMIT**. This permit supersedes a special use permit designated NESTLE WATERS NORTH AMERICA, INC, FCD728501, dated AUGUST 24, 2018

**D. SUPERIOR CLAUSES**. If there is a conflict between any of the preceding printed clauses and any of the following clauses, the preceding printed clauses shall control.

**E. Water Wells and Associated Pipelines (D-23).**

1. State and Local Documentation for Water Wells. The holder shall obtain all required State and local water permits, licenses, registrations, certificates, and rights for existing and proposed water wells and shall provide a copy of this documentation to the Authorized Officer. (See clause D-24) For proposed water well construction, development or redevelopment, this documentation shall be provided prior to commencement of work.

2. Water Well Construction and Development. For water well construction and development (or redevelopment), the holder shall prepare a well construction and development plan and submit it to the Authorized Officer for approval. The well construction and development plan must have written approval from the Authorized Officer before well construction or development commences. The holder shall follow applicable Federal, State, and local standards for design, construction, and development of new wells or redevelopment of existing wells. If these standards do not exist, the holder shall follow applicable standards issued by the American Society for Testing and Materials (ASTM), American Water Works Association (AWWA), or National Ground Water Association (NGWA). The construction and development plan must identify all potential sources for any proposed water injection during well construction and development. Only non-chlorinated, potable water may be injected during construction and development of wells that will be used for monitoring or water withdrawal. Copies of all documentation for drilling, constructing, or developing wells, including all drilling, boring, and well construction or development logs, shall be provided to the Authorized Officer within 60 days of completion of work.

3. Water Conservation Plan. For new or redeveloped wells, as part of a well development plan, the holder shall prepare and submit for written approval by the Authorized Officer a water conservation plan utilizing appropriate strategies to limit the amount of water removed from National Forest System lands.

4. Water Well Decommissioning. The holder shall properly decommission and abandon all water wells that are no longer needed or maintained in accordance with applicable Federal, State, and local standards for water well abandonment. If these standards do not exist, the holder shall follow applicable standards issued by the ASTM, AWWA, or NGWA. At

least 30 days prior to initiation of well decommissioning, the holder shall submit a well decommissioning plan to the Authorized Officer. The well decommissioning plan must have written approval from the Authorized Officer before well decommissioning commences. All documentation of well decommissioning shall be provided  to  the Authorized Officer within 60 days of completion of the work.

**F.  Water Facilities and Water Rights (D-24).**

1.  Water Facilities. No ditch, reservoir, well, spring, seepage, or other facility to pump, divert, store, or convey water (hereinafter "water facilities") for which the point of diversion, storage, or withdrawal is on National Forest System lands may be initiated, developed, certified, or adjudicated by the holder unless expressly Authorized in this permit. The authorization of any water facilities in the permit area is granted to allow use of water only in connection with the use Authorized by this permit. If the use of any water facilities in connection with  this  use  ceases,  the  authorization  to  use any  associated  water facilities also ceases. The United States may place conditions on installation, operation, maintenance, and removal of water facilities that are necessary to protect public property, public safety, and natural resources on National Forest System lands in compliance with applicable law. Any change in a water facility, including a change in the ownership or beneficial use of water or location of use of water from a water facility, that is not expressly Authorized in this permit shall result in termination of the authorization for that water facility.

2.  Water Rights. This permit does not confer any water rights on the holder. The term "water rights" includes all authorizations, such as certificates, reservations, decrees, or permits, for water use issued under state, local, or other law and all water rights otherwise recognized under state law. Any necessary water rights must be acquired and maintained by the holder in accordance with State law and the terms of this permit. After this permit is issued, all water rights obtained by the holder for facilities that divert or pump water from sources located on National Forest System lands for use on National Forest System lands, whether Authorized or unAuthorized, are for the benefit of the United States and shall be acquired in the name of the United States. Any expenses for acquiring water rights shall be the responsibility of the holder and not the responsibility of the United States.

3.  Water Rights Acquired in the Name of the Holder

   a.  Identification of Water Rights. The holder has obtained the following water rights for use under this permit in the holder's name:

   State ID #:  None
   Owner:    NA
   Purpose of Use:     Commercial
   Decree, License, or Certificate:   None
   Point of Diversion:   See maps

   b.  Termination or Revocation for Reasons Other Than Nonuse. Upon termination or revocation of this permit, other than revocation for nonuse, the holder shall transfer the water rights enumerated in clause 3.a to any succeeding permit holder, for use only in connection with the use and infrastructure Authorized by this permit, provided that if that use is not re-Authorized, the holder shall promptly petition in accordance with State law to remove from National Forest System lands the point of diversion and water use associated with the water rights enumerated in clause 3.a or shall transfer these water rights to the United States.

   c.  Revocation for Nonuse. Upon revocation of this permit for nonuse, the holder shall transfer any of the water rights enumerated in clause 3.a that remain in the name of the holder at the time of revocation to the United States to hold for the benefit of any succeeding permit holder for use only in connection with that use, activity, and/or infrastructure, provided that if that use is not re-Authorized and the holder has not petitioned to remove those water rights per clause 3.b, the holder shall transfer the water rights to the United States.

   d.  Documentation of Transfer. The holder and the holder's assigns shall execute and properly file any document ready to transfer ownership of the water rights enumerated in clause 3.a to a succeeding permit holder or the United States. By executing this permit, the holder hereby grants limited power of attorney to the Authorized Officer to execute any document on behalf of the holder as may be necessary to transfer the water rights enumerated in clause 3.a to a succeeding permit holder or the United States. *Holder's initials and date: _____*

   e.  Waiver. The holder waives any claims against the United States for compensation for any water rights that are transferred, removed, or relinquished as a result of revocation, including revocation for nonuse, or termination of this permit, or for compensation in connection with imposition of any conditions on installation, operation, maintenance, and removal of water facilities associated with water rights enumerated in clause 3.a.

**G. Water Facilities and Water Rights (D-25).**

This permit does not confer any water rights on the holder. Any necessary water rights must be acquired by the holder in accordance with State law. Any expenses for acquiring water rights shall be the responsibility of the holder. The United States reserves the right to place any conditions on installation, operation, maintenance, and removal of facilities to pump,divert, store, or convey water on National Forest System lands covered by this permit that are necessary to protect public property, public safety, and natural resources on National Forest System lands in compliance with applicable law. The holder waives any claims against the United States for compensation in connection with imposition of any conditions on installation, operation, maintenance, and removal of water facilities under this permit.

**H. Signs (X-29).**

Signs or advertising devices erected on National Forest System lands shall have prior approval by the Forest Service as to location, design, size, color, and message. Erected signs shall be maintained or renewed as necessary to neat and presentable standards, as determined by the Forest Service.

**I.  Improvement Relocation (X-33).**

This authorization is granted with the express understanding that should future location of United States Government-owned improvements or road rights-of-way require the relocation of the holder's improvements, such relocation will be done by, and at the expense of, the holder within a reasonable time as specified by the Authorized Officer.

THIS PERMIT IS ACCEPTED SUBJECT TO ALL ITS TERMS AND CONDITIONS.

**BEFORE ANY PERMIT IS ISSUED TO AN ENTITY, DOCUMENTATION MUST BE PROVIDED TO THE AUTHORIZED OFFICER OF THE AUTHORITY OF THE SIGNATORY FOR THE ENTITY TO BIND IT TO THE TERMS AND CONDITIONS OF THE PERMIT.**

ACCEPTED:

_____    7/28/2022
LARRY LAWRENCE, NATURAL RESOURCE MANAGER    SIGNATURE    DATE

APPROVED:

_____    8/18/2022
JOSEPH RECHSTEINER, DISTRICT RANGER         SIGNATURE    DATE
Joseph Jordan, Acting District Ranger

For the limited power of attorney, section VIII.E.3:

State of California County of _Los Angeles_ ) On _July 28, 2022_ before me,

_Julien Ismael Zaragoza, notary public_ (insert name and title of the officer) personally appeared

_Larry Lawrence_ , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____    (Seal)

Notary Public for the State of California

My commission expires _May 21, 2026_

JULIEN ISMAEL ZARAGOZA
COMM. #2405092
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires MAY 21, 2026

verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0596-0082. The time required to complete this information collection is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and, where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at 202-720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW, Washington, DC 20250-9410 or call toll free (866) 632-9992 (voice). TDD users can contact USDA through local relay or the Federal relay at (800) 877-8339 (TDD) or (866) 377-8642 (relay voice). USDA is an equal opportunity provider and employer.

The Privacy Act of 1974 (5 U.S.C. 552a) and the Freedom of Information Act (5 U.S.C. 552) govern the confidentiality to be provided for information received by the Forest Service.

**San Bernardino National Forest**
**Appendix A – Terms and Conditions**
**BlueTriton Brands, Inc. (formerly Nestlé Waters North America)**
**Permit for Operating and Maintaining a**
**Water Collection and Transmission System**
**(931, 753, 715, 915, 914)**

Terms and Conditions included:

(rev. 01-2022)

| Section | 101 | MONITORING |
|---------|-----|------------|
| Section | 102 | REPORTING REQUIREMENTS |
| Section | 103 | NOTIFICATIONS TO USFS |
| Section | 104 | REGULATORY REQUIREMENTS |
| Section | 105 | ADAPTIVE MANAGEMENT PLAN |

**101 <u>MONITORING</u>**

1. Strawberry Creek (FL-1, FL-2, FL-4, FL-5, TR-BF-XS-6, 18, 28, 43, 49), including the confluence, shall be monitored monthly for surface flow and temperature.
   a. Monitoring results shall be reported to the permit administrator by the final business day of the month.
2. Equivalent locations in East Twin Creek (TL1, 2, 3, 4) and West Fork City Creek (CL1, 2, 3, 4, 5) shall be monitored monthly for surface flow and water temperature.
   a. Results shall be reported to the permit administrator by the final business day of the month.
   b. Monitoring should begin immediately following the signing of the permit.
   c. Coordinates and maps of monitoring sites shall be provided with monthly monitoring data.

**102 <u>REPORTING REQUIREMENTS</u>**

1. By the final business day of the month following monthly required hydrologic monitoring, all raw hydrologic data collected (e.g., pictures, copies of field notebooks, values, maps, extraction rates, volumes per location, coordinates for extraction location, etc.) shall be provided to the Permit administrator electronically.
   a. Monitoring data should also be provided to permit administrator in a Microsoft Excel format.
   b. For months when no flow data is collected, the permit administrator should be notified by the final business day of the month.
2. The Permittee shall provide a trend analysis of the data collected (e.g., hydrographs, evapotranspiration, precipitation, vegetative health, extraction rates and volumes, etc.) **on a quarterly schedule based on the calendar year. This report shall include graphs** (e.g., percent loss ratio of stream over time, confluence flow rate over time) and a short narrative that incorporates previously collected data and builds a long-term record.
3. The Permittee shall provide descriptive and quantitative reporting based on daily measurements and management actions, including changes to extraction.
4. The Groundwater-Surface Water Modeling report following the ASTM D5718-13 standard[1] shall be provided to the permit administrator within 45 days following the signing of the permit.
   a. Comments from USFS staff shall be incorporated into a final report and/or addressed in a comment matrix and delivered to the permit administrator no later than 45 days following the date of receipt of USFS comments.

---

[1]ASTM D5718-13, Standard Guide for Documenting a Groundwater Flow Model Application, ASTM International, West Conshohocken, PA, 2013.

5. Additional model simulations may be requested by USFS staff and documentation of these simulations per ASTM D5718-13 will be delivered to the permit administrator within 60 days.

6. Raw macroinvertebrate data shall be delivered no later than 120 days after each monitoring event.
   a. In the documentation of the BMI (Benthic Macro-Invertebrate) data collection, the percentage of reaches that are pools, riffles, and runs, and the percentage of each group that does not have surface flow shall be measured and reported.

7. The Annual Paired Basin Study report shall be provided electronically by March 1 annually. Appendices, tables, and figures shall be incorporated into one complete document and provided in an editable Microsoft Word format to USFS staff for review. All reports and data shall be provided to the permit administrator electronically.

8. All Annual Paired Basin Study and Hydrology Report comments from USFS shall be incorporated into a final report and/or addressed in a comment matrix and delivered to the permit administrator no later than 45 days following the date of receipt of USFS comments.

## 103 NOTIFICATIONS TO USFS

1. The permit administrator shall be notified electronically within 7 days of any actions and the reasons for such actions that significantly change extractions (increases or decreases) from any extraction location (e.g., shut ins, turn outs, down for maintenance, etc.).

## 104 REGULATORY REQUIREMENTS

1. The permittee may be required to provide proof of compliance with other applicable federal and state agency permits, regulations, or policy, as a condition of this special use authorization.

2. Unless prior arrangements have been made with the authorized officer or the permit administrator, no condition or circumstance shall prevent the permittee from meeting the conditions and reporting deadlines set forth above. Any such arrangements shall be recorded with the permit and reporting documents.

3. The authorized officer may revoke or suspend this permit in whole or in part, without notice, if the terms and conditions set forth herein are not met.

4. Failure of the USFS to enforce any part of the special use authorization shall in no event be deemed a waiver of the right to do so thereafter.

5. Any forbearance on the part of the USFS to notify the permittee or exercise its rights in the event of noncompliance shall not be deemed or construed to be a waiver of its authority or of its right to enforce compliance at any time.

**105 Adaptive Management Plan for Arrowhead Springs** San Bernardino National Forest Special Use Permit No. FCD728502 BlueTriton Brands, Inc. (Permittee)

## SCOPE

Special Use Permit No. FCD 728502 (SUP) was issued for use and occupancy of National Forest System lands in the San Bernardino National Forest (SBNF) which includes operation of water conveyance infrastructure through the SBNF. Implementation of this Adaptive Management Plan (AMP) will identify whether incremental changes to the mitigation measures are necessary to reduce effects on National Forest resources.

This final AMP serves as an implementation tool that incorporates an "implement-monitor-adapt" strategy that provides flexibility to respond to monitoring information that indicates that desired conditions are not being met. If monitoring demonstrates that the intended effects are not being achieved through the initial management action, the action can be modified using one or more of the adaptive management actions to achieve the intended effects. The AMP includes:

1) Forest Plan objective (standard, requirement, handbook);

2) Monitoring to assess if the objective is being met;

3) Goal(s) where Forest Plan objective(s) is not being met;

4) Action(s) to meet Forest Plan objective(s); and

5) Monitoring to assess success of mitigation and restoration.

This final AMP, developed by the permittee in conjunction with the Forest Service, and approved by the authorized officer, will be active for the term of the permit, and may be amended based on the results of the paired basin studies described above.

This final AMP is intended to meet SBNF Land Management Plan (LMP) requirements and standards as part of the permit when issued. Permittee herein provides detailed information on implementation of the AMP, for approval by the Forest Service. As stated in the Decision Memo, this AMP will be implemented so long as monitoring indicates that the environmental effects of the adaptive management approach do not exceed the scope of those anticipated in the decision, and the actions serve to move the project toward the intended effects, implementation continues using the "implement monitor adapt" cycle without the need for new or supplemental National Environmental Policy Act review. If any changes are proposed that are outside the scope of this decision, the provision of the Forest Service Handbook 1909.15 Section 18 would apply.

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

## A. Objective 1 - Water Standards

1) **LMP, Part 3, S46:** Surface water diversions and groundwater extractions, including wells and spring developments will only be authorized when it is demonstrated by the user, and/or agreed to by the Forest Service, that the water extracted is excess to the current and reasonably foreseeable future needs of forest resources.

2) Monitoring components

   a. Determination of safe yield (water balance) in the sub-watershed containing the extraction points:

      i. Inputs: Precipitation gaging, groundwater inflow, infiltration

      ii. Outputs: Evapotranspiration gaging, overland flow, surface water outflow, groundwater outflow including extraction

      iii. Build a gridded surface water-groundwater model and calibrate it with collected data including structural geology (e.g. faults) components

         1. Building and calibrating a fractured mountain-front hydrogeologic model is a longer-term goal given the lack of baseline data and the multiple parameters needed.

   b. Water quality testing to maintain compliance with Clean Water Act Basin Plan:

      i. 475 milligrams per liter total dissolved solids.

   c. Maintenance of surface water flow to support macroinvertebrate populations and riparian vegetation.

   d. The 2002 and 2015 studies showed that the stream reach below Wells 10,11, 12 was dry and did not support macroinvertebrate populations. The goal is to reduce extraction until the desired condition (riparian vegetation and macroinvertebrate populations similar to the paired watershed) is achieved. Stream Condition data has yet to be collected in stream reaches below Wells in complex 7 and below the cluster of wells/springs 1, IA, 8, and the FS Spring, and tunnels 2 and 3.

   e. Provide drinking water for wildlife at two locations as specified in the Resource Mitigation Measures.

3) Goals:

   a. Flows as specified will be maintained in two (2) locations as follows:

      i. Lower spring complex (10, 11, 12) - 20 gallons per minute (gpm) in the drainage area A tributary of Strawberry Creek immediately above the confluence of drainage area A and Bas defined in URS 2002. Drainage area A is the watershed influenced by the water extraction.

      ii. Borehole complex 1, IA, and 8 -  6.25 gpm as measured at water right A6108.

   b. These flows are established as initial minimum flows. Permittee must manage extraction to maintain those minimum flows.

      i. Flows below the required minimum flows indicate that surface flow is trending towards too dry and that there is no water in excess of the needs of forest resources and therefore there is no water available for extraction.

      ii. As future data is collected these goals can change if monitoring shows the need for adjustment.

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

4) Actions:

a. In support of goals (a.i) or (a.ii), Permittee will conduct a study of hydrologic conditions to determine appropriate actions to support the Objective or define alternative measurement points, goals, and actions. The study will continue for the duration of the 3-year permit and will include evaluation of the hydraulic connection between diversion points and water flow at the identified goal location and conditions relevant to achieving the goal. Specific testing methods and the locations are described in the document titled *Strawberry Canyon Hydrologic Data Collection Plan* included as Attachment A to this document. The study will include reduction and/or stopping extraction at the closest diversion point to the measurement reach as described in (i) through (iii) below, or other diversion points determined in consultation with SBNF, or taking other actions to support the Objective. Initial actions include the following:

   i. Water right A6108 is in closest proximity to boreholes 1, IA, 8, which will need to be shut-in, potentially seasonally, to provide for the 6.25 gpm.

   ii. The 20 gpm minimum requirement is hypothesized to be directly affected by extraction at boreholes 10, 11, 12, and indirectly by tunnels 2, 3 and boreholes 7, 7A, 7B, 7C.

   iii. As the hydrogeology becomes better understood (travel times, groundwater/surface water connections), reduction of extraction from the appropriate sources can be better identified.

b. If the initial actions do not achieve the stated metric criteria for the goal, or if no measurable relationship is identified between the diversion and the stated metric criteria, Permittee will consult with SBNF technical specialists to determine next steps and to evaluate locations and methods to establish meaningful monitoring to address hydrologic and biological concerns or take other approved actions to support the Objective.

5) Monitoring:

a. Monitor flow at least bimonthly to ensure minimum flow levels are met.

b. Emphasize more frequent monitoring intervals as flow levels approach the minimum flow levels, or less if minimum levels are exceeded over a longer period, such as winter/wet season conditions.

c. Monitor flows with recording hydrographs to capture diurnal fluctuation.

d. Track groundwater recovery (i.e., pressure transducers, piezometers) between spring locations and surface water drying location(s).

e. Measure travel time through the system.

f. Measure water quality parameters.

g. Track groundwater recovery.

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

## B. Objective 2 - Riparian Standards

1) **LMP, Part 3, S47:** When designing new projects in riparian areas, apply the Five-Step Project Screening Process for Riparian Conservation Areas as described in Appendix E - Five-Step Project Screening Process for Riparian Conservation Areas. Activities are designed to protect, maintain, or restore the riparian ecosystem. In the riparian conservation areas that include perennial and intermittent streams, lakes, and wetlands allow only those actions that maintain or improve long-term aquatic and riparian ecosystem health including quantity, quality, and timing of stream flows. As part of the analysis consider physical factors, such as soil characteristics, groundwater and surface water characteristics, geology and geologic hazards, slope, and stream characteristics; and biological factors, such as aquatic and riparian dependent species present, their habitat needs (see species guidance documents in Part 3, Appendix H), and the ability of the existing environment to provide needed habitat. [Strategy WAT 1 includes RCA language and "Restore, maintain and improve watershed conditions over the long-term.")

2) Monitoring components - determine potential of riparian ecosystem for restoration purposes

   a. Conduct a paired watershed study to assess the riparian health of control sites (where no water extraction occurs) located East Twin Creek and other accessible, proximal, and approved sub-watershed compared to the sub-watershed of Strawberry Creek where the extraction points are located. Multiple paired study locations may be used to look at different parts of the watershed. Actual locations will be determined following discussions with the United States Forest Service (USFS) and will be described in the Paired Basin Study Plan. The study will be designed to provide an objective, quantitative assessment of the riparian and aquatic habitat health that can be compared over time at all study reaches.

      i. Since the 2002 and 2015 studies noted that the creek was dry below the geologic fault near Wells 10,11, 12, set one monitoring location transect and channel length in East Twin Creek based on elevation and lateral extent of geologic fault structures (this could occur near the HI bird survey area, Figure 7, Bio technical report).

      ii. Additional suitable comparison reach locations should coincide with elevation, faulting, geomorphology, etc. for extraction locations 1, 2, 3, 7, 8 spring/well groupings, where safely accessible.

      iii. Use a modified stream condition inventory/proper functioning condition protocol to gather geomorphology, plant physiology, extent of riparian vegetation (including native mid to late seral stage), condition of the channel, stream characteristics, flow, water quality, macroinvertebrate diversity, stream hydrograph, precipitation, geologic structural controls on flow, etc. Macroinvertebrate analysis will include the California Stream Condition Index scoring system to obtain data that can be compared to each study site.

      iv. Use standard forest inventory plot measurements to monitor condition of riparian vegetation, including seral stage, shrub and tree density, distribution, regeneration, mortality, species composition, cover, and other relevant variables.

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

    i. Perform aerial photographic analysis of canopy, vegetation diversity, distribution, and general riparian conditions including overall health at key riparian areas within the study plots in Strawberry Creek and the control plot locations. The photographic aerial imagery survey will be captured by drone, compiled into a digital high-resolution aerial map and analyzed by high-resolution computer applications. Each year, the plot location area imagery will be compared as part of the Paired Basin Study to determine any patterns in changes that may be due to an environmental response and/or water extraction.

    ii. Determine improvement in habitat suitability from increased flow rate in drainage by using protocol standards established for southwestern willow flycatcher, least bell's vireo, California gnatcatcher, Santa Ana speckled dace, and mountain yellow-legged frog in year 2 and year 4 (if the permit is reissued). If the permit is reissued for year 5, conduct protocol presence surveys for the listed species to determine any occupancy. Focused surveys will be conducted in accordance with United States Fish and Wildlife Service approved survey protocols.

    iii. Conduct comparison of upper reaches of East Twin Creek and other accessible, proximal, and approved sub-watershed (control site) at same elevation points in watershed as well sites/monitoring stretches in Strawberry Creek.

3) Goals:

    a. The magnitude, duration, and/or timing of annual extreme flows (low/base and/or high) do not significantly depart from the natural hydrograph measured at control sites. [Indicates an Impaired rating for Flow Characteristics under Watershed Condition Classification protocol.]

    b. Benthic macroinvertebrate (providing base of food chain to riparian dependent wildlife resources): diversity and abundance supported by base flows measured in East Twin Creek watershed or other approved control sites are maintained at the minimum 70 percent level by the 6.25 gpm and 20 gpm initial minimum flows in the diversion sub-watershed. [Indicates an Impaired rating for Life Form Presence under Watershed Condition Classification protocol.]

    c. No more than 25 percent of diversion sub-watershed channel length has width-to-depth ratios greater than the control sites. [Indicates an Impaired rating for Channel Shape and Function under Watershed Condition Classification protocol.]

    d. Native vegetation is vigorous, healthy and diverse in age, structure, cover and composition on 75 percent or more of the riparian/wetland areas in the diversion sub-watershed where extraction is taking place compared to the control sites. [Indicates an Impaired rating for Riparian Vegetation under Watershed Condition Classification protocol.]

4) Actions:

    a. In support of goals (a through d), Permittee will conduct a study to determine the appropriate actions to support the Objective and to characterize the relationship between the diversion points and the stated goal metric criteria. The study will continue for the duration of the 3-year permit and will include evaluation of riparian

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

conditions relative to diversion points. The study will include reduction and/or stopping extraction at the diversion point closest to measurement reach as set forth in goals (a through d) above or other diversion points determined in consultation with SBNF and may include other actions to support the Objective. Additional actions will be defined in collaboration with SBNF technical specialists. The study will:

    i. Evaluate the connectedness magnitude, duration, and/or timing of base flow relative to the goal conditions.

    ii. Evaluate effect of diversions on benthic macroinvertebrate diversity and abundance in Strawberry Canyon relative to control study sites.

    iii. Evaluate effect of diversions on the rooting depth of the riparian dependent vegetation, water availability to woody species and other vegetation during periods of changed water flow such as shut-in and turn-out periods and may incorporate other actions to support the stated Objective.

    iv. Evaluate effect of diversions on vegetation conditions and will include assessment of vigor, health and age diversity, structure, cover, and composition relative to diversions as described by the Watershed Condition Classification standards and may include other actions to support the Objective.

5) Monitoring:

    a. Base flow maintenance levels are to be maintained and measured in the low flow periods until sufficient fall/winter rainfall raises the level to a non-base flow level based on gaging in control watershed.

    b. Benthic macroinvertebrate diversity and abundance will be measured in Strawberry Creek and the control watershed control sites at the same time (same day or week). Data should be collected at strategic time intervals and locations with appropriate protocols, avoiding taking data immediately following scouring flows, and matching the substrate, spatial, and lateral components of the control watershed and focusing on riffles rather than runs or pools.

    c. Shallow groundwater monitoring piezometers (with data loggers) set back from the channel to either side within the riparian corridor to measure wetted depth for supporting riparian vegetation.

    d. Monitor riparian vegetation health across the lateral extent of the survey reaches using vegetative health indicators, determined through consultation with Forest Service specialists, until goal is reached. Track water needs to reach this level and maintain reduced extraction levels seasonally to maintain this level of vegetative health.

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

## C. Objective 3 - Species Standards

1) **LMP, Part 3, S11:** When occupied or suitable habitat for a threatened, endangered, proposed, candidate or sensitive (TEPCS) species is present on an ongoing or proposed project site, consider species guidance documents (see Appendix H) to develop project-specific or activity-specific design criteria. This guidance is intended to provide a range of possible conservation measures that may be selectively applied during site-specific planning to avoid, minimize, or mitigate negative long-term effects on threatened, endangered, proposed, candidate, or sensitive species and habitat. Involve appropriate resource specialists in the identification of relevant design criteria and appropriate species lists. Include review of species guidance documents in fire suppression or other emergency actions when and to the extent practicable.

**LMP, Part 3, S24:** Mitigate impacts of on-going uses and management activities on threatened, endangered, proposed, and candidate species.

2) Monitoring components - determine potential of micro-riparian habitats from untapped springs and meadows to be used as reference point for determining restoration potential in Strawberry Creek watershed

   a. Investigate East Twin Creek and other accessible, proximal, and approved sub-watershed to find untapped springs, and seeps both in upper areas (elevations similar to diversions) and lower down (where increased groundwater pressure could be maintaining these features).

      i. Document lateral/spatial extent of riparian vegetation and TEPCS plants and wildlife on bi-yearly interval, years 2 and 4 of permit

         1. Conduct two focused plant surveys, during the targeted species blooming periods, in a methodical and organized manner to promote full coverage of the study areas. Surveys will be conducted during Year 2 and Year 4 to account for annual variations in precipitation.

         2. Conduct protocol surveys established for southwestern willow flycatcher, least bell's vireo, California gnatcatcher, Santa Ana speckled dace, and mountain yellow-legged frog.

      ii. Document wildlife diversity and abundance on annual interval for amphibians, reptiles, birds, and mammal species. This includes documentation of invasive species as part of Objective 4 Invasive Species Standards.

         1. Conduct diurnal and nocturnal amphibian and reptile daytime surveys.

         2. Conduct avian point counts to assess avian diversity and estimate population densities at the established sampling sites which consists of visual or vocal observations at the established locations.

         3. Conduct mammal tracking at the established sampling locations to determine what types of mammal species are present and potentially utilizing the area as a wildlife corridor. Utilize a motion sensitive digital wildlife camera at each study and control location, if feasible. Conduct acoustic monitoring to detect the presence of bats.

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

    iii.  Measure rooting depth.

    iv.  Measure water availability to woody species.

    v.  Measure sap flow.

    vi.  Measure groundwater levels.

    vii.  Conduct presence/absence surveys for special status wildlife and plant species identified with habitat present; years 2 and 4 of permit.

    viii. Identify spring discharge and surface water extent

        1.  Set movement cameras to document use of surface water by animals - monitoring for 1 week in spring, summer and fall quarters.

  b.  AU types of monitoring in control watershed must be duplicated in diversion sub-watershed.

3) Goals:

  a.  From 70 percent or more of expected aquatic life forms and communities are present relative to the presence observed at the control sites based on the potential found in the East Twin Creek watershed. [Indicates a Functioning at Risk rating for Life Form Presence under Watershed Condition Classification protocol.}

  b.  No less than 70 percent of expected aquatic life forms and communities are present relative to the presence observed at the control sites. [Indicates an Impaired rating for Life Form Presence under Watershed Condition Classification protocol.)

4) Actions:

  a.  In conjunction with SBNF technical specialists, evaluate the occurrence of species, abundance and diversity conditions and establish appropriate goal metric criteria, and actions to meet species standards, or take other actions to support the Objective.

  b.  Once the appropriate metric criteria have been defined through scientific study, take appropriate actions in consultation with SBNF technical specialists to protect riparian resources including native special status vegetation and provide for wildlife habitat linkages.

5) Monitor restoration of plant and animal communities on bi-annual basis.

Adaptive Management Plan for Arrowhead Springs
San Bernardino National Forest Special Use Permit No. FCD728502
BlueTriton Brands, Inc. (Permittee)

D. **Objective 4 - Invasive Species Standards**

1) **LMP Part** 1. **Goal** 2.1: Reverse the trend of increasing loss of natural resources due to invasive species. Forest Service Manual (FSM) direction for Invasive Species Management is contained in FSM 2900, effective S December 2011. This direction sets forth National Forest System policy, responsibilities, and direction for the prevention, detection, control, and restoration of effects from aquatic and terrestrial invasive species.

2) Monitoring components - identify, quantify, and map existing occurrences of priority invasive plant and animal species within the project area and document with GIS polygon shapefiles or GPS coordinates.

   a. The priority invasive plant and animal list is to be based on species that are included in the Cal IPC list of species considered to be High and Medium threat to ecological systems and are not already ubiquitous throughout both the project area and the paired watershed of East Twin Creek. This list will be compiled in consultation with USFS botany and wildlife specialists.

   b. Map invasive weed species within the pipeline right-of-way, helicopter landing areas, spring sites, study areas, and access routes. Prepare weed occurrence forms per species and provide GPS coordinates for points and polygons of mapped weeds.

3) Goals:

   a. Cover, quantity, or extent of current infestations are not increasing.

   b. No new invasive species are identified.

4) Actions:

   a. Prepare a Weed Management Plan, in cooperation with the Forest Service for survey, prevention, reporting, controlling, and monitoring invasive plants and otherwise non-native weed species found within the control and study areas. Strategies to prevent, detect, and control those species will be discussed with the USFS. Hand-pulling and hand tools (e.g., shovels, pulaskis, line trimmers) will be used to remove invasive weed species as identified in the Weed Control Plan, included as Attachment B to this document. No use of herbicides is planned or authorized.

   b. Consult with USFS botany and biology specialists to determine the most effective control/eradication methods allowed by agency policy and direction.

   c. Initiate control as soon as possible within the time period for most effective treatment.

   d. Remove biomass containing reproductive potential (root segments, seeds, or flowers that could develop into viable seed) from project site and forest service land.

   e. Provide yearly report of monitoring and control efforts including names of workers/surveyors, date, method of control, and location.

5) Monitor and re-treat when necessary to control or eradicate identified invasive plant and animal infestations.

9

REQUIRED ATTACHMENTS:
- *Strawberry Canyon Hydrologic Data Collection Plan*
- *Weed Control Plan*
- *Water Conservation Plan*

This Adaptive Management Plan Is APPROVED BY:

_____
Authorized Officer (Name and Title)

LARRY A. Lawrence, NRM

_____
Permittee Representative (Name and Title)

_____        _____
Signature                              Date

_____  7/28/2022
Signature                              Date

Initials _____

ARROWHEAD SPRINGS PIPELINE WITHIN SAN BERNARDINO NATIONAL FOREST

EXHIBIT B

March 2022

**HYDROLOGIC DATA COLLECTION PLAN FOR ARROWHEAD SPRINGS**
**San Bernardino National Forest Special Use Permit No.  FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

# 1.    SCOPE

Special Use Permit No. FCD 728502 (SUP) was issued for operation of water conveyance infrastructure
through the San Bernardino National Forest (SBNF) and incorporates an Adaptive Management Plan
(AMP) which establishes Objectives for management of forest resources related to the SUP.  The
purpose of the AMP is to facilitate collection of data and completion of analyses describing the
relationship between the permitted facilities and forest resources identified in the AMP.

The AMP includes metric criteria associated with Objectives 1 (Water Standards) and 2 (Riparian
Standards) that specify surface water flow goals at two locations within Strawberry Canyon.  The flow
criteria and locations are:

- 6.25 gallons per minute (gpm) at the location of water right application A6108; and

- 20 gpm at the main branch of Strawberry Creek, immediately above the confluence with East
  Strawberry Creek.

This document describes planned hydrologic data collection associated with these criteria.

# 2.    6.25 GPM CRITERION

Water right application A6108, as referenced in the AMP, pertains to a spring water diversion location
originally developed by State of California Department of Public Works, Division of Highways and used
for recreational use.  This diversion was later transferred to the United States Forest Service and was
reported to be in use for firefighting as recent as 2007, and to fill firefighting tanks and support wildlife
since that time.  The diversion consists of one horizontal boring (SBNF horizontal boring) and a small
hand excavated depression near the boring that may also have been used for collecting water.  The
depth and date of completion of the horizontal boring are unknown.  The horizontal boring is located up
gradient of the spring site referred to as 1, 1A & 8, which is operated by Permittee.  The planned
hydrologic data collection is described below.

## 2.1    USFS Boring Hydrologic Data Collection

1. Measure flow from the SBNF horizontal boring;
2. Measure flow in channel below the SBNF horizontal boring;
3. Record water level at piezometer installed near SBNF horizontal boring.

## 2.2 Determination of more applicable upper watershed monitoring location

Studies performed under the AMP have conclusively shown that current operations of boreholes 1, 1A,
and 8 cannot affect flow at the USFS POD A6108. Per AMP Objective 1, Goal 3) b. ii. monitoring has shown
the need for adjustment. Studies (FDA compliance, dye testing) also indicate a connection between
operations at boreholes 1, 1A, and 8 and the Spring 4 location. As the new upper watershed monitoring
location and minimum flow value are determined, the following hydrologic data collection will occur:

**HYDROLOGIC DATA COLLECTION PLAN FOR ARROWHEAD SPRINGS**
**San Bernardino National Forest Special Use Permit No.  FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

1. Measure flow from the Spring 4 pool via piezometer/stilling well
2. Measure flow in the channel immediately below Spring 4
3. Measure the continuity of flow between Spring 4 and other upper canyon flow measurement locations
4. Measure the flow of the channel at FL-1, FL-2, FL-4, and FL-5

# 3.    20 GPM CRITERION

The 20 gpm criterion described in the AMP represents a flow value and location postulated by SBNF to bear a relationship to operation of the permitted infrastructure in Strawberry Canyon. Studies conducted under the 2019 AMP (per Objective 1, 4) a. ii.) focused on the postulated connections with boreholes 10, 11, 12, and 7, 7A, 7B, 7C, which are located 1 or more miles upcanyon from the confluence with the main channel. Studies have not yet tested the postulated connection with the operations at Tunnel 2 or Tunnel 3.  The planned hydrologic data collection is described below.

### 3.1    20 gpm Hydrologic Data Collection

1. Measure creek flow at monitoring station TR-BF-XS-6.

2. Record water level at the Meadows North and Meadows South piezometers.

3. If/when flow at TR-BF-XS-6 falls below 20 gpm, stop extraction at Tunnel 2 and Tunnel 3, measure the released volumes at these Tunnel locations, and track the response of the channel for all upper and lower canyon monitoring locations. These releases will continue until the minimum instream flow condition is achieved from precipitation or water returned to the channel from locations upgradient of TR-BF-XS-43.

# 4.    ADDITIONAL DATA COLLECTION

In addition to the data collection described above, Permittee will provide a monthly summary of water collection at each water collection point. These points include:

1. In Strawberry Canyon: FL-1, FL-2, FL-4, FL-5, TR-BF-XS-6, 18, 28, 43, 49

2. In East Twin Creek: TL1, 2, 3, 4

3. In West Fork City Creek: CL1, 2, 3, 4, 5

# 5.    SCHEDULE

Hydrologic data will be collected and reported on a minimum monthly basis to the permit administrator.

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

## 1.  SCOPE

The Permittee operates and maintains a spring water collection system and water conveyance pipeline located in the San Bernardino National Forest (SBNF).  Spring water collection infrastructure includes a total of ten horizontal boreholes located within four spring vaults and two spring water collection tunnels.  The aggregate length of the pipeline covered under this permit is approximately 4.5 miles.  The Permittee operates five communication sites associated with the spring complexes and pipeline.  The communication sites are co-located with the spring vaults and are operated for the purpose of transmitting monitoring data describing system performance and security information.

This Weed Management Plan (Plan) describes measures and best management practices (BMPs) that will be implemented by the Permittee and its contractors to survey, prevent, report, control and monitor noxious and invasive plant species in accordance with Adaptive Management Plan (AMP) associated with Special Use Permit (SUP) No. FCD728502.  The Project Area includes the pipeline right-of-way (ROW), approximately 5 feet wide, points of diversion, a 30-foot survey buffer along creek channels within the study area (15 feet on each side of stream), access trails to 7a and confluence within U.S Forest Service (USFS) managed lands, helicopter landing areas, and spring sites.

The purpose of this Plan is to identify weed control and abatement methods or practices, as well as to recommend treatment timing for all areas along the ROW where weeds could establish.  The management practices and activities in this Plan are intended to accomplish the invasive species objectives identified in the AMP.

## 2.  RESPONSIBILITY

   a.   Permittee Representative

| Role | Responsibility | Contact |
|------|---------------|---------|
| Springs Representative | Responsible for project execution and oversight | Springs Resource: Tam Pham (909-229-1650) or Springs Manager: Larry Lawrence (714-812-4814) |

## 3.  MONITORING

The Permittee will monitor and control weeds to prevent establishment and limit the spread of localized invasive plant species throughout the Project work area.  Qualified botanists (subject to approval of the USFS Officer) will survey the area that may be impacted by the Permittee's operations and maintenance activities to identify and record all non-native invasive plant species.  Qualified botanists will have a minimum of 2 years' experience identifying native and non-native plant species common in San Bernardino County and will have a working knowledge of dichotomous keys (e.g., Baldwin et al. 2012) or be able to consult with a more experienced botanist on a regular basis for any unknown species.  The Project Area should be surveyed every year for the duration of the SUP to identify and map these species prior to the need for emergency repairs to prevent spread of these aggressive species to adjacent land or downstream.

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

**3.1    Mapping**

Botanists will map invasive weed species on an annual basis within the Project Area.  Mapping of invasive weed species will begin in March in order to allow sufficient time for the maintenance crews to mobilize and treat weeds prior to seed set.  Additional occurrences of weed populations may be noted when conducting other survey/monitoring efforts in the Project Area.

Weed infestations of priority weeds rated as having potentially "high" or "moderate" ecological impacts as rated by the California Invasive Plant Council (Cal-IPC) that are within the Project Area or along travel routes near the Project Area will be hand treated or flagged for treatment at the appropriate time of year according to the species present.

Mapping of all invasive weed species will occur as described above; however, active control is not necessary for invasive plant species that are already ubiquitous throughout the local area. Invasive plant species that fall into this category include:

- *Hirschfeldia incana* (short-pod mustard);

- *Bromus diandrus* (rip-gut brome);

- *Bromus madritensis* subsp. *rubens* (red brome);

- *Bromus tectorum* (cheat grass);

- *Melilotus albus* (white sweet clover);

- *Avena fatua* (wild oats); and

- *Erodium* sp. (stork's bill).

For each species, the botanists will prepare a USDA Forest Service Weed Occurrence Form, a SBNF Non-Native Plant Eradication Form, and provide Global Positioning System (GPS) coordinates for points and polygons of mapped weeds.  Data including maps, GPS coordinates, and forms will be provided to USFS within 45 days of the mapping effort.

**3.2  Weed Control Treatments**

Priority invasive weeds that are within the project area or along travel routes near the project area will be manually removed or "flagged and avoided" according to the species present and project constraints. Treatment recommendations for potentially occurring invasive weed species are included in Table 1. Prior to treatment a weed control plan documenting species to be treated, map of location, acreage, and control methods to be used will be submitted to the USFS for approval by the line officer and resource specialists.

As of current mapping, priority invasive weed species known from the project area include, bull thistle (*Cirsium vulgare*), pampas grass (*Cortaderia selloana*), Himalayan blackberry (*Rubus armeniacus*), and Spanish broom (*Spartium junceum*). A weed control plan for these species should be submitted to the USFS for approval. Himalayan blackberry may be controlled where feasible – Site 9 and if this species appears in other sites where it is not currently mapped – Sites 2, 4, 5, 6, 7, and 7 Alternative.

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

When priority invasive weed species are found within the project area control efforts will be undertaken immediately following approval of the weed control plan submitted to the USFS.

For each species treated, the botanists will prepare a USDA Forest Service Weed Occurrence Form, an SBNF Non-Native Plant Eradication Form, and provide Global Positioning System (GPS) coordinates for points and polygons of treated weeds. Data including maps, GPS coordinates, and forms will be provided to USFS within 45 days of the treatment effort.

## 4.  CONTROL MEASURES BY SPECIES

**Table 1.** Potentially occurring weed species and specific weed control measures by species.

| Table 1.  Weed Control Measures by Species | | | | | |
|---|---|---|---|---|---|
| **Scientific Name** | **Common Name** | **Growth Type** | **Bloom Period** | **Cal-IPC Invasiveness Rating[1]** | **Treatment Recommendations** |
| **ANNUAL GRASSES** | | | | | |
| *Avena barbata* | slender wild oat | Annual Grass | Mar - Jun | Moderate | Hand pulling small infestations; string trimming large infestations.  If seed is ripe, bag and solarize onsite. |
| *Bromus diandrus* | rip-gut brome | Annual Grass | Apr - Jun | High | Hand pulling or string trimming in early spring before seed ripens.  If seed is ripe, bag and solarize onsite. |
| *Bromus madritensis* subsp. *rubens* | red brome | Annual Grass | Feb - Mar | High | Hand pulling or string trimming in early spring before seed ripens. If seed is ripe, bag and solarize onsite. |
| *Bromus tectorum* | cheat grass | Annual Grass | May - Jun | High | Hand pulling or string trimming in early spring before seed ripens.  If seed is ripe, bag and solarize onsite. |
| *Festuca myuros* | rattail fescue | Annual Grass | Feb - May | Moderate | Hand pulling or string trimming in spring before seed ripens.  If seed is ripe, bag and solarize onsite. |
| *Schismus barbatus* | Mediterranean grass | Annual Grass | Mar - Apr | Limited | String trimming in spring before seed ripens.  If seed is ripe, bag and solarize onsite. |
| **PERENNIAL GRASSES** | | | | | |
| *Arundo donax* | giant reed | Perennial Grass | Mar-Sep | High | Hand pull younger plants. Giant reed can also be dug using hand tools, in combination with cutting near the base of the plant. Care must be taken to |

3

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | remove the entire rhizome and dispose of properly off site. |
| *Cortaderia selloana* | pampas grass | Perennial Grass | Sep - Mar | High | Hand pulling of seedlings; remove mature plants with shovels and Pulaskis.  Plants should be bagged and solarized onsite. |
| *Pennisetum setaceum* | fountain grass | Perennial Grass | Jul - Aug | Moderate | Hand pull small plants; uproot large plants with Pulaskis. Plants should be bagged and solarized onsite. |
| *Stipa miliacea* var. *miliacea* | smilo grass | Perennial Grass | Mar - Sep | Limited | Hand pulling of seedlings or plants.  Plants should be bagged and solarized onsite. |

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| | | | | | |
|---|---|---|---|---|---|
| **Table 1. Weed Control Measures by Species** | | | | | |
| **Scientific Name** | **Common Name** | **Growth Type** | **Bloom Period** | **Cal-IPC Invasiveness Rating[1]** | **Treatment Recommendations** |
| **HERBS** | | | | | |
| *Alliaria petiolata* | garlic mustard | Herb | Apr-Jun | Newer invasive species to California. Considered highly invasive and a priority for control. The species has been collected in 2020 and 2021 from a small population in San Bernardino National Forest in San Bernardino County. | Hand pulling is an effective strategy for control, particularly with small or newly formed populations. When the plants have bolted in the second growing season, the stem may be easily grasped and pulled; roots will usually come out intact along with the stem. Because the fruit is photosynthetic, if fruit development has started, plants should not be left on site or hung from neighboring vegetation as the fruits are well known to continue to develop and dehisce even while lying on the ground, thus plants should be bagged and taken off site. |
| *Brassica nigra* | black mustard | Herb | Apr - Jul | Moderate | Hand pull rosettes and small plants; uproot large plants with Pulaski. Mow before seedpods develop. Solarization onsite or bag and solarize seedpods. |
| *Carduus pycnocephalus subsp. pycnocephalus* | Italian thistle | Herb | Feb - Jun | Moderate | Hand pull, till, or hoe before flowering; sever plant below soil surface. Plants should be bagged and solarized onsite. |
| *Centaurea melitensis* | tocalote | Herb | Apr - Aug | Moderate | Hand pull, till, or hoe before flowering; sever plant below soil surface. Plants should be bagged and solarized onsite. |
| *Centaurea solstitialis* | yellow star thistle | Herb | May-Oct | High | Hand pull after plants have bolted but before seed set; sever plants 2 inches below soil surface. Plants should be bagged and solarized on site. |
| *Centaurea stoebe ssp. micranthos* | spotted knapweed | Herb | Jul-Sep | High | Hand pull before plants produce viable seed, repeat up to three times a year. Sever plant 2 to 4 inches below soil surface. Plants should be |

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | bagged and solarized on site. |
| *Chondrilla juncea* | skeleton weed | Herb | Jun-Jan | Moderate. New invasive found on SBNF | Young seedlings may be controlled by cultivation. Frequent mowing may exhaust root storage. |
| *Cirsium vulgare* | bull thistle | Herb | Jun - Sep | Moderate | Hand pull, till, or hoe before flowering; sever plant below soil surface. Plants should be bagged and solarized onsite. |
| *Conium maculatum* | poison-hemlock | Herb | Apr-Jul | Moderate | Hand removal is recommended for small infestations. When pulling the plants, dig down and remove the entire taproot. Wear gloves and wash hands after working with poison-hemlock. Manual control efforts can be successful, but can cause soil disturbance encouraging further germination of seeds. Solid carpets of hemlock seedlings are not uncommon following soil disturbance. Cutting is ineffective; the plants send up new seed stalks in the same season the cutting occurs. Establishment of populations can be prevented with repeated cultivation and plowing. |
| *Dipsacus fullonum* | wild teasel | Herb | Apr-Aug | Moderate | With small infestations, digging or hand-pulling before flowering are effective controls. When digging, sever the root below the soil surface. Mowing is often ineffective because the root crown will resprout and flower after being cut. Repeated mowing can be effective but must be done often enough to prevent flowering regrowth. Tillage effectively controls emerged plants but can stimulate new |

6

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | germination. |
| *Erodium cicutarium* | Stork's bill | Herb | Feb - Jun | Limited | Hand pull or till before fruits are ripe. |
| *Foeniculum vulgare* | fennel | Herb | May-Sep | Moderate | Hand chop small infestations. Slashing before flowering may kill plants. Plants can be dug with hand tools to remove the entire root. |
| *Hirschfeldia incana* | shortpod mustard | Herb | Jan - Dec | Moderate | Hand pull rosettes and small plants; uproot large plants with Pulaski. Mow before seedpods develop. Solarization onsite or bag and solarize seedpods. |
| *Lactuca serriola* | prickly lettuce | Herb | May - Sep | NL | Hand pull, till, or mow before flowering. Plants should be bagged and solarized onsite. |
| *Lepidium latifolium* | perennial pepper-weed | Herb | Jun-Sep | High | Seedlings are easily controlled by hand-pulling or tillage, but these techniques do not control established plants because shoots quickly resprout from vast root reserves. In addition, seedlings are not often encountered. Root segments as small as 1 inch are capable of producing new shoots. Cultivation and tillage typically increase infestations by dispersing root fragments. Clean equipment after tillage to prevent spreading root fragments. |
| *Linaria dalmatica* ssp. *dalmatica* | dalmatian toadflax | Herb | Apr-Sep | Moderate | Hand pull seedlings before plants become established. |
| *Lotus corniculatus* | bird's-foot trefoil | Herb | May - Jul | NL | Hand pull when soil is moist; remove the up to 3-inch long taproot to prevent resprouting. |
| *Oncosiphon pilulifer* | stink net | Herb | Mar-Jul | High. New invasive found on SBNF | Hand pull plants before seed set. Plants should be bagged and solarized on site. |
| *Rumex crispus* | curly dock | Herb | Jan - Dec | Limited | Remove plants at least 2 inches below the soil surface with shovels. Plants should be bagged and solarized onsite. |

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| | | | | | |
|---|---|---|---|---|---|
| *Saponaria officinalis* | bouncing-bet | Herb | Jun-Sep | Limited | Hand pull, dig, or grub. Care must be taken to remove entire root as plant can resprout from rhizomes. |
| *Sisymbrium altissimum* | tumble mustard | Herb | May - Jul | NL | Hand pull rosettes and small plants; uproot large plants with Pulaski.  Mow before seedpods develop.  Plants should be bagged and solarized onsite. |

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| Table 1.  Weed Control Measures by Species | | | | | |
|---|---|---|---|---|---|
| **Scientific Name** | **Common Name** | **Growth Type** | **Bloom Period** | **Cal-IPC Invasiveness Rating[1]** | **Treatment Recommendations** |
| *Sisymbrium irio* | London rocket | Herb | Jan - Apr | Moderate | Hand pull rosettes and small plants; uproot large plants with Pulaski.  Mow before seedpods develop.  Solarization onsite or bag and solarize seedpods. |
| *Sonchus asper* subsp. *asper* | prickly sow thistle | Herb | Feb - Oct | NL | Hand pull, till, or hoe before flowering; sever plant below soil surface.  Plants should be bagged and solarized onsite. |
| *Tanacetum parthenium* | feverfew | Herb | Jun - Aug | NL | Hand pulling, tillage, or hoeing, or repeated mowing.  Plants should be bagged and solarized onsite. |
| *Trifolium hirtum* | rose clover | Herb | Feb - Mar | Moderate | Hand pulling, tillage, or hoeing is effective.  Mowing is not recommended.  Plants should be bagged and solarized onsite. |
| *Verbascum thapsus* | woolly mullein | Herb | Mar - Sep | Limited | Hand pull or till before seed set.  Repeated mowing in bolting/early flowering can reduce seed production. |
| **SHRUBS, VINES, AND TREES** | | | | | |
| *Ailanthus altissima* | tree of heaven | Tree | Jun | Moderate | Hand pull seedlings or small saplings; use Pulaski or weed wrench for large trees. Care must be taked to extract entire root or stump sprouting will occur. |
| *Delairea odorata* | German ivy | Vine | Nov-Mar | High | Manual removal of plants, including roots and rhizomes, before viable seed develops can help control infestations in areas where plants are accessible. Removing all plant material from the site will help prevent rerooting of rhizomes, stolons, or stem fragments. Follow-up removal of resprouts is essential. In some large patches, all stems can be cut at ground level and Cape-ivy rolled up like a rug. Although the belowground |

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  | reproductive tissues will resprout, this strategy makes it possible to detect and spot-treat new sprouts while avoiding contact with desirable vegetation. |
| *Elaeagnus angustifolia* | Russian olive | Tree | May-Jun | Moderate | Hand pull seedlings or small saplings; use Pulaski or weed wrench for large trees. Care must be taked to extract entire root. Girdling can kill older trees. |
| *Ficus carica* | edible fig | Tree | Mar - Apr | Moderate | Hand pull or hoe seedlings; use Pulaski or shovel to remove small trees, removing the roots.  Girdling or repeated cutting to ground level may kill large trees. |
| *Hedera helix* | English ivy | Vine | May – June | High | Hand pull seedings. Pull vines climbing into trees and along the ground by hand or with rakes. Cut woody stems with pruners or loppers and dig up the roots with a shovel to prevent resprouting. Plants should be bagged and solarized onsite. |

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| Table 1.  Weed Control Measures by Species | | | | | |
|---|---|---|---|---|---|
| **Scientific Name** | **Common Name** | **Growth Type** | **Bloom Period** | **Cal-IPC Invasiveness Rating[1]** | **Treatment Recommendations** |
| *Nicotiana glauca* | tree tobacco | Shrub | Mar - Sep | Moderate | Hand pull seedlings or small saplings; use Pulaski or weed wrench for large shrubs. Girdle or cut trees.  Cut close to ground with chainsaw at end of dry season; resprouting may occur.  Repeat for several seasons. |
| *Ricinus communis* | castorbean | Shrub/Tree | All year | Limited | For individual plants, it is possible to remove by digging. Smaller plants can be hand pulled, although it is important to wear gloves, as castor bean is poisonous. Even larger plants can be removed by hand pulling in wet sandy soils. It is important to remove the bulk of the root crown to prevent regeneration. Weed wrenches can be a very effective tool for small to medium-sized plants with a single stem. This is much more effective in moist soils. In dry soils the plant can break off and leave the root system. |
| *Rubus armeniacus* | Himalayan blackberry | Shrub/ Vine | Apr - Aug | High | Remove canes, roots, and root crowns with a Pulaski or shovel.  Remove before fruit production. |
| *Spartium junceum* | Spanish broom | Shrub | Apr - Jun | High | Hand pull seedlings or small shrubs; pull large shrubs with weed wrench or Pulaski; remove roots to prevent resprouting.  Soil disturbance can stimulate seedbank. |

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

| | | | | | |
|---|---|---|---|---|---|
| *Tamarix ramosissima* | saltcedar | Tree | Apr - Aug | High | Hand pull seedlings or small shrubs; pull large shrubs with weed wrench or Pulaski; remove roots to prevent resprouting. Cutting or girdling will only suppress, not eradicate infestations. Resprouts from root crown or plant fragments, so remove entire plant. |
| *Notes*: Cal-IPC = California Invasive Plant Council | | | | | |

## 5. BEST MANAGEMENT PRACTICES

The following policies have been adopted by the USFS to manage National Forest Service lands. The Permittee and its contractors will, as applicable, prevent the introduction and spread of weed species in the Project Area by using the following USFS-policy BMPs.

### 5.1 Determine the vectors, environmental factors, and pathways that favor the establishment and spread of invasive species.

- Determine the vectors, environmental factors, and pathways that favor the establishment and spread of invasive weeds in National Forest lands and implement BMPs to reduce or mitigate the risk for introduction or spread of weeds in those areas (Table 1).

- Determine the risk of introducing, establishing, or spreading weeds associated with implementing weed management activities, as an integral component of project planning and analysis (Table 1).

- Prevent the introduction of weeds from outside National Forest Service lands, as far as it is practical and within their control (Table 1).

- When setting priorities for treating weed infestations, consideration will be given to the rate of spread, the likeliness of environmental harm resulting from the establishment and spread, geography within the watershed, potential to impact sensitive or endangered species, and the probability that the treatment(s) will be successful (Table 1).

- Develop and utilize site-based and species-based risk assessments to prioritize the management of weeds (Table 1). This Plan complies with this policy.

- All equipment used for weed management activities and off-road equipment will be cleaned prior to entering USFS land to prevent the introduction and spread of weed seeds into the Project Area.

- Minimize the amount of ground and vegetation disturbance during construction and maintenance.

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

**5.2    Design management practices to reduce or mitigate the risk for introduction or spread of invasive species.**

- Ensure that all weed management activities are designed to minimize or eliminate the possibility of establishment or spread of weeds on National Forest lands or to adjacent areas (Table 1).

- The proposed action includes Resource Protection Criteria and this Weed Management Plan subject to USFS approval will be part of the Permittee's SUP. These criteria are intended to reduce the potential for introduction and/or spread of invasive weeds during implementation of this project. Resource protection criteria included in the proposed action and AMP will reduce but not eliminate the risks of introduction of weeds or of spreading existing weed infestations (Table 1).

**5.3    Prevent the accidental spread of invasive species carried by contaminated vehicles, equipment, personnel, or materials.**

- Make every effort to prevent the accidental spread of weeds carried by contaminated vehicles, equipment, personnel, or materials (Table 1).
- All off-road equipment will be cleaned prior to entering NFS land. The cleaning measures must be practical, verifiable, and not cause other unacceptable environmental problems. Depending on the nature of the debris, the equipment may be cleaned using water or mechanical methods (brushing, scraping, prying), compressed air, high-pressure water, or steam. This includes wheels, tires, buckets, stabilizers, undercarriages and bumpers.

- Use only weed-free equipment, mulches, and seed sources. Salvage topsoil from project area for use in onsite revegetation, unless contaminated with weeds. All activities that require seeding must utilize locally collected native seed sources when possible. Plant and seed material should be collected from or near the project area, from within the same watershed, and at a similar elevation when possible. This requirement is consistent with the USFS Region 5 policy that directs the use of native plant material for revegetation and restoration for maintaining "the overall national goal of conserving the biodiversity, health, productivity, and sustainable use of forest, rangeland, and aquatic ecosystems." Seed mixes must be approved by a Forest Service botanist.

- Minimize the amount of ground and vegetation disturbance during construction and maintenance.

**5.4    Make every effort to ensure that all materials are free of invasive species; use materials certified as weed-free (or invasive-free) when possible.**

- All gravel, fill, erosion control, or other materials used in the Project Area including gravel will be weed-free and subject to review and approval by the USFS line officer with input from appropriate resource specialists (Table 1).

- Salvage topsoil from project areas for backfill or on-site revegetation.

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

**5.5    Monitor all management activities for potential spread or establishment of invasive species.**

- Routinely monitor weed control efforts to determine success and to evaluate the need for follow-up treatment or different control measures.  Monitor known infestations as appropriate in order to determine changes in density and rate of spread (USFS 2005a; 2005b).

**5.6    Manage invasive species using an integrated pest management (IPM) approach.**

- Initiate, coordinate, and sustain actions to prevent, control, and eliminate priority infestations of weeds of the Project Area using an IPM approach (Table 1).

- Manage weeds in the Project Area using an IPM approach to assist the USFS with achieving their goals and objectives identified in Forest Land and Resource Management plans and other USFS planning documents (Table 1).

**6.    ADAPTIVE MANAGEMENT**

The Permittee understands the goal of this Plan is to identify weed control and abatement methods within all areas of ground disturbance along the ROW where weeds could establish.  Although BMPs for treating and preventing the spread of invasive weed species have been discussed above, continued monitoring and an adaptive management approach will allow for flexibility and modifications if necessary.  As part of the weed management strategy, the Permittee will:

- Provide Environmental Awareness Training for work crews;

- Implement avoidance and minimization measures to prevent the spread of weeds; and

- Adapt to changing conditions with alternative control methods, if needed and in coordination with the USFS, depending on the treatment response, site specific conditions, etc.

**7.    COMMUNICATION**

Data, including maps and GPS coordinates of invasive weed locations, as well as USDA Forest Service Weed Occurrence Forms, SBNF Non-Native Plant Eradication Forms (one form per species) will be provided to USFS within 45 days of each annual mapping effort.   the Permittee will keep in close communication with the USFS to provide updates on any new weed populations observed or the need for additional control measures.

**8.    ANNUAL REPORTING**

The Permittee will prepare an annual report (in addition to the 45-day reports for mapping and treatment) summarizing the weed control efforts and results from that year as part of compliance with the SUP and this Plan.  The annual reports will include:

- A description of the monitoring and control efforts that occurred during the prior calendar year including names of workers/surveyors, dates of activity, methods of control, species treated, and locations of treatment.

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

- Maps, USDA Forest Service Weed Occurrence Forms and SBNF Non-Native Plant Eradication Forms depicting locations of invasive weeds will be included as appendices.

- A determination of relative quantities/densities of invasive weed populations within the Project Area and whether population densities seem to be stable, increasing, or decreasing.

- Recommendations for additional avoidance and minimization measures to prevent the spread of weeds.

**WEED MANAGEMENT PLAN**
**For Activities Associated with San Bernardino National Forest**
**Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

## 9   REFERENCES

Baldwin, B.G., D.H. Goldman, D.J. Keil, R. Patterson, T.J. Rosatti, and D.H. Wilken (eds), 2012.  *The Jepson Manual: Vascular Plants of California*, 2nd edition.  University of California Press, Berkeley.

California Invasive Plant Council (Cal-IPC), 2006.  Cal-IPC Inventory. https://www.cal-ipc.org/plants/inventory/.

U.S. Department of Agriculture/U.S. Forest Service (USFS), 2005a.  *Land Management Plan, part 1 Southern California National Forests Vision. Angeles National Forest, Cleveland National Forest, Los Padres National Forest, San Bernardino National Forest.*  U.S. Department of Agriculture/U.S. Forest Service, Pacific Southwest Region. Publication no. R5-MB-075.  September 2005.

USFS, 2005b.  *Land Management Plan, part 2 San Bernardino National Forest Strategy.*  U.S. Department of Agriculture/U.S. Forest Service, Pacific Southwest Region.  Publication no. R5-MB-079.  September 2005.

**WATER CONSERVATION PLAN FOR ARROWHEAD SPRINGS**
**San Bernardino National Forest Special Use Permit No. FCD728502**
**Triton Water Holdings, Inc. (BlueTriton Brands) (Permittee)**

# 1.    SCOPE

Special Use Permit No. FCD 728502 (SUP) is an authorization for operation of water conveyance infrastructure through the San Bernardino National Forest (SBNF).  This document describes water conservation measures associated with this permit.

# 2.    WATER CONSERVATION MEASURES

BlueTriton Brands has prioritized responsible water stewardship and supports efforts to improve water use patterns.  Key objectives include lowering overall water use intensity thereby increasing water use efficiency.  The planned water conservation measures implemented in Strawberry Canyon are described below.

## 2.1    Metered Water Flows
1. Borehole and tunnel flows,
   a. Report monthly summary of flows from each borehole and tunnel.
2. Strawberry Creek discharge,
   a. System overflow is diverted to a location on Strawberry Creek below 10, 11 and 12 site.
   b. Report monthly summary of flows from this location.

## 2.2    Water System Overflow Management

1. When the water silos are full, Permittee will divert available overflow to the Strawberry Creek discharge location.
2. If overflow is expected to be greater than 50 gpm for more than 90 days, Permittee will identify water collection points for shut in or turn-out depending on the infrastructure, for that period of time.

## 2.3    Water System Maintenance
1. Permittee will repair damage or correct errors resulting in water-loss such as water system control, pipe breaks, or other leaks in a timely manner.
2. Permittee will verify meter performance on an annual basis.
3. Malfunctioning meters will be correct in in a timely manner.

# 3.    SCHEDULE

Metering data will be reported on a minimum monthly basis.

1